**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01485-RBJ

KEITH CLINGMAN,

Plaintiff,

v.

DRIVE COFFEE, LLC, DRIVE COFFEE, INC. and ALEX GRAPPO,

Defendant(s).

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

**INTRODUCTION**

Although Plaintiff's claims are framed as wage violations under the Federal Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), reality and circumstances of Plaintiff's interactions with Drive Coffee, Inc. ("Drive") and its Chief Executive Officer Alex Grappo ("Grappo") (together the "Drive Defendants") require that Plaintiff not be awarded damages under those statutes, which are intended to protect hourly and manual labor workers from exploitive employers and oppressive working conditions. Plaintiff is an experienced marketing professional, who was a regional executive for an international energy drink company who also operated his own marketing agency at one point. Plaintiff took a chance on a start-up company with amazing potential, but extremely limited funding. When the funding did not materialize in the timeframe he wanted, Plaintiff turned his disappointment into a retroactive claim for unpaid wages and overtime—even though he'd never been an employee of Drive. The undisputable facts show that he has tried to shoehorn a state law breach of implied contract case[1] into the FLSA and

[1] Defendants strongly dispute the existence of any sort of contract, implied or otherwise.

NYLL framework. Here, Plaintiff attempts to obtain a financial windfall have no basis in fact or in law.

The Drive Defendants move for summary judgment on four grounds based on the undisputed facts and evidence: (i) Plaintiff was not an employee of the Drive Defendants (or either of them); (ii) even if Plaintiff was an employee of Drive, Drive was not subject to FLSA minimum wage and overtime provisions for 2019 as he was subject to the "administrative" exemption; (iii) the Drive Defendants acted in good faith with respect to Plaintiff and did not willfully violate or recklessly disregard the FLSA; and (iv) the Drive Defendants did not enter into a contract with Plaintiff.

## BACKGROUND

Grappo founded Drive in 2018. It is a true start-up in the sense that Grappo started the business with a love of coffee and fast cars, and a dream to blend the two into a product and brand. In the early days of the company, Grappo met several people, including Plaintiff, who he thought would be great as an executive team to take the company to the next level. Grappo became friends with these people, including Plaintiff. It seemed to Grappo that Plaintiff was excited about the company's potential and they talked about the business (as well as pop culture and weekend activities), Grappo's next steps to grow the business by gaining investors and increasing sales and visibility. Grappo told Plaintiff that he would love to hire him to head the marketing efforts **once the company was funded enough to be able to pay salaries**. In particular, Grappo had a commitment from specific investors that Grappo understood would make the next step possible in the near future. Plaintiff lived in NYC and had experience in the industry, Grappo asked what kind of salary Plaintiff would need in order to work for Drive in the future and they discussed what kind of salary might be appropriate. Grappo invited Plaintiff to go with him on several trips—to

meet people in the car-enthusiast community and see how Drive might get a foothold there. Grappo always paid for Plaintiff's travel expenses and the trips consisted of socializing and some networking. Unfortunately, Grappo's plans were delayed by one setback after another. Certain investors that had committed to investing in the company were delayed in making their investments, other potential investors were preparing to invest, and then Covid-19 shut down the world. Plaintiff became increasing impatient with Grappo about when Drive would be able to hire him. Grappo told Plaintiff that he simply could not be sure when the company would be funded enough to hire him. Plaintiff told Grappo that he could not wait for the company to be fully funded any longer. Plaintiff then, for the first time, claimed that he had been an employee of Drive all along and was entitled to back pay.

## STATEMENT OF FACTS

1. Drive Coffee, founded by Alex Grappo, is a premium coffee company that sells its whole coffee beans and ready-to-drink coffee products direct to consumers. Ex. 1 (Declaration of Alex Grappo), ¶ 1; see also, https://www.drivecoffee.com.

2. Although Grappo had operated Drive all on his own, in 2019, the company was growing and gaining visibility and Grappo realized he needed to be ready to hire a team to take Drive to the next level. Ex. 1, ¶ 2. Grappo was introduced to Plaintiff through a mutual friend and met with him to discuss the status of the company, see if Plaintiff was interested in potentially joining Drive if the funding was sufficient. Ex. 1, ¶¶ 3-6; Ex. 4, p. 137:17-25. Plaintiff had just finished working at another beverage start-up—leaving after only two months and was looking for another opportunity. Ex. 3 (Deposition of Keith Clingman), p. 22:20-24:20.

