UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Case No. 1:20-cv-01485-RBJ

KEITH CLINGMAN,

    Plaintiff,

v.

DRIVE COFFEE, LLC; DRIVE COFFEE, INC and ALEX GRAPPO, an individual,

    Defendants.

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

## I. INTRODUCTION

Is it permissible for a startup company to enjoy the benefit of workers' labors without paying for them?

The primary questions in this case are whether the Plaintiff was in fact an "employee" of the Defendants as that word is defined by the applicable wage laws, and what period of his work was compensable. Thus, the key concepts are those of the "economic reality" of the employment relationship and whether and to what extent Defendants "suffered or permitted" the Plaintiff to work for them. For the reasons set forth herein, there should be a legal determination that he was in fact an employee, based on undisputed facts as have been established through testimonial and other evidence. *Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1025 (10th Cir. 1993) (ultimate determination of employee status is one of law).

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 1

### III. FACTUAL BACKGROUND

#### A. Narrative

For the factual background of this case, Plaintiff incorporates by reference his Statement of Undisputed Material Facts, and supporting materials, and summary Timeline of relevant events. Following is a narrative recitation of this story, premised upon those cited and supported facts.

Defendant Alex Grappo founded Drive Coffee in approximately 2017. First it was a Colorado LLC; later he incorporated Drive Coffee Inc. as a Delaware entity. For this racecar-themed energy drink startup, he sought, and received, investments from outside investors. He established relationships with relevant vendors such as coffee bean suppliers, roasters, and relevant equipment provision. He secured a warehouse in which to package and ship out the coffee products. He put up a website and established a social media presence.

While he was the founder of this enterprise, he did not do all of this alone. For example, there was a team of warehouse workers who packaged and shipped the beans. Somebody served as a "coffee roaster" who also "[p]rovided suggestions on coffees to acquire," "[s]erve[d] coffee during in-person functions," and "help[ed] with the shipping of product." And somebody, most relevant here, worked on large scale marketing strategies and relationships in order to work toward making the company not just a small local company but "the Red Bull of coffee."

Plaintiff Keith Clingman had worked for the international energy drink company Red Bull in its marketing department. A mutual acquaintance introduced him and Defendant Grappo, recognizing the potential for symbiosis. They had a call or two to gauge interest and to get to know each other, they arranged to meet in person in New York, they discussed the kinds of things Grappo wanted Clingman to do for Drive, and they discussed salary ranges.

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 2

In mid-September, 2019, Grappo flew Clingman and several other "management level" (as opposed to production worker) type individuals to Colorado to all get together for a "kickoff" event. He gave them a tour of the Drive Coffee warehouse. They had a meeting at their WeWork office space. They went to Aspen for a few days to engage in teambuilding exercises. Grappo indicated to Clingman (and the others) that at this event he would be giving them their paperwork – i.e. their official employment agreements.

The kickoff event happened as planned, but the paperwork didn't. Grappo told Clingman that it was coming… it was just being held up. In time Clingman learned that one of the Drive investors was not able to (or didn't) provide a certain amount of funding that Grappo had been expecting, due to some kind of complications with the investor's pending divorce proceedings.

Clingman, and his coworkers, got to work. He trusted the assurances Grappo made that the paperwork was coming, but even that he did not worry much about, as the employment had commenced and the work was underway. He knew he had a verbal agreement, and that was good enough for the time being, in his mind. He trusted Grappo.

Clingman embarked on his work by doing things like reaching out to various individuals in the industry, after running his intentions by Defendant Grappo. He worked on getting a Drive Coffee "popup" store established in Macy's in New York. Grappo flew him to meet potential investors. Meanwhile, Grappo held Clingman out to the outside world as being part of Drive's marketing team.

At first Clingman was not overly concerned that he did not receive his paycheck exactly on the date he might have expected to receive it. It was a startup. There were delays. Things were busy. He was a team player; he understood.