3. Grappo invited Plaintiff invited Plaintiff and a few others he hoped would be a good fit for Drive's executive team to Colorado. The purpose of the trip was to showcase

Colorado, Denver, and the company's warehouse—to show people who lived in New York and London why Denver was the home of Drive. Ex. 1, ¶ 7. Grappo also wanted to see how the different people got along to see if they would work well as a team. *Id.* At a dinner on that trip, Plaintiff was introduced to investor Dan Berg as the potential Chief Marketing Officer. Ex. 2, ¶ 5.

4. Plaintiff and Grappo discussed potential salaries for Plaintiff, and Grappo told Plaintiff his goals to have exceptional benefits once he could hire employees. Ex. 1, ¶ 9, 11; see also, Ex. 3, p.55: 4-57:7

5. Following the trip to Colorado, Grappo, Plaintiff and the others who had attended began regular communications by text message. There was a tremendous amount of energy from all of them regarding the possibilities for the company and the fact that Grappo understood a large investment to be imminent. Ex. 1, ¶ 2, 10. Grappo believed that he and Plaintiff were friends and they talked about pop culture, weekend activities, and occasionally, they discussed Drive and any updates Grappo may have had about pending investments. Ex. 1, ¶ 10.

6. Grappo never asked Plaintiff to complete tax paperwork, nor was Plaintiff ever presented with an offer letter, an employment agreement, tax paperwork, or any other typical "onboarding" activities. Ex. 1, ¶ 12; Ex. 4, p. 183:12-185:9.

7. Grappo did not require Plaintiff to perform any duties, did not ask him to prepare any deliverables, give him a timeline for deliverables, did not check in with him on the status of projects, nor did Plaintiff have a set time or schedule to communicate with Grappo. Ex. 1, ¶ 12; Ex. 4, p. 183:12-185:9. Drive did not provide a computer or cell phone for Plaintiff, nor did it reimburse him for his personal expenses related to technological requirements for the Company. Ex. 3, 130:6-131:7. When Plaintiff accompanied Grappo on trips to meet with potential investors, Plaintiff was not required to prepare anything to be presented to potential investors, and in fact did

not prepare any presentations or materials for potential investors. Ex. 1, ¶¶ 12-14. If Plaintiff was not able to go with Grappo on a trip or unable to speak with him at a specific time, there were no consequences for Plaintiff. Ex. 1, ¶¶ 15, 21. Plaintiff did not have a Drive email account until he requested one in November 2019. Ex. 4, p. 166:20-167:16

8. Grappo understood that Plaintiff was actively performing marketing consulting work for other businesses while he waited for Drive to be able to fund his position. Ex. 1, ¶ 17. Plaintiff also maintained his own company (LKC Ventures, LLC), through which he performed freelance work. Ex. 8, p. 5.

9. After the September 2019 meeting in Denver, Plaintiff communicated frequently with Moody regarding the status of the investments and Drive's ability to hire them. Ex. 5 (multiple text communications in which Plaintiff and Moody wondered about the status of investment and when they would be able to "get started.").

10. Unfortunately, due to multiple events, investors' money to Drive was delayed, resulting in Drive's inability to hire the team he had met. Ex. 2, ¶ 4; Ex. 1, ¶ 16. During this time, Plaintiff had a few communications with Grappo regarding planned marketing campaigns and coordinated the placement of Drive products in a retail concept at Macy's. Ex. 1, ¶¶ 23-24, Ex. 7, P00151. Any duties that Plaintiff provided to Drive (with or without the knowledge of Grappo), were in the categories of marketing and business operations. Ex. 8 (Plaintiff's Amended Interrogatory Responses), p. 2-4; and Ex. 9 (Plaintiff's Responses to Requests for Admissions), p. 4-5; *see also*, Ex. 5, P00316-19

11. For any efforts that Plaintiff made on behalf of Drive, and because Grappo personally felt bad that the investment timing was delayed and wanted to show appreciation for Plaintiff's enthusiasm for the company, Grappo made three payments to Plaintiff. Ex. 1, ¶ 20, 22;

Ex. 6. One payment of $13,300 was made by wire from a Drive bank account. Another payment for $6,650.00 was made by Paypal on January 13, 2020, and the third on April 10, 2020 of $3,500 from Zelle and $1,500 from Venmo (split due to transaction limits on the transfer apps). *Id.* Plaintiff did not declare the payment on his taxes as employment wages or 1099 income. Ex. 10 (see, fn 3, *infra* for additional detail).