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 3

A few months in, however, he was starting to become more and more concerned. Eventually, Drive issued him one payment in late November for $13,300, which he basically understood to be one month's pay. After some additional prodding, Drive issued him a second payment for $6,650 in mid-January, 2020. By April, 2020 he had been working for Drive for about seven and a half months and had not been paid significantly less than the $150,000/year salary he had been expecting to receive reliably. At that point he finally decided that enough was enough and emailed Grappo about the payments. After much back-and-forth that eventually culminated in Grappo terminating Plaintiff's use of the keith@drivecoffee.com email address and the two parting ways, Grappo issued Plaintiff a final payment of $3,500.

While they were all busily engaged in the various endeavors associated with building Drive, there were a number of things Grappo was *not* doing for the company. He did not file any tax returns, for example – either for himself or for the company, for any of the relevant years. On the books, Drive did not have *any* employees at all during the entirety of the time period at issue, even though the company was engaged in marketing, sales, distribution of a product, and other business activities. It is undisputed that various people performed services for Drive. Drive did not pay them regularly. On the occasions it did pay them, it did not issue them even 1099s, much less W2s. He did not characterize *anyone* as "employees" of Drive – even those he was paying on an hourly basis to run the machines in the warehouse to get the coffee packaged and shipped. But he also didn't characterize them as independent contractors at the time either (such as by issuing 1099s, asking them to sign independent contractor agreements etc). He just didn't get into it, either way.

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 4

Startup founders are perhaps the quintessence of the proverbial plate spinners. While he was spinning some of the Drive plates, he wholly neglected others. Mr. Clingman's lack of wages was one of those plates that fell.

Defendants try to characterize this all as a misunderstanding, claiming he was never really their employee and so they don't owe him anything. This wishful thinking revisionist history simply does not match up with what the law, as applied to the undisputed facts, concludes. The truth is, the Defendants simply disregarded their obligations under the law altogether, apparently thinking that if they did get caught later on, they could just go back and fix it if need be, like they're trying to do with getting their significantly overdue tax returns filed.

Contemporaneous email and text conversation evidence shows that the Plaintiff (and others) asked Grappo for their pay on multiple occasions. Grappo did not deny that they were owed money but rather kept saying that the money was coming, and that there was a delay because of Drive not receiving funding from an investor on the timeline they were anticipating it.

As can be seen through hundreds of pages of texts, emails, calendars, and other contemporaneous evidence, throughout the relevant time period Plaintiff Clingman was actively doing the job that Grappo had hired him to do for Drive. He should have been properly paid for this work, but instead was only given a few partial payments. For this, he and his company should be held responsible.

**IV. DEFENDANTS "SUFFERED OR PERMITTED" PLAINTIFF TO WORK FOR THEM.**

The definitions set forth in the FLSA's statutory language include this: "'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). The regulations on point elaborate that "Work not requested but suffered or permitted is work time. … The reason is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time…." and

ANDERSONDODSON, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 5

"The rule is also applicable to work performed away from the premises or the job site, or even at home. If the employer knows or has reason to believe that the work is being performed, he must count the time as hours worked" and "… it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. …" 29 C.F.R. § 785.11-13.

As seen in the indisputable evidence, Plaintiff was performing services for the benefit of Drive. He was in regular communication with Grappo and others about them. This constitutes "work" and was compensable. Defendants failed to pay Plaintiff even the minimum wage rate for all hours worked, much less at the rate he should have been paid. Therefore, Defendants are in violation of the FLSA and NYLL for these failures.[1]

## V. UNDER THE ECONOMIC REALITIES OF THE RELATIONSHIP, PLAINTIFF WAS AN "EMPLOYEE" OF DEFENDANTS

**A. Legal Background**

***1. Economic Realities Framework***

The familiar framework of the economic realities test[2] entails the following analytical components:

1. The FLSA defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).

2. This definition is not particularly helpful.

3. An "employer" is defined as including "any person acting directly or indirectly in the interest of an employer in relation to an employee ." 29 U.S.C. § 203(d).