12. In early April 2020, Plaintiff told Grappo that he expected he was owed pay for the time since he had come to Colorado in September 2019. Ex. 1, ¶¶25-27, Ex. 3, p. 118:15-119:25. That was the first time that Plaintiff told Grappo that he believed himself to be an employee of Drive. *Id.*

## **LEGAL STANDARD**

This Court should grant the Drive Defendants' motion for summary judgment because "there is no genuine dispute as to any material fact" and the Drive Defendants therefore are "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986); *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). That is, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

Here, the undisputed facts show that Plaintiff was not an employee of the Drive Defendants. Separately, if the Court determines that Plaintiff was an employee –which it should not –as a matter of law, Plaintiff was exempt from minimum wage and overtime pay under the

"administrative" exemption to the FLSA. Due to the same legal standards, Plaintiff's claims under the NYLL fail as well. Finally, this Court should find that Plaintiff has failed to prove the elements of breach of contract and therefore all claims against the Drive Defendants should be dismissed.

## ARGUMENT

### A. Plaintiff's FLSA Claims Fail

In order to prevail on his claim for damages for unpaid wages pursuant to the FLSA, Plaintiff has the burden to prove by a preponderance of the evidence that: "(1) he was in an employment relationship with [Drive], (2) he was engaged in activities within the coverage of FLSA, (3) he worked over forty hours within a workweek without overtime compensation [and/or was paid less than the federal minimum wage of $7.25/hour], and (4) he is owed a definite amount of compensation." *Scott v. Antero Resources Corp.*, 2021 WL 2012326, *4 (D. Colo. May 20, 2021); 29 U.S.C. §§206(a), 207(a)(1).

#### 1. Plaintiff Was Not an Employee of Drive

"Where the employer-employee relationship is in question, courts are to consider the 'economic realities of the relationship, grounding the analysis in 'economic reality rather than technical concepts." *Lopez v. Edwards*, 2018 WL 2241062, *3 (D. Colo. May 15, 2018) (citations omitted). Under this test, courts consider "whether the alleged employer (1) had the power to hire and fire the employee, (2) supervised and controlled the employee's work schedule or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id*. No one of the four factors standing alone is dispositive, rather courts look to the totality of the circumstances. *Id*. In evaluating the factors identified above, courts are looking to see whether as a matter of economic reality, a worker is dependent on a given employer. *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012). "While the term 'employee' should be

broadly construed, 'when relationships have deviated from the traditional understanding of employment in fundamental ways, the Supreme Court refused to shoehorn them into the [FLSA]'" *Frank v. Thomas J. Palic DC PC*, 2019 WL 6609471, *2 (D. Colo. Dec. 5, 2019)(citing *Steelman v. Hirsch*, 473 F.3d 124, 129 (4th Cir. 2007)(noting that FLSA does not apply to volunteers or "individuals who without any express or implied compensation agreement might work for their own advantage on the premises of another."). Plaintiff cannot show that he was an employee of Drive or Grappo as his relationship with the Drive Defendants did not exhibit any of the hallmarks of employment.