---

[1] Further, as a matter of law based on undisputed fact, Plaintiff is not subject to any exemptions, because the Defendants did not meet the "salary basis test" for any potentially applicable exemptions. 29 C.F.R. § 541. At no time did they pay him a regular salary.

[2] The New York Labor Law has a similar but slightly different analytical framework, and "there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)" *Hart v. Rick's Cabaret Int'l, Inc*. 967 F. Supp. 2d 901, 924 (S.D.N.Y. 2013) (discussing similarities and differences of the two).

ANDERSONDODSON, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 6

4. The FLSA "defines the verb `employ' expansively to mean `suffer or permit to work.'"[3]

5. Courts have interpreted the definition of "employee" broadly in order to effectuate the broad remedial purposes of the FLSA.

6. Because the definition of "employee " under the FLSA is broad, but not precise, courts apply the Supreme Court's "economic reality" test to determine the scope of employee coverage under the FLSA in particular cases. *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1966);

7. Under that test, the focus is "upon the circumstances of the whole activity," with the ultimate criterion being the economic reality of the relationship. The focal point is `whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself.'"

8. In applying this "economic reality" test, courts generally look to six factors:

    1. the degree of control exerted by the alleged employer over the worker;
    2. the worker's opportunity for profit or loss;
    3. the worker's investment in the business;
    4. the permanence of the working relationship;
    5. the degree of skill required to perform the work; and
    6. the extent to which the work is an integral part of the alleged employer's business.

    This test is based upon the totality of the circumstances, and no one factor in isolation is dispositive.

*Henderson v. Inter-Chem Coal Co., Inc*, 41 F.3d 567, 570 (10th Cir. 1994); *Baker v. Flint Eng'g & Constr. Co*. 137 F.3d 1436, 1440 (10th Cir. 1998); *Johns v. Stewart,* 57 F.3d 1544, 1557 (10th Cir. 1995).

### 2. W*age Payments In the Context of Companies Experiencing Financial Difficulties*

It is not an uncommon problem for startup companies like Defendant Drive Coffee to be on rough financial footing as they get going. Employing the "build your bicycle as you're riding

---

[3] See also *United States v. Rosenwasser*, 323 U.S. 360, 362, 363 n. 3 (1945) (quoting statement of then Senator Hugo Black that the term "employee " as used in the FLSA "had been given `the broadest definition that has ever been included in any one act.'")

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 7

it" mentality, startup founders operate, almost by definition, without full resources at their disposal. One way some founders offset this problem is to attempt to attract outside investment. That can come with its own set of problems, such as the funding not coming through as expected or becoming financially beholden to others' ideas about how things should be done.

In short, these challenges do not trump the wage laws' mandates.

A number of courts have found that even where employees of startups actively agree to defer payments until the company is financially viable or until some fortuitous event occurs at an unspecified date in the future, those agreements have been found to be at odds with the precepts of relevant wage laws requiring prompt payment of wages. <u>See e.g.</u> *Dobin v. CIOview Corp.*, No. 01-00108, 2003 WL 22454602 (Mass. Super. Oct. 29, 2003). That court expressly noted that "enforcing this provision in the Wage Act may adversely affect those start-up companies which ask employees to for[go] wages until the company reaches financial viability." It went on to offer that "This Court does not offer any opinion as to whether the Wage Act is wise in prohibiting deferral agreements in all circumstances, or whether there are ways in which start-ups can avoid this prohibition by paying employees only the minimum wage and offering bonuses that are conditioned on the company's financial performance." *Id*. Following *Dobin*, another court found that a wage deferral agreement in an employee's employment contract was void as a matter of law. *Stanton v. Lighthouse Financial Services*, 621 F. Supp. 2d 5, 13 (D. Mass. 2009)

Also out of Massachusetts, another company's former chief technical officer sued its president and chairman for $100,000 in unpaid salary under its state wage law. In *Kalra v. Viking Networks, Inc.*, No. 02-2171, 2005 WL 503723 (Mass.Super.Ct. Jan. 21, 2005), when the plaintiff was being recruited, defendants had emailed him that "[t]he hope is that we will raise money soon and can pay you a real salary, but of course it's a question mark." *Id*. When defendants fired him

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 8

seventeen months later, he had not been paid at all. *Id*. There the court denied the defendant's motion for partial summary judgment based on the existence of genuine issues of material fact as to whether the plaintiff understood the contingent nature of his salary. *Id*.