**First Factor:** Drive did have the ability to hire and fire Plaintiff. Ex. 4, p. 79: 15-24. Grappo told Plaintiff directly that he wanted to hire Plaintiff—as soon as the company had the funding (either through sales or investment) to be able to pay Plaintiff. Ex. 1, ¶¶ 8-11. As it happened, Plaintiff was never presented with an offer letter, an employment agreement, tax paperwork, or any other typical "onboarding" activities. Ex. 1, ¶ 12; Ex. 4, p. 183:12-185:9. The Drive Defendants did not tell Plaintiff when he had to perform any duties, did not check in with him on the status of projects, nor did Plaintiff have a set time or schedule to communicate with Grappo. *Id*. Drive did not provide a computer or cell phone for Plaintiff, nor did it reimburse him for his personal expenses related to technological requirements for the Company. Ex. 3, 130:6-131:7. As for termination, Plaintiff claims that he was "terminated" when Grappo asked Plaintiff to communicate through his personal email account. Ex. 3, p. 117:13-118:2. However, there was no discussion about termination, Plaintiff's last day, any last paycheck, or exit interview. *Id*. There was no discussion about Plaintiff returning any property to the company or communications that would be made to any of the rest of the "team" about Plaintiff's departure. The matter was as simple as Plaintiff's informing Grappo that he could not wait any longer to be hired as an employee

and Grappo reluctantly accepting that. *Id*., and Ex. 1, ¶ 26. It was not until Plaintiff came to the conclusion that funding was not happening on the timeframe that he wanted that Plaintiff even claimed to Grappo that he was an employee of Drive. Ex. 1, ¶¶25-27, Ex. 3, p. 118:15-119:25.

**Second Factor:** The Drive Defendants did not control any of Plaintiff's activities related to Drive. The reason for this is that the Drive Defendants had not hired Plaintiff and did not believe that he worked for Drive. Plaintiff communicated with Grappo remotely from his apartment in Brooklyn, New York the entire time that he was acquainted with Grappo—except the few times when they saw each other in person. Grappo did not require that Plaintiff check in on a daily, weekly, or less frequent basis. Ex. 3, p. 127:24-128:6. In fact, Plaintiff would go weeks without communicating with Grappo at all. Ex. 1, ¶ 21. Grappo did not give Plaintiff deadlines for the production of marketing or business strategy materials, did not require Plaintiff to execute on a marketing strategy, ask Plaintiff to analyze the success of any particular ad, or undertake any particular marketing campaign. Ex. 1, ¶ 12, Ex. 4, p. 166: 20-167:16. Grappo told Plaintiff his could choose his own title and Plaintiff did not have any official company email until Plaintiff requested one. Ex. 4, p. 166:20-167:16. When Plaintiff was ill and unable to attend an event with Grappo, Plaintiff was not required to account for a sick day and was not given any negative consequences for his last-minute cancellation. Ex. 1, ¶ 15.

**Third Factor:** The Drive Defendants discussed with Plaintiff what his desired salary range would be upon hire, but during the period at issue here, the payments made to Plaintiff were dependent on the company's ability to pay. Ex. 3, p. 41:16-42:6; Ex. 1, ¶¶ 20, 22. Grappo understood that Plaintiff was disappointed that the expected investment funding had not materialized on the original timeframe. In a show of good faith that Grappo understood Plaintiff's

excitement about the brand and still wanted to hire him when finances allowed, Grappo made three separate payments to Plaintiff in order to keep him afloat financially while they all waited. Ex. 6.

**Fourth Factor:** The Drive Defendants did not keep employment records for Plaintiff as the Drive Defendants did not consider that he was an employee. Upon hiring Plaintiff, the Drive Defendants would have kept a personnel file, tax forms and other standard documents related to employment.

As to Plaintiff's dependence on the Drive Defendants, Grappo understood that Plaintiff was actively performing marketing consulting work for other businesses while he waited for Drive to be able to fund his position. Ex. 1, ¶ 17. Plaintiff also maintained his own company (LKC Ventures, LLC), through which he performed freelance work. Ex. 8, p. 5. That Plaintiff put all of his eggs in Drive's basket, when he was told that the offer was contingent, and then panicked as COVID-19 uncertainty set in does not convert Plaintiff to the Drive Defendants' employee.