In *Meyers v. Penn N. Ctrs. for Advanced Wound Care, P.C.,* a Pennsylvania district court addressed a similar deferred payment situation. Civil No. 11-182 Erie, at *24 (W.D. Pa. Mar. 28, 2014). At some point in that plaintiff's employment, which was first as Vice President of Clinical Operations and later National Sales Manager for a certain product, the company experienced financial difficulties. Based on that the individual defendant decided to withhold paychecks from four employees. *Id*. "The employees agreed to the withholding of their pay for the simple reason that they would be out of a job if they did not. All parties agree that the withheld pay was temporary and would be repaid when the company had the funds." *Id*. One withheld payment was eventually paid but the others were not. *Id*. The court there noted that recovery under the statutory provisions of the state wage law was not a separate right to compensation, but rather a vehicle to enforce an already existing right to payment. *Id*. It characterized the state wage law as "a vehicle for employees to enforce payment of their wages and compensation held by their employers. The underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages. The WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Id*. There, the court found that the parties had entered into an employment agreement, even though there was no formal written agreement – an oral agreement. *Id*. As such, it concluded that the plaintiff was entitled to be paid his wages earned. The decision to skip a few pay periods was not the plaintiff's, and acquiescence

ANDERSONDODSON, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 9

did not amount to agreement in the court's eyes: "To state the terms of the alleged agreement reveals that it is a one-sided agreement that vests sole discretion in one party to determine when the vague condition of 'the company having funds' is met." *Id*. As in the instance case, "the evidence and testimony also support [plaintiff's] position that he continually and consistently requested to be paid for the skipped pay periods." *Id*. On that basis the court concluded that there was an enforceable contract between the parties for the payment of wages, that the employer breached that contract by failing to pay him those earned wages, and therefore was subject to the state's wage law protections as well. *Id*. In addition, the court went on to mention that " even if there were no contract, we could invoke the ancient doctrine of *quantum meruit* - he worked; he is entitled to be compensated for his work." *Id*.

In this case New York wage law applies because the Plaintiff was based in New York, even though he worked for the Denver-based Defendants. See e.g. O'Neill v. Mermaid Touring Inc., 968 F. Supp. 2d 572, 578 (S.D.N.Y. 2013). Regardless, on the relevant points New York and Colorado state wage law are not vastly different. Both contain prompt payment requirements. CRS § 8-4-103; NYLL § 191. Both require employers to pay their employees their full earned wages, which can be in amounts greater than the amounts that the FLSA's minimum wage and overtime protections might cover. *Coley v. Vannguard Urban Improvement Ass'n, Inc.* 12-CV-5565 (PKC) (RER), at *21 (E.D.N.Y. Mar. 27, 2018) (""NYLL § 198(1)-(a) expressly provides that 'any employee paid less than the wage to which he or she is entitled under the provisions of this article' is entitled to recover his or her 'full wages', and NYLL § 663 [regarding minimum wages] does not prohibit an award based on an employee's agreed-upon wages. ")

While the state wage acts from the Massachusetts and Pennsylvania there are not identical to the NYLL or CWA, they are similar enough to warrant similar conclusions. For public policy

ANDERSONDODSON, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

reasons it is critical that employed workers be able to depend on receiving the wages they have earned on a timely basis. Without that assurance, the economy would surely falter. Some companies experience financial difficulty from time to time, whether at the startup stage or later on. Just as parents experiencing financial difficulties are not legally permitted to fail to feed their children without legal consequence, so too companies have to "take care of" the people who work for them. Unlike parents, companies have the option to discontinue the relationship if they don't think they can fulfill those obligations. But if they do continue to receive the benefits of the work, they're obligated to pay for it, pure and simple.