As part of the consideration the totality of the circumstances, the Court must also consider Plaintiff's expectations at the time. In considering whether FLSA applies in other contexts, courts have considered the parties' expectations during the period at issue. See, *Ortrega v. Denver Institute L.L.C.*, 2015 WL 4576976, *17 (D. Colo. July 30, 2015) (citing the Dept. of Labor's six-factor text to determine whether trainees are employees: factor number 6 "[t]he employee and the trainees understand that the trainees are not entitled to wages for the time spent in training."). The present situation is not one of traditional misclassification, but one where Plaintiff has attempted to retroactively classify himself as an employee when he knew that Drive did not have the financial resources to hire him. Plaintiff's claim in this litigation that he believed he was an employee all along is contradicted by his communications at the time, in which he was clearly aware (and concerned) that he (and the rest of the "team") could not become employees until the company

received additional operating funds. Plaintiff was introduced to Grappo through a former work colleague, Becky Moody. Ex. 4, p. 137:17-25. Moody and Plaintiff were in the same position—they desperately wanted (and needed) for Drive to get the funding that would allow Drive to hire them on as full time executives. Plaintiff, in particular, had had an unpleasant experience at his previous start up position[2], where he had worked for only two months, and needed Drive to work out. Ex. 3 p. 22:20-24:20 (Coincidentally, Plaintiff cited disagreement with the CEO's strategy, discrepancy in actual operations from what he understood them to be and insufficient resources as the reason for his short tenure at the previous company). Plaintiff's contemporaneous communications with Moody show undisputedly that Plaintiff (a) knew that Drive needed funding before he could be hired as an employee, and (b) Drive did not have the funding yet. Plaintiff alleges that he believed he was an employee of Drive as of September 15, 2019, however, on September 24th, Plaintiff and Moody texting acknowledging that they were not "actually contracted yet" and Plaintiff asked Moody "Still sounding like things are tracking for Oct 1 start?" Ex. 5, P00224-25. Moody responded, "[h]onestly , no idea . . .." *Id.* This discussion corresponds with Plaintiff's first trip to Denver where he was introduced to a key investor as the possible future Chief Marketing Officer, if the company received the funding necessary to bring on the team. Ex. 2, ¶ 5.

On October 14, 2019, Plaintiff inquired again if Moody knew anything about whether the proposed "team" was going to be able to start working, asking her "Curious if you've heard any updates from Alex re: offers and timelines?" Ex. 5, P00228. And then later the same day, "[Let

---

[2] Plaintiff admitted that at his previous position, also a start-up, he completed all of the typical onboarding activities that are expected when one is hired as an employee. He completed paperwork, had a definitive start date, etc. Ex. 3, p. 32:12-33:3. Thus, Plaintiff was not unaware of a typical hiring process—even for an early start-up company.

me know] if you hear anything re: offers and dates from him. Time to get this [expletive] wrapped up! [laughing emoji]". *Id*. at P00229.

One week later, on October 21, 2019, Plaintiff complained to Moody, "Completely forgot Alex was leaving [on a trip]. We deserve concrete answers/commitments before he leaves. Without it, I don't know that I'm willing to stick around. We've ALL been MORE than patient." *Id*. at P00230. Plaintiff continued, " . . . quite frankly am starting to sound silly to [people] when they come back to talk and I still don't have anything concrete." Moody responded, "These timelines keep switching and that's challenging when we're all ready to get going. Hope you and Alex can have some frank [conversations] and that $$ is coming in . . .." *Id*. at P00231.

On November 8, 2019, following a particularly promising meeting with an investor, Grappo, excited and optimistic, texted Plaintiff, " . . . Just wanted to call and offer you a job [happy face emoji] call me when you you're [sic] back and Happy Birthday!" Ex. 7, P00150. Rather than question Grappo in that text, or later by phone, text or email, Plaintiff simply replied "Well [expletive] yeah! Hammer down." *Id*. Grappo's text did not consist of a concrete job offer, but instead was the short-hand with which they were both familiar: a promising investor meeting meant Drive was approaching the ability to officially hire Plaintiff. Ex. 1, ¶ 19.

Plaintiff's communications during that time also show that he had not fully taken on any role with the company. Plaintiff claims that he was Chief Marketing Officer, but on November 14, 2019, approximately two weeks before the largest shopping holiday in the country (i.e. Black Friday), Plaintiff asked Grappo—by text—"Yo! Do we have any current marketing plans around holidays/e-comm?" Ex. 7, P00151. On November 21, 2019, Plaintiff relayed information to Moody that he'd learned from Grappo about marketing efforts with movie studios with which he

had no involvement, and commented that he believed the company was having cash flow problems. *Id*., Ex.5, P00254.