### B. Application of Law to Facts: Plaintiff Was An Employee, Who Is Owed Wages

#### 1. *The degree of control exerted by the alleged employer over the worker*

Alex Grappo directed Plaintiff's activities. He was the one to hire, fire, and set wage rates for individuals performing services for Drive, including the Plaintiff. He was the CEO, and was in charge of payroll and/or payments made throughout the relevant time period.

#### 2. *The worker's opportunity for profit or loss.*

The arrangement was one of a standard management-level compensation package. While Defendants attempt to dispute that there was any such agreement in place factually, the important thing here for these purposes is that nobody contends that the Plaintiff had the authority to determine profit or loss for Drive. He did not have input into financial priorities of the company (e.g. paying the individuals working in the warehouse before paying the Plaintiff).

#### 3. *The worker's investment in the business.*

Other than his time, energy, and reimbursable business expenses related to his own activities the Plaintiff did not invest in the business. It is or should be undisputed that he did not contribute monetary investments in the business.

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 11

### 4. *The permanence of the working relationship.*

It is or should be undisputed that there was no set end date for the working relationship. While the Defendants dispute that there was in fact a start to an employment relationship, for these purposes no one can contend that there was a specified duration for the Plaintiff's work. He was not hired to engage in a specific month-long marketing project, for example. The Plaintiff worked for Drive for about 7.5 months, voluntarily discontinuing the relationship only after multiple promises of forthcoming payment remained unfulfilled.

### 5. *The degree of skill required to perform the work*

Plaintiff's background in marketing at Red Bull was important to Alex Grappo and Drive Coffee, but it was not an outside, independent kind of skill. It was not as if Drive Coffee, a coffee business, was hiring a plumber to come to the warehouse and fix its pipes based on that plumber's independent skills and training that had nothing to do with the operations of a coffee business. The Plaintiff strategized high level regarding Drive's marketing and sales opportunities and efforts.

### 6. *The extent to which the work is an integral part of the alleged employer's business*

It should not be disputed that the nature of the work that Plaintiff performed for Defendant was an integral part of Drive's business. Effectively marketing the coffee product (and brand of the business) was essential to its success, especially on the levels contemplated by Grappo.

### 7. *Other Factors*

Courts recognize that the six above enumerated factors should not serve as a checklist, but as general guidance. The six above pertain primarily to situations in which the primary dispute is whether the person at issue is an "employee" or an "independent contractor." Here, while that too is at issue, Defendants also (incredibly) contest that he performed compensable work.

Defendant Grappo stated his understanding of what an "employee" is as follows: "an

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 12

ANDERSONDODSON, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

employee is someone that has filled out their W-2 paperwork, has received and signed an offer letter, is a full-time employee that shows up to work at the company's physical location every day." While it may be true that such a person may in fact be an "employee," that definition only covers a small subset of "employees" as the law defines that term. There are millions of employees who have never seen an offer letter or formal contract. Having a formal contract in hand may solidify or evidence the relationship, but it is not a prerequisite of one. Plenty of employees are part time rather than full time. Especially in this day and age in which remote work has become par for the course, showing up to a company's physical location is not critical to the analysis. (See also 29 C.F.R. §785.12). And, while the IRS would presumably agree that W-2 paperwork should be completed for employees, that does not happen in every case – as the Defendants more than anyone should know, since they did not bother to issue W2s or 1099s for any of the individuals they compensated, nor did either the individual or corporate defendant complete any tax returns at all for the years of 2017-2020. It is an odd contention indeed to attempt to define the word "employee" in part by reference to the proper completion of tax forms, insofar as the Defendants implicitly attempt to avoid their responsibilities to their workers as "employees" in part by basing such justification on their own blatant failures in regard to the tax laws.