On November 22, 2019, Moody told Plaintiff that she wanted the opportunity with Drive to work out ("I don't want another job, I want this job."). Plaintiff responded, "I'm confident that we can make it happen, but only if the funding is there and Alex shows we can move things forward." Ex. 5, P00257. Ultimately, Plaintiff revealed his true feeling—that he could run the company better than Grappo, telling Moody on March 20, 2020, "[t]ruly and objectively, the best way to save Drive and to give it a chance to live up to its potential, is for Alex to give up control of the company and give it to a team that knows what to do with it and can make sound decisions." Ex. 5, P00301 [date on P00296].

Thus, Plaintiff's communications at the time show that Plaintiff understood that he was taking a chance on Drive, and that if the investors who had expressed interest and commitment to Grappo would be able to follow through, Grappo would bring him on. Furthermore, for the efforts that Plaintiff made, he was paid. Even though Drive was never able to hire him as an employee, Grappo recognized the risk that Plaintiff had taken and appreciated his support of the brand. In exchange for the contributions he did make, Drive paid him $24,950.00 in three separate payments. Ex. 6. Tellingly, Plaintiff never requested a W-2, did not inquire about why he was not issued any tax form and did not declare the amounts he received on his taxes or file the IRS form an employee files when his employer does not issue a W-2. Ex. 10[3] and Ex. 4, 185:1-9. The totality of the

[3] Exhibit 10 is a copy of Plaintiff's 2019 federal and state tax returns. Page P001179 (line 7) shows his total reported income as matching the amount on his and his wife's reported income—which does not include any payments from Drive. *See*, P001207 (W-2 income of $113,434 (wife) and $18,750 (Plaintiff from previous position)) and P001184 (wife's business income of $1,000), equals the amount in line 7. By this Court's order, Plaintiff was required to produce all supporting documents for his tax returns and he did not produce a Form 4852, which is what he would have had to file to declare payments from Drive as employee wages. https://www.irs.gov/forms-pubs/about-form-4852 (as of July 30, 2021). In fact, the $13,300 that

circumstances here reveals an indisputable truth that Plaintiff was not an employee of the Drive Defendants, and accordingly Plaintiff is not entitled to the minimum wage and overtime protections of FLSA.

**2. Even if Plaintiff Was an Employee—He was Administratively Exempt from FLSA Wage Protections.[4]**

If the Drive Defendants are his employers, Plaintiff bears the burden of proving that the Drive Defendants violated the FLSA. *Archuleta v. Wal-Mart, Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008). The FLSA requires employers to pay their covered employees one and one-half times their regular hourly rate for each hour the employees work in excess of forty hours per workweek. See 29 U.S.C. § 207(a)(1). However, the law exempts from minimum wage and overtime provisions "any employee employed in a bona fide executive administrative or professional capacity." 29 U.S.C. § 213(a)(1). When determining whether an exemption exists, the Supreme Court has ruled that the regulations governing exemptions are to be given a "fair reading" as opposed to being construed narrowly as they have been in the past. *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018).

To qualify as a bona fide "administrative employee" sufficient to qualify for this exemption, the employee must (1) be compensated on a salary basis at a rate of not less than $684 per week, (2) his primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's

---

Plaintiff received from Drive in November 2019 appears to have not been declared on his taxes at all.

[4] Plaintiff's claims under NYLL fail for the same reasons. "[T]he NYLL mandates overtime pay and applies the same exemptions as the FLSA." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 (2nd Cir. 2012); *see also Morris v. Alle Processing Corp.*, 2013 WL 1880919 (E.D.N.Y. May 6, 2013)("an employee is exempt from receiving overtime wages under NYLL if he was employed in a bona fide executive, administrative, or professional capacity, pursuant to section 13(a)(1) of the FLSA.").

customers," and (3) the employee's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)[5].