The overall "economic reality" of the relationship is that the Plaintiff worked exclusively for Defendants during the relevant time. He had a solid professional pedigree that Drive could benefit from. He engaged in activities consistent with his background and the needs of the company. He had a clear expectation that he would, sooner or later, be paid for his efforts. He complained about not being paid – both to Mr. Grappo directly, and amongst his coworkers. The response was not "What are you talking about? You don't work here!" but rather "It's coming – just be patient."

The story arc of the parties' relationship, while differently *characterized*, is or should not be disputed *factually*. Someone introduced Plaintiff and Defendant Grappo based on her perception of potentially symbiotic skillsets and needs. They talked by phone. They met in person. They discussed the business and what Plaintiff's role in it might look like. Grappo asked him to submit a resume, which he did. Most people would probably call this phase of what happened the interview phase. Next, Grappo invited the Plaintiff to join other "team members" for a "kickoff" event in Denver and Aspen. They toured facilities, met the people they would begin working with, discussed the company in high-level terms, and engaged in "team building" exercises. Most people would consider this to be the "onboarding" phase, paperwork or not. Next, Plaintiff got to work. Defendant Grappo sent him on business trips. Plaintiff secured a relationship for Drive to have its products in a "popup" store within Macy's in New York. He had a @drivecoffee.com email address, and used it to correspond with other Drive team members and the outside world. Etc. At some point when he complained about not being paid, Defendants did in fact pay him something, albeit not what he had fully earned. When the nonpayment continued, eventually Plaintiff declared that he had had enough, and left the relationship. Most people would consider that to be a "separation" event.

Defendants admit that they are currently in the process of trying to "fix things" in regard to the fact that they never issued 1099s or W2s or tax forms and did not pay attention to how people (including Grappo himself) were being characterized for tax or other purposes. The implicit mantra is that in a startup one should "build the business" without being mired down with details like taxes and paying employees. After all, if the startup succeeds, those things can be fixed later; if it fails, then there's no need to fix anything.

AndersonDodson, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 14

For public policy reasons, this mindset must be kept in check. Going through litigation over unpaid wages should not be deemed a badge of honor for a startup. It is not healthy for the affected workers, but it is also not healthy for the businesses. Startups – that enjoy the many benefits associated with corporate formation - have to take responsibility for their workers. As one of the cases above even mentioned as an aside in dicta, there are ways to both keep costs low and abide by the laws. Drive could have paid everybody on the books at minimum wage, with contingent promises of discretionary bonuses should the company meet certain goals. They didn't do that. Instead they just plain didn't pay people, and now that's catching up with them.

## VI. CONCLUSION

WHEREFORE, the Plaintiffs request that summary judgment be entered in favor of the Plaintiff and against the Defendants, holding that

a. Plaintiff was an "employee" of Drive.

b. Plaintiff's period of employment was from mid-September, 2019 through the end of April, 2020 (7.5 months).

c. Plaintiff's rate of pay should have been $150,000 per year. Thus, Plaintiff is owed $150,000 divided by 12 months, times 7.5 months, minus the amounts Drive paid him along the way.

d. Defendants also owe Plaintiff for the business expenses for which they did not reimburse him, in the amount of $6,205.

e. Liquidated damages, state law penalties, attorney fees, and costs, can be computed in alignment with the Court's rulings on the above issues.

Respectfully submitted, this **2nd** day of **August, 2021.**

ANDERSONDODSON, P.C.

*/s/ Penn Dodson*
**Penn A. Dodson, Esq.**
CO Bar No. 54677
penn@andersondodson.com
Attorney for Plaintiff

ANDERSONDODSON, P.C.
11 Broadway
Suite 615
New York, NY 10004
212.961.7639
www.AndersonDodson.com

*Clingman v. Drive Coffee*
Case No. 1:20-cv-01485-RBJ

Ps' MSJ
Page 15