"In FLSA cases, a court must first determine the employee's primary duty, and then determine whether that primary duty disqualifies the employee from FLSA's protections." *Bernard v. Group Pub., Inc*., 970 F.Supp.2d 1206, 1223 (D. Colo. 2013)(*citing Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012)). The regulations specifically identify "marketing" as a type of "work directly related to management or general business operations." 29 C.F.R. § 541.201(b).

It is undisputed the tasks Plaintiff identifies as the duties he performed fall squarely within the administrative exemption (i.e. "Created comprehensive U.S. marketing strategies," "assisted with vendor and retailer relations", etc.). Ex. 8, p. 2-4. Without doubt, these duties relate to Drive's management and general business operations as they reflect work on essential business needs. While Plaintiff acknowledged that in a small company he also performed services outside of traditional marketing, it is undisputed that he spent all of his time on exempted activities. Ex. 9, p. 4-5 ("Strategy, Product Development, Distribution, Operations (order fulfillment, packaging, logistics) and Fundraising (investor relations, pitch meetings, informing pitch deck)."

In order to exercise "discretion and independent judgment," Plaintiff must compare and evaluate possible courses of conduct and make a decision after various possibilities have been considered. 29 C.F.R. § 541.202(b). "Matters of significance" refers to the level of importance or consequence of the work performed. 29 C.F.R. § 541.202(a). With respect to this factor, the "fact that an employee's decision may be subject to review and that upon occasion the decisions are

---

[5] The salary basis rate for 2019 was $455 and changed to $684 effective January 1, 2020. See, 29 C.F.R. § 541.600 and 84 FR 51306 (Sept. 27, 2019). Accordingly, the different rates will apply to the time for which Plaintiff was paid.

revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." 29 C.F.R. § 541.202(c). Plaintiff's identified duties unquestionably satisfy this prong as well. For example, Plaintiff took it upon himself to coordinate with Moody, and contractors that Drive used for Amazon consulting, Drive's bean roasting contractors, and others to analyze the production costs of Drive's products in an effort to determine whether Drive's margins could be improved. Ex. 5, P00316-19.

Plaintiff also qualifies for the salary amount of $455/week for 2019 and $684/week for 2020. For 15 weeks in 2019, Plaintiff was paid $13,300, or $866/week; for 14 weeks in 2020, Plaintiff was paid $11,650, or $832/week.[6] Salary payment is required to be paid on a weekly, or **on a less frequent basis**, and cannot be subject to reduction because of variations in the quality or quantity of work performed. 29 C.F.R. § 541.602(a)(emphasis added). An employee is required to receive the full salary for any week in which he works, yet unlike many state labor laws, the FLSA does not require any periodic frequency for payment.[7] Plaintiff's claims do not include any allegations that Plaintiff's payments were subject to reduction based on the quality or quantity of his work which would be impermissible deductions under the FLSA. Particularly important here, under the FLSA a Plaintiff does not lose the exemption if the deduction in pay is for a permissible reason—i.e. cash flow issues. *See*, *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843 (6th

---

[6] The Drive Defendants concede that if the Court determines Plaintiff was an employee, there is a material dispute about when any said employment would have begun. Plaintiff alleges that it would have begun at the September 2019 "kick off" meeting. Ex. 3, p. 47:25-48:1. However, as discussed above, Plaintiff repeatedly wondered when work at Drive was going to "get started" and responded positively when Grappo "called to offer him a job" in November 2019. However, for the purpose of considering the administrative exemption, even using Plaintiff's dates, he qualifies for the exemption.

[7] See, https://www.dol.gov/agencies/whd/compliance-assistance/handy-reference-guide-flsa (as of July 30, 2021)("The FLSA does not provide wage payment or collection procedures for an employee's usual or promised wages or commissions in excess of those required by the FLSA."); and https://www.dol.gov/agencies/whd/state/payday (as of July 30, 2021)(chart cataloguing the pay frequency statutes of each state and the District of Columbia).

Cir. 2012)(noting that the "*reasons* for reduction in pay is dispositive, not the amount.")(emphasis in original). While Plaintiff may not feel that he was paid what he believes he was promised, he was paid above the minimum amount to qualify as administratively exempt. As such, Plaintiff's claim does not qualify for FLSA protection, and is more properly framed as a breach of contract claim (which also fails, as discussed below).

Applying this exemption also "comports with the apparent purpose of the FLSA's exemption. The exemption is premised on the belief that exempt employees normally earn salaries well above the minimum wage and perform a kind of work that is difficult to standardize to a particular time frame and that cannot easily be spread to other workers." *Christoper v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2161 (2012)(noting that a pharmaceutical salesman who made more than $70,000 and had a flexible schedule was "hardly the kind of employees that the FLSA was intended to protect."); see also, *Encino Motorcars*, 138 S.Ct. at 1142 ("Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement.").

**B. The Drive Defendants Acted in Good Faith and Did Not Wilfully or Recklessly Disregard the Law**

It is the employee's burden to show that the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited." *Wilson v. Schlumberger Technology Corporation*, 2019 WL 1916200, *4 (D. Colo. Apr. 24, 2019)(quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). "A showing of negligence or an employer's incorrect assumption that a pay plan complies with the FLSA is insufficient." *Id*. Plaintiff cannot produce any evidence that Drive and/or Mr. Grappo knew or showed reckless disregard for whether Plaintiff was subject to FLSA regulations. In *Wilson*, the Court recognized that willfulness was found where the evidence showed admissions that an "employer knew its method of payment violated the FLSA . . . [or a] continuation of a pay practice without further investigation

after being put on notice that the practice violated FLSA." *Wilson*, 2019 WL 1916200 at *5 (internal citations omitted). Plaintiff cannot present any evidence that the Drive Defendants were on notice that the individual being considered for a C-suite executive position would be subject to the minimum wage rules and regulations of FLSA. There is no evidence of an audit, complaint or even a question from anyone who worked with Drive, including Plaintiff.

**C. Plaintiff Cannot Show a Breach of Contract Claim**

To establish the existence of a contract, the evidence must show that the parties agreed upon all essential terms. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986). Plaintiff's breach of contract claim must be dismissed as the undisputed evidence is that there was no agreement between Plaintiff and the Drive Defendants on any single term related to employment: start date, salary, grant of equity, schedule of equity grant, type of shares to be awarded, essential duties, travel requirements, budget, or team members. Further, Plaintiff cannot produce evidence that the parties agreed on Plaintiff's right to "back pay." Agreements to agree in the future are generally unenforceable because the court cannot force parties to come to an agreement or grant a remedy. *Griffin v. Griffin*, 699 P.2d 407, 410 (Colo. 1985). "There can be no binding contract if it appears that further negotiations are required to work out important and essential terms." *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001). Plaintiff admits that although he and Grappo had discussed a range of salary, they had not agreed on a number (Q: Oh, so you didn't know at that time what your salary was going to be? A. Correct. I expected to see that.). Ex. 3, p.55: 4-57:7. Plaintiff further admits that he did not know what the equity offer would (a range of "4-8%"; did not know what class the shares would be). Id. The absence of an agreement on material issues is an unenforceable agreement to agree. *Id*.

**CONCLUSION**

Plaintiff was not an employee of the Drive Defendants. Should the Court find otherwise, Plaintiff is still not entitled to purported unpaid minimum wage and overtime pay under the "administrative" exemption of the FLSA, which also defeats Plaintiff's claim under NYLL. The Drive Defendants did not act recklessly or willfully to violate the FLSA. Finally, Plaintiff's claims are really state law breach of contract claims that he has tried to bring under the statutory wage laws meant to protect low wage workers from brutal hours and exploitation by sophisticated employers. However, even under breach of contract the claim fails as it is indisputable that no "meeting of the minds" occurred and thus no contract was formed. For these reasons, the Drive Defendants therefore respectfully request that this Court grant its motion for summary judgment.

Dated this 2nd day of August, 2021.

Respectfully submitted,

SUSSEX LAW, LLC

/s/ *Lisa N. Nobles*____________

Lisa N. Nobles
Sussex Law, LLC
1129 E. 17th Avenue
Denver, CO 80218
Tel. (720) 223-6525
lnobles@sussexlawfirm.com
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of August, 2021 I served the foregoing by sending to the following email addresses:

penn@andersondodson.com

*s/ Lisa N. Nobles*