IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-01485-RBJ
_____

DEPOSITION OF:  ALEXANDER GRAPPO - APRIL 7, 2021
_____

KEITH CLINGMAN,

Plaintiff,

v.

DRIVE COFFEE, LLC; DRIVE COFFEE, INC.; and ALEX
GRAPPO, an individual,

Defendants.

_____


        PURSUANT TO NOTICE, the remote
deposition of ALEXANDER GRAPPO was taken on
behalf of the Defendants, on April 7, 2021, at
9:01 a.m. MDT, before SUZANNE STOTZ, Registered
Professional Reporter, Certified Realtime
Reporter and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiff:

    (Via Videoconference)
      CHRISTOPHER ANDERSON, ESQ.
      PENN A. DODSON, ESQ.
      AndersonDodson, P.C.
      11 Broadway
      Suite 615
      New York, New York 10004

For the Defendants:

    (Via Videoconference)
      LISA N. NOBLES, ESQ.
      Sussex Law, LLC
      1430 Larimer Street
      Suite 307
      Denver, Colorado 80202

I N D E X

EXAMINATION OF ALEXANDER GRAPPO     PAGE
April 7, 2021

    BY MR. ANDERSON     5
    BY MS. NOBLES     224

I N D E X  (Cont'd)

| | DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|---|
| 1 | Ground rules for depositions | 6 |
| 2 | Notice of 30(b)(6) deposition | 9 |
| 3 | Excerpt of slide deck | 111 |
| 4 | E-mail chain Bates stamped DRIVE 0237 and 238 | 139 |
| 5 | Text messages Bates stamp P00136 through 200 | 145 |
| 6 | Text messages Bates stamp P00136 through 148 | 150 |
| 7 | E-mail from Clingman to Grappo dated 8/11/19 | 155 |
| 8 | Spreadsheet Bates stamped P000126 and 127 | 168 |
| 9 | Spreadsheet Bates stamped P000125 | 171 |
| 10 | Document Bates stamped P000131 and 132 | 175 |
| 11 | E-mail chain Bates stamped DRIVE 0002 through 10 | 177 |
| 13 | Text messages Bates stamped P00190 through 200 | 189 |
| 15 | Defendants' Responses to Plaintiff's First Interrogatories | 208 |

(Exhibits attached to transcript.)
(Exhibits 12 and 14 not introduced)

WHEREUPON, the following proceedings were taken
pursuant to the Colorado Rules of Civil
Procedure.

    *    *    *    *    *    *

THE COURT REPORTER:  Will all counsel please
stipulate to the swearing in of the witness
remotely.

    MR. ANDERSON:  Yes.
    MS. NOBLES:  Yes.
      ALEXANDER GRAPPO,
having been first duly sworn to state the whole
truth, testified as follows:
      (Deponent's reply to oath:  Yes.)
      EXAMINATION
BY MR. ANDERSON:
    Q.  All right, Mr. Grappo.  My name is
Christopher Anderson.  I am working with the law
firm of AndersonDodson representing Mr. Clingman
in this matter.  Just preliminarily, have you
ever given a deposition before?
    A.  I have not.
    Q.  Okay.  Have you sat in on any or
observed any or is this a brand new experience
for you?
    A.  Brand new.

1    Q.   Okay.  Ever testified in court?
2    A.   No.
3         (Whereupon, Exhibit 1, Ground rules
4    for depositions, was marked for identification.)
5    BY MR. ANDERSON:
6    Q.   Okay.  That's just fine.  What I've
7    done just to sort of help -- we usually, when
8    we're in person, we read these, but to help I am
9    also going to just put them up on the screen as
10   Exhibit 1, a set of kind of ground rules for the
11   deposition.  I will review them with you as well.
12        But just so we kind of understand
13   how the mechanics of this work, if you will take
14   a minute, Mr. Grappo -- first of all, let me ask
15   you.  Is this clear?  Are you able to read and
16   see exhibits posted on the screen this way?
17   A.   Yes.
18   Q.   Fantastic.  If you will take a
19   moment and just read through the -- my proposed
20   ground rules for the deposition and then let me
21   know if you have any questions about it.
22   A.   Okay.
23   Q.   Ground rules for depositions.  Do
24   you have any questions about those ground rules?
25   A.   No.

1    Q.   Okay.  Fantastic.  Is there anything
2    today going on with you that would make it
3    difficult or interfere with your ability to be
4    truthful or to remember things as you sit here
5    today?
6    A.   No.
7    Q.   Okay.  What did you do to prepare
8    for today's deposition?
9    A.   I consulted with our attorney.
10   Q.   Okay.  I obviously don't want to ask
11   you anything that you talked about with your
12   attorney, but did you also review any documents,
13   materials, talk with anybody else in preparation
14   for today's deposition?
15   A.   I spoke with my attorney and
16   reviewed the materials that she put before me.
17   Q.   Okay.  So just -- just with the
18   attorney, but not anybody else, and no other
19   materials on your own?
20   A.   That is correct.
21   Q.   Okay.  Did you also review -- in
22   doing that, did you review the topics for the --
23   what's known as the 30(b)(6) portion of this
24   deposition?
25   A.   They were presented to me by my

1    attorney.
2    Q.   Okay.  Did you review them?
3    A.   Some of them, yes.
4    Q.   Okay.  Let's go ahead and look at
5    them together.  First of all, do you understand
6    that you are here both in your personal capacity
7    and as a 30(b)(6)?  Do you understand the
8    difference between those two things?
9    A.   If you'd like to clarify for me, I
10   am happy to...
11   Q.   Sure.  So in your personal capacity,
12   I may ask you questions during the course of this
13   deposition -- some questions may pertain to you
14   specifically and things that you have in your
15   personal knowledge.  And as a 30(b)(6)
16   deposition, I may be asking you questions as a
17   representative of Drive Coffee, and those things
18   may or may not have been in your personal
19   knowledge, but you've been requested to prepare,
20   as a representative of the corporation, to answer
21   those questions.
22   A.   Sure.  Yes, our attorney made that
23   clear.
24   Q.   Fantastic.  So let's go ahead and
25   look at -- I'm going to go ahead and post Exhibit

1    Number 2, which is the 30(b)(6) notice.
2         Is this -- this is the notice that
3    you have reviewed previously with counsel?
4         MS. NOBLES:  You're still on
5    Exhibit 1.
6         THE WITNESS:  That is the same
7    document that was up before.
8    BY MR. ANDERSON:
9    Q.   That's interesting.  Okay.  Let's
10   try -- you know what?  Okay.  I'm sorry about
11   that.  Apparently it's not as convenient as I
12   thought it was.  We'll try that again.  Here we
13   go.  I am going to now share Exhibit 2.
14        (Whereupon, Exhibit 2, Notice of
15   30(b)(6) deposition, was marked for
16   identification.)
17   BY MR. ANDERSON:
18   Q.   Is that better?
19   A.   Yes.
20   Q.   Okay.  Fantastic.  Thank you.  Is
21   this the notice of deposition -- 30(b)(6) notice
22   that you reviewed with your counsel?
23   A.   Yes.  That looks like what she put
24   before me.
25   Q.   I'm going to turn page 4 of the

1  notice.  These are the list of topics.  If you
2  would take a moment to review the 13 topics on
3  this page, and then I'll advance to the next page
4  as well to finish the topics.
5              Because you said you were prepared
6  on some of them.  I just want to ask you to let
7  me know any of these topics that you are not
8  prepared to talk about today.
9       A.   Okay.
10      Q.   Are there any topics on this page
11  that you're not prepared to talk about today?
12      A.   No.
13      Q.   Okay.  Turning to the page 5 -- so
14  those were topics 1 through 13.  Page 5 has
15  topics 14 and 15.  If you just review those
16  quickly and let me know if you're not prepared to
17  talk about either of those.
18      A.   I'm prepared.
19      Q.   Fantastic.  Other than -- again, you
20  have told me that you've spoken about this with
21  your counsel.  So other than counsel, have you
22  spoken with anybody else about this deposition
23  today?
24      A.   Personal friends in my life are
25  aware.

1       Q.   Okay.  Have you -- did you use those
2  conversations to prepare for the deposition or
3  simply to kind of --
4       A.   No.
5       Q.   -- discuss your feelings --
6       A.   No.
7       Q.   -- about it?
8       A.   No.
9       Q.   Not to prepare?
10      A.   Not to prepare.
11      Q.   Okay.  Very good.  All right.  Who
12  is your current employer, Mr. Grappo?
13      A.   Drive Coffee, Inc.
14      Q.   And what -- is that your only
15  current employer?
16      A.   Yes.
17      Q.   Okay.  And what is your title or
18  titles with Drive Coffee, Inc.?
19      A.   I am the CEO and founder.
20      Q.   What kind of entity is Drive Coffee,
21  Inc.?  Is that a C Corp. or an S Corp.?
22      A.   Delaware C Corp.
23      Q.   Delaware.  Thank you.  You've
24  answered two questions in one.  Thank you.
25              And as we talk today, I may -- if

1  it's all right with you, if we could both agree
2  that Drive Coffee, Inc. I won't refer to every
3  single time as Drive Coffee, Inc.  We'll talk
4  about it as Drive, but I will mean Drive Coffee,
5  Inc. when I do that.  Can we agree to that?
6       A.   Sure.
7       Q.   Can you just make sure -- you've
8  introduced yourself as Alex Grappo.  Is that your
9  full name?
10      A.   Alexander David Grappo.
11      Q.   Okay.  And have you ever had -- have
12  you ever gone by any former names other than
13  Alexander David Grappo?
14      A.   No.
15      Q.   Okay.  Where do you currently live?
16  What's your current residence?
17      A.   Denver, Colorado.
18      Q.   What's the address?
19      A.   I'm not sure why I need to give my
20  personal address here.
21      Q.   I'll leave it to your attorney to
22  instruct you to answer the question.
23              MS. NOBLES:  It's a standard
24  question.  As part of --
25              THE WITNESS:  Sure.  633 Josephine

1  Street, Denver, Colorado, 80206.
2  BY MR. ANDERSON:
3       Q.   Thank you.  Do you have any other
4  residences?
5       A.   No.
6       Q.   And do you have a workplace that you
7  go to?
8       A.   Yes.
9       Q.   What is the address of that
10  workplace?
11      A.   3801 Race Street, Denver, Colorado,
12  80205.
13      Q.   When did you graduate high school?
14      A.   2004.
15      Q.   And what high school was that?
16      A.   Forest Park High School.
17      Q.   And that's in Forest Park -- where?
18      A.   That's in Woodbridge Virginia.
19      Q.   Woodbridge, Virginia.  Thank you.
20              On the Drive Coffee website you're
21  described as having grown up overseas in lots of
22  different places:  Nicaragua, Portugal, Jordan,
23  Dubai, Oman.  Do you continue to travel the world
24  that way or was that something that you did as a
25  youngster?

1    A.    That was something primarily in my
2  younger years, given my father's job.
3    Q.    And what was that job?
4    A.    He was a diplomat in the U.S.
5  Foreign Service.
6    Q.    And you went to Virginia Polytech
7  and State University?
8    A.    That is correct.
9    Q.    And that's from 2004 to 2006; is
10 that right?
11   A.    That is correct.
12   Q.    And did you -- what year did you
13 graduate -- or did you graduate from that school,
14 I should say?
15   A.    I did not graduate from that school.
16   Q.    Okay.  Did you -- you graduated from
17 Pepperdine?
18   A.    I did not graduate from Pepperdine.
19   Q.    Okay.  Where did you go after -- did
20 you continue school after Virginia Polytech?
21   A.    Yes, I went to Pepperdine
22 University.
23   Q.    Okay.  And have you graduated or
24 received a degree from any institution of higher
25 learning?

1    A.    I have not.
2    Q.    Okay.  And you went to Pepperdine
3  from 2007 to 2011; is that right?
4    A.    That sounds about right, to the best
5  of my recollection.
6    Q.    Okay.  And a little bit of work
7  history.  While at -- during the time that you
8  were at Polytech -- Virginia Polytech, you were
9  an intern at Cushman & Wakefield from May 2005 to
10 July of that year?
11   A.    That is correct.
12   Q.    And what kind of firm is Cushman &
13 Wakefield?
14   A.    Commercial real estate firm.
15   Q.    Subsequently, you also served as
16 a -- in the Student Endowment for Educational
17 Development in the area of materials, energy and
18 utilities as an analyst, is that right, from
19 January 2006 to June 2006?
20   A.    That is correct.
21   Q.    Okay.  And you also worked at UBS in
22 Newport Beach, California as an intern from July
23 2006 all the way through January 2007; is that
24 also correct?
25   A.    That is correct.

1    Q.    Other than those three before
2  Pepperdine, did you have any other jobs?
3    A.    Yes, I've had other jobs in my life
4  prior to them.
5    Q.    So specifically during the years
6  2004 through 2007 when you went to Pepperdine,
7  what other jobs did you have?
8    A.    Oh, no, not during that time I have
9  not had any other jobs.
10   Q.    Okay.  Okay.  Then at Pepperdine you
11 were at -- you've already established you were at
12 Pepperdine from 2007 to 2011.  Indicate -- is it
13 correct that you worked at Tesla Motors from July
14 2009 through January 2010?
15   A.    That is correct.
16   Q.    What was your role at Tesla?
17   A.    We referred to myself as an
18 associate just because I was never really given a
19 formal job title, but I handled everything from
20 logistics and sales to assisting the management
21 of the showroom and customer relations.
22   Q.    Okay.  And what were you paid for
23 that role?
24   A.    I do not recall.
25   Q.    Were you paid for that role?

1    A.    I was paid for that role.
2    Q.    Okay.  And that was in New York?
3    A.    Correct.
4    Q.    Where did you attend Pepperdine for
5  business from 2007 to 2011?
6    A.    At their campus in Malibu,
7  California.
8    Q.    Okay.  That's what I thought.  All
9  right.  Then subsequent to -- or withdrawn.
10         During that same time, from January
11 2007 to August 2009, you also indicated that --
12 sorry, you hadn't yet.  Is it true that you have
13 held yourself out to be self-employed as a
14 strategic consulting and business development
15 person from January 2007 through August 2009?
16   A.    That is correct.
17   Q.    Okay.  In July 2012 you founded a
18 company called Call It Out, Inc. in Santa Monica;
19 is that right?
20   A.    That is correct.
21   Q.    What did Call It Out, Inc. do?
22   A.    We developed a mobile content
23 sharing application.
24   Q.    All right.  And for us lay folks,
25 mobile content sharing application, what kind of

1  content did it share?

2       A.   Photos and videos.

3       Q.   Was it peer to peer?  Was it meant

4  for personal storage or -- more for storage or

5  more for sharing?

6       A.   More for sharing, like a social

7  network, similar to the way Instagram works.

8  However, the company did pivot using the same

9  underlying software application to do enterprise

10  content sharing photos and videos.

11       Q.   All right.  And in that pivot, did

12  the name change to Wurksite, spelled

13  W-U-R-K-S-I-G-H-T [sic]?

14       A.   Correct.

15       Q.   Okay.  What was the cause for that

16  pivot?

17       A.   Seeing a larger opportunity in the

18  enterprise space that was more differentiated and

19  would have a clearer strategy to pursue.

20       Q.   And what -- did you change the name

21  of the company from Call It Out, Inc. to Wurksite

22  or was it just the product name changed?

23       A.   Just product name change.

24       Q.   Okay.  What has happened to that

25  company?

1       A.   It dissolved.

2       Q.   Why did it dissolve?

3       A.   Lack of funding.

4       Q.   Did you ever make a profit in that

5  company?

6       A.   No.

7       Q.   Subsequently, you also worked for a

8  company called Altvia Solutions, LLC as a product

9  manager; is that right?

10       A.   That is correct.

11       Q.   The listing that I've seen has you

12  there from July 2015 to present.  Is that true?

13  Are you still presently a product manager for

14  Altvia?

15       A.   No, I am not.  I just am not really

16  big on LinkedIn, so I never bothered to update it

17  after I left.  I also am somewhat superstitious

18  when it comes to that stuff, so I just felt like

19  not really messing with it.

20       Q.   Okay.  When did you actually

21  terminate your employment with Altvia?

22       A.   I left Altvia -- I believe my last

23  day was right around September of 2017.

24       Q.   And were you paid at Altvia as a

25  product manager?

1       A.   Yes, I was.

2       Q.   What were you paid at Altvia as a

3  product manager?

4       A.   I believe my salary was, like,

5  96,000.

6       Q.   Okay.  And did you have any

7  employment subsequent to Altvia before founding

8  Drive Coffee?

9       A.   I did not.

10       Q.   Okay.  And does the fact that Drive

11  Coffee -- well, first of all, let me ask you.  Is

12  Drive Coffee -- is it true that Drive Coffee is

13  not listed in your LinkedIn profile at all?

14       A.   That is correct.

15       Q.   Is that the same superstition or

16  what -- what's your reason for not listing Drive

17  Coffee?

18       A.   Yeah, I think -- there is a lot of

19  risk involved in pursuing a start-up.  So I think

20  it felt premature.  As the company has progressed

21  over time, I've also found value in -- my inbox

22  is already flooded on a daily basis, and LinkedIn

23  often just leads to even more spam of people

24  trying to get ahold of me.  So I found value in

25  not being publicly discoverable.  It just limits

1  my spam.  The partners that want to work with us

2  reach out to our primary company inbox and, you

3  know, it's passed up the food chain if it's

4  something I need to look.

5       Q.   Very good.  You are aware, though,

6  that Drive Coffee itself does have a presence on

7  LinkedIn?

8       A.   Yes, I believe several other team

9  members have updated their profiles to include

10  Drive Coffee there.

11       Q.   Okay.  Do you have any other

12  relatives over the age of 18 in the State of

13  Colorado?

14       A.   Yes, I do.

15       Q.   Who are those people?

16       A.   Both my parents as well as my older

17  sister.

18       Q.   And both of your parents -- is that

19  a mother and father?

20       A.   Correct.

21       Q.   And older sister you said.  Can you

22  please tell me your mother's name?

23       A.   My mother's name is Rebecca Grappo.

24       Q.   Father's name?

25       A.   Gary Grappo.

1    Q.    And your older sister's name.

2    A.    Michelle Grappo.

3    Q.    And you said they all live in

4  Denver?

5    A.    Correct.

6    Q.    Okay.  Over the past ten years, so

7  we are going to go back to 2011, other than

8  Colorado and I guess with this work at -- well,

9  let me just ask it this way:  Other than

10  Colorado, what states have you lived in in the

11  United States?

12    A.    I have lived in New York State.  In

13  the last -- you're saying within the last 11

14  years?

15    Q.    I said ten years, back to 2011.

16    A.    Oh.  Yeah.  Actually -- I mean, I

17  left New York -- you got the date there, so I

18  don't even think that would qualify.  I have

19  lived in California and Colorado.

20    Q.    Okay.  All right.  I'm going to turn

21  first to a couple of topics regarding your role

22  here as 30(b)(6) representative, so based on your

23  knowledge of the company and things that you have

24  done to prepare for this deposition as well as

25  personal knowledge.  You've already answered one,

1  the nature of the business of Drive Coffee, and I

2  am just going to repeat it just to be sure I got

3  it right, is a Delaware C corporation; is that

4  right?

5    A.    That is correct.

6    Q.    All right.  And what does Drive

7  Coffee do?

8    A.    Drive Coffee roasts and sells coffee

9  and coffee beverages.

10    Q.    What's special, I mean, about Drive

11  Coffee as opposed to other coffee and coffee

12  beverages?

13    A.    Everything.  But I would say that we

14  have a unique commitment to quality that exceeds

15  a lot of other firms, especially ones trying to

16  operate at our scale.  We have unique packaging

17  and design and it's designed to create an

18  experience.  Our beverages are designed to not

19  only be the best-tasting products on the market,

20  but also be good for you, or I should say at

21  least not bad for you.

22          So those are the primary things I

23  would say.

24    Q.    Okay.  So it's a premium coffee

25  product?

1    A.    Sure.

2    Q.    Okay.  And do you sell this direct

3  to consumer, to businesses or both?

4    A.    Primarily direct to consumer.  We

5  have a couple of business clients.

6    Q.    And the business clients, do they

7  serve it single serve or have they been reselling

8  the product to consumers?

9    A.    They will either gift or donate the

10  products to employees or clients or other

11  business associates.

12    Q.    Okay.  So they are not reselling;

13  they are using it as -- in a gifting program?

14    A.    Some.  Others do resell our

15  products.

16    Q.    Oh, okay.  All right.  And do you

17  also partner with any other entities to display

18  merchandise and sell in their space?

19    A.    I am not aware at present of any

20  companies where our product is displayed.

21    Q.    Okay.

22    A.    With that said, I think there's been

23  a few coffee shops that have sort of bought as a

24  regular customer and put it on display, but

25  nothing that we've formally arranged at this

1  point, with the exception of one location in

2  California.

3    Q.    And what's that location?

4    A.    It's called Ranch At the Pier.

5    Q.    Ranch At the Pier?

6    A.    Correct.

7    Q.    Okay.  And what pier is that ranch

8  at?

9    A.    Malibu Pier.

10    Q.    Okay.  So would you say that you

11  don't have any significant retail partners?

12    A.    That is correct.

13    Q.    Okay.  What is your relationship

14  with Shopify?

15    A.    They are our eCommerce platform

16  provider.

17    Q.    Are they -- is Shopify an investor

18  in any way in Drive?

19    A.    We have a line of credit with

20  Shopify, but no, they are not an investor.

21    Q.    What is the size of the line of

22  credit with Shopify?

23    A.    I'm not aware how large it is right

24  now.

25    Q.    What would you have to do to

1  discover the answer to that question?
2      A.   I can look it up for you right now.
3      Q.   Please do.
4      A.   We currently have $38,729.68
5  outstanding with Shopify.
6      Q.   Okay.  That's the balance.  Do you
7  know what the size of the line is or is it not a
8  set amount?
9      A.   So it's not a revolving line where
10 it opens up.  It's more of a -- I mean, it's
11 referred to as a line, but the total size of that
12 loan was 56,500.
13     Q.   Can you say that number again?  I'm
14 sorry, you broke up just a little bit.
15     A.   56,500.
16     Q.   Okay.  Thank you.  So relatively
17 small line compared to the revenues of the
18 company?
19     A.   Sure.
20     Q.   Okay.  Have you in the past had a
21 display relationship with Macy's or a pop-up
22 store in a Macy's department store?
23     A.   Yes, that is correct.
24     Q.   Okay.  When was that?
25     A.   I believe it was in the fall of

1  2020.  I am not --
2      Q.   And how long did that last?
3      A.   -- entirely sure the exact dates of
4  how long it took place.
5      Q.   Who would be aware of that?
6      A.   I can go look in to it.
7      Q.   So you would be able to get the
8  answer to that and then provide it?
9      A.   Yes, I would have dig back through
10 some e-mails.
11     Q.   Okay.  When I asked earlier about
12 your title at Drive, you stated CEO and founder.
13 Are you the sole founder of Drive Coffee?
14     A.   I am.
15     Q.   Okay.  There is nobody that would --
16 you would describe as a co-founder?
17     A.   No.  I think there's -- like, my
18 very first investors, I think I have told them
19 sometimes if they want to say they were involved
20 in the founding or they were -- if they wanted to
21 refer to themselves as a co-founder, I have told
22 them.  But, you know, for all intents and
23 purposes, it was, you know, 100 percent me.
24     Q.   Okay.  So let me just get this
25 right.  So if Markus Hammarberg holds himself out

1  as a co-founder from January 2018 to present,
2  that would not be accurate?
3      A.   I think it was more of we wanted to
4  find a way to communicate in some way that he's
5  been around since the early days.
6      Q.   But it would not be accurate that he
7  is actually a co-founder?
8      A.   Correct.
9      Q.   Okay.
10          MR. ANDERSON:  And for the court
11 reporter, that's M-A-R-K-U-S, last name
12 H-A-M-M-A-R-B-E-R-G.
13          THE WITNESS:  Correct.
14 BY MR. ANDERSON:
15     Q.   Same question for -- and now I'm
16 going to ask you to help me pronounce this, so I
17 am just going to spell it and you can pronounce
18 it.  J-O-A-K-I-M.
19     A.   Yeah.  Joakim is his brother.
20     Q.   Okay.  Joakim Olsson, O-L-S-S-O-N,
21 has also listed himself as co-founder from
22 February 2018 to present.  You would answer that
23 the same way?
24     A.   I would answer that it same way.
25     Q.   Okay.

1      A.   And I think they would happily
2  confirm what we're saying.  I think we've juggled
3  the best way to categorize their early support
4  for the company, being our first investors, but
5  at no point have they been employed by the
6  company.
7      Q.   Including they are not employed by
8  the company today?
9      A.   Correct.
10     Q.   Okay.  Today Markus Hammarberg also
11 lists himself as executive creative director for
12 the company; is that correct?
13     A.   I was not aware of that but
14 Markus --
15     Q.   Does he serve in that role?
16     A.   Has tremendous creative input on the
17 company, so if that's something that he wanted to
18 put there, that's perfectly fine.
19     Q.   Okay.  How is he compensated for his
20 tremendous creative input into the company?
21     A.   He invested in the company, so he
22 owns shares of stock.  And he and his brother,
23 through their design firm, received shares early
24 on for design work that they had planned on doing
25 for the company.

1      Q.    Okay.  Other than shares in the
2   company, have they been compensated in any way?
3      A.    No.
4      Q.    Okay.  Are they continuing to
5   provide design services for the company?
6      A.    Yes.
7      Q.    And for their continued efforts,
8   they are also not being compensated?
9      A.    That is correct.
10     Q.    And so other than the initial award
11  of early shares, they have not been issued
12  additional shares since that time for their
13  design services or any other services?
14     A.    That is correct.
15     Q.    Okay.  When did you start Drive?
16     A.    There's -- do you mean formally
17  incorporating the company or do you mean start
18  playing around with the idea?
19     Q.    Let's start with playing around with
20  the idea.
21     A.    Fall of 2017.
22     Q.    So about four years ago?
23     A.    I suppose that's what it would be.
24     Q.    Okay.  In an interview recently with
25  Drive Yeah, which is a podcast, you described the

1   spark of it as being -- coming seven years ago or
2   so from a relationship with a girlfriend.  Do you
3   remember talking about that?
4      A.    Yeah, I think that's an important
5   distinction to make.  I think that's when my
6   interest in coffee began, but not --
7      Q.    Okay.  You described it as the seed
8   of the idea.  So that's what you mean?
9      A.    Yeah.  I mean, I think to interpret
10  that as any motivation to start Drive or
11  anything, you know, in connection with the
12  company that Drive is now would be incorrect.
13  That's what sparked my interest in coffee.
14     Q.    Okay.  And then -- but so the idea
15  of actually creating a business incorporating
16  coffee and race cars, that started about four
17  years ago?
18     A.    That would be accurate.
19     Q.    Okay.  And actually you said fall of
20  2017, so to be fair, that would actually be about
21  three-and-a-half years ago.
22     A.    Yes.  Whatever that is.
23     Q.    Okay.  Where were you initially as
24  you were getting it started?  Was that in Denver
25  or were you located somewhere else?

1      A.    In Denver.
2      Q.    Okay.  And just going back -- just
3   looking at my notes here -- going back on the
4   question a couple of questions ago where I was
5   asking you about Macy's and retail locations, is
6   it also true that you did display and merchandise
7   at 7-Eleven in 2019?
8      A.    In one store, which was sort of a
9   rogue effort by somebody that wanted to become
10  involved in the company.
11     Q.    Okay.  Who was that somebody?
12     A.    Remmy Castillo.
13     Q.    And was that in Austin, Texas?
14     A.    That is correct.
15     Q.    Okay.  All right.  Where -- in what
16  states -- you mentioned, again, that Drive -- I
17  think you said Drive Coffee, Inc. was a Delaware
18  C corporation, so registered in Delaware.  Have
19  you registered the corporate entity in any other
20  jurisdictions?
21     A.    I believe we are registered in
22  Colorado.
23     Q.    As a separate corporation or just
24  registered as a Delaware corp in Colorado?
25     A.    A foreign entity.

1      Q.    A foreign entity.  Good.
2            Is there an entity also known as
3   Drive Coffee, LLC?
4      A.    That may exist.  It is not an entity
5   that's used.
6      Q.    Okay.  But if it exists, is it an
7   entity that you created or are you saying that
8   somebody else has?
9      A.    Yes, it is an entity that I created.
10     Q.    Okay.  But what you're telling me
11  right now is that your testimony here is that
12  it's not an active entity; it's not being used in
13  any way?
14     A.    That is correct, it is not being
15  used in any way.
16     Q.    Okay.  And what state was that
17  organized in, Drive Coffee, LLC?
18     A.    Colorado.
19     Q.    Okay.
20     A.    I believe.
21     Q.    And other than that LLC, which you
22  say is not active, and Drive Coffee, Inc., are
23  there any other corporate entities involved in
24  the business of Drive Coffee?
25     A.    We have another Colorado LLC now.

1    Q.    Okay.  What's that called?

2    A.    I believe it is called the Drive

3  Coffee Roasting Company or Drive Coffee Roasting.

4    Q.    And that's a Colorado company?

5    A.    LLC, yes.

6    Q.    Limited liability company.

7          And who are the members of Drive

8  Coffee Roasting, LLC?

9    A.    Drive Coffee, Inc.

10    Q.    It's the sole member?

11    A.    Correct, to the best of my

12  knowledge.

13    Q.    What percentage of Drive Coffee,

14  Inc. do you hold?

15    A.    I am unaware of what my exact

16  percentage is at this moment in time.

17    Q.    Do you believe you are majority

18  shareholder?

19    A.    I am not the majority shareholder.

20  I am the largest shareholder, but I do not own a

21  majority of the company.

22    Q.    Are there more than one class of

23  stock in Drive Coffee, Inc.?

24    A.    There is common and preferred stock.

25    Q.    Do both classes of stock have voting

1  rights?

2    A.    I'm not sure.

3    Q.    Which type do you own?

4    A.    I own common stock.

5    Q.    Who owns the preferred?

6    A.    Our investors.

7    Q.    Does Drive Coffee, Inc. pay

8  dividends to either common or preferred shares at

9  this time?

10    A.    We do not.

11    Q.    Have you ever -- has Drive Coffee,

12  Inc. ever paid dividends to common or preferred

13  shareholders?

14    A.    We have not.

15    Q.    Has Drive Coffee, Inc. been a C corp

16  since its inception?

17    A.    The original entity that was formed

18  early on was that Colorado LLC, but it was never

19  really used, and it was -- ultimately, all

20  business and fundraising was done through Drive

21  Coffee, Inc.

22    Q.    And has that entity, Drive Coffee,

23  Inc., been a C corp since its inception?

24    A.    It has.

25    Q.    Going back again, you said your

1  initial activities in the creation of Drive

2  Coffee were back in the fall of 2017.  What did

3  you do back then?  What -- what were the actions

4  you took to start the Drive Coffee business?

5    A.    Looking for designers to help me

6  come up with a design, learning about coffee,

7  doing industry research, learning about coffee

8  origins, roasting styles, trying to find a good

9  roaster for us at the time, as well as beginning

10  to look into how we could possibly fundraise to

11  raise capital to do this, looking into, you know,

12  potential -- other companies that were in the

13  market doing similar things or just trying to do

14  direct-to-consumer coffee.

15    Q.    This wasn't your first -- I think,

16  as we've discussed -- your first try at starting

17  a business.  You had started this -- you had

18  started other businesses before; is that correct?

19    A.    That is correct.

20    Q.    And -- so tell me about your

21  thinking around forming the LLC and then the

22  C corp.  Why did you do it that way?

23    A.    Because when I started the company,

24  I just needed something to operate out of that

25  would have a -- you know, some sort of legal

1  protection layer.  And forming a -- money was

2  tight back then, and I believe there was

3  something on Legal Zoom for -- I don't know --

4  100 bucks or whatever it was for a 24-hour

5  turnaround on an operating entity.  So that's

6  really --

7    Q.    That's how the LLC came to be?

8    A.    That is how the LLC came to be.

9    Q.    Okay.  Then what was your decision

10  process in deciding that you needed to then open

11  a C corp instead?

12    A.    That if we were going to raise money

13  and really become, you know, a real company,

14  then, you know, we would try and follow start-up

15  best practices and venture capital best

16  practices, which is a Delaware C corp.

17    Q.    Okay.  How did you learn start-up

18  best practices?

19    A.    I've consulted with attorneys and --

20  you know, again, this is not the first time I've

21  done this, and have received advice in the past.

22    Q.    Okay.  So when you formed the

23  C corp, did you do that paperwork yourself?

24    A.    No.  That was done through an

25  attorney.

1    Q.   Okay.  Who was that?
2    A.   It was a firm out in Palo Alto.  I
3 cannot recall exactly who it was.
4    Q.   Is that information that you would
5 be able to provide, given an opportunity to do
6 so?
7    A.   Yeah, I can try and dig it up for
8 you.
9    Q.   I'm not saying, like, in the next
10 minute.  I'm just saying, if we asked for it --
11    A.   I --
12    Q.   -- it isn't lost to the mists of
13 time.
14    A.   Yeah, I mean, if you want to wait
15 just a minute or two here, I can try and dig this
16 up for you.
17    Q.   Sure.  Let's take a second.
18    A.   It's a fairly well-known firm.  It's
19 Dorsey Whitney.
20    Q.   Thank you.  In Palo Alto?
21    A.   Yes.
22    Q.   And did they also take care of
23 getting the EIN for you for that entity, for the
24 new entity?
25    A.   I believe they did.

1    Q.   Okay.  And did you ever have a bank
2 account for Drive Coffee, LLC?
3    A.   I do not believe that I did.
4    Q.   Okay.  And did you personally open
5 the bank account -- the first bank accounts for
6 Drive Coffee, Inc.?
7    A.   I did.
8    Q.   Where are your --
9    A.   And our attorney's name was Adrian
10 Rich at Dorsey Whitney.  He is no longer with the
11 firm.
12    Q.   Thank you.  Where are Drive Coffee's
13 banking relationships currently?
14    A.   Bank of America.
15    Q.   Okay.  And have they always been
16 with Bank of America?
17    A.   Yes.  We had accounts with Silicon
18 Valley Bank, but they have not been used.
19    Q.   Okay.  And what kind of accounts do
20 you have with Bank of America?
21    A.   Checking account.
22    Q.   Just one?
23    A.   Just one.
24    Q.   Okay.  Line of credit with Bank of
25 America?

1    A.   We do not.
2    Q.   Did you -- did Drive Coffee, Inc.
3 acquire any funds through the payment -- Payroll
4 Protection Program, PPP?
5    A.   We did not.
6    Q.   In either round?
7    A.   In either round.
8    Q.   Has Drive Coffee, Inc. acquired any
9 funds through the economic -- through the EIDL.
10 I'm blanking on the acronym.  Economic impact --
11 damn it.  Hang on a second.  I'll get you the
12 actual acronym.
13    A.   I think -- I think I understand the
14 question.
15    Q.   Yeah, I just want to make sure --
16 it's actually for the court reporter.  The EIDL
17 program, which is E-I-D-L, economic injury
18 disaster loan.  Has Drive Coffee, Inc. acquired
19 any funds through that program?
20    A.   We have not.
21    Q.   Has Drive Coffee, Inc. acquired any
22 funding, loans or grants through any government
23 programs since its inception?
24    A.   We have not.
25    Q.   Okay.  Does Drive Coffee, Inc. have

1 accounts with the State Department of Revenue of
2 Colorado?
3    A.   Like, tax accounts?
4    Q.   Yeah, account numbers with the
5 Department of Revenue for the payment of taxes.
6    A.   That would be a question for my
7 attorneys -- or, sorry, for my accountants.  We
8 outsource all of our accounting and they take
9 care of everything for me.
10    Q.   Do you know if you've -- if Drive
11 Coffee, Inc. has applied for and/or received
12 account numbers from the Department of Labor of
13 Colorado?
14    A.   I believe so.  That would be a
15 question, however, for the -- both the
16 accountants as well as our -- one of our team
17 members that assists us with payroll and such.
18    Q.   To your knowledge, does Drive
19 Coffee, Inc. have an account with workers' comp
20 in Colorado?
21    A.   To the best of my knowledge, we do.
22    Q.   The same questions -- to your
23 knowledge, does Drive Coffee, Inc. have any
24 accounts with the Department of Revenue of any
25 other states than Colorado?

1    A.   We do not.

2    Q.   To your knowledge, does Drive

3 Coffee, Inc. have any accounts with the

4 Department of Labor for any states other than

5 Colorado?

6    A.   We do not.

7    Q.   And does Drive Coffee, Inc. have any

8 accounts with workers' comp of any states other

9 than Colorado?

10    A.   To the best of my knowledge, we do

11 not.

12    Q.   Now, you say that when you set up

13 the accounts with the Department of Labor that

14 that wasn't actually -- you did not specifically

15 do that?

16    A.   I did not do that.

17    Q.   Who runs your payroll?

18    A.   It's done through our accountants

19 and the assistance of a team member.

20    Q.   Who are your accountants?

21    A.   It is a called Simple Startup in

22 Boulder, Colorado.

23    Q.   And who is the team member that

24 assists them?

25    A.   Nick Fong, I believe.

1    Q.   That's N-I-C-K?

2    A.   Yes.

3    Q.   F-O-N-G?

4    A.   Let me see.  Yes, that's correct.

5    Q.   What's his role in the company?

6    A.   Senior accountant.

7    Q.   And is Nick Fong an employee of

8 Drive Coffee, Inc.?

9    A.   No.  He is an employee of Simple

10 Startup.

11    Q.   Okay.  I'm sorry.  I thought you

12 said Simple Startup in Boulder and a team member

13 of yours.  You meant a team member of Simple

14 Startup?

15    A.   Yeah.  No, sorry.  I thought you

16 were asking for -- who at Simple Startup.  No.

17 Our team member in Colorado is Alyssa Neumann.

18    Q.   And what's Alyssa Neumann's role

19 with Drive Coffee, Inc.?

20    A.   Essentially, she serves as -- well,

21 we call her executive coordinator now, but my

22 assistant, as well as assisting us with things

23 like payroll and whatnot.

24    Q.   Okay.  When did Alyssa start with

25 Drive Coffee?

1    A.   I believe three or four weeks ago.

2    Q.   Okay.  Who handled payroll for Drive

3 Coffee before that?  Who coordinated with Simple

4 Startup?

5    A.   I did.

6    Q.   Okay.  And how long has Simple

7 Startup been operating payroll for Drive Coffee?

8    A.   I still handle -- they're setting up

9 a new payroll system for us that's an a formal

10 payroll system.  Prior to that, I was handling

11 it.  They are -- I believe we hired them last

12 summer.  I'm not sure of the exact start date.

13    Q.   Okay.  But -- so you hired them last

14 summer, but you just stated that they're just now

15 setting up a new payroll system?

16    A.   That is correct.

17    Q.   Okay.  Before then, what were they

18 doing for you since last summer till just now?

19    A.   Sorry.  Can you repeat the question?

20    Q.   Sure.  Yeah.  So I'm just trying to

21 connect the timeline.  You said you hired Simple

22 Startup last summer, but they are only setting a

23 new payroll right now.  So between last summer

24 and right now, what have they been doing for

25 Drive?

1    A.   Handling all of our accounting.

2    Q.   Okay.  Just full -- full rep

3 accounting?  They're doing your accounts payable,

4 accounts receivable?  Like, what are they

5 actually doing for you?

6    A.   Bookkeeping and financial

7 statements.

8    Q.   Okay.  Are they CPAs?  Or do they

9 have CPAs?

10    A.   They have CPAs, that's correct.

11    Q.   Okay.  Do they prepare your tax

12 forms?

13    A.   Yes.

14    Q.   And just to be specific, do they

15 prepare your income taxes?

16    A.   For the company?

17    Q.   Yeah, for Drive.

18    A.   I believe that would be one of them.

19    Q.   Okay.  Are you familiar with what an

20 1120 is?

21    A.   No.

22    Q.   Okay.  Do they perform -- do they

23 prepare your payroll tax forms as well?

24    A.   As of right now, no, they do not.

25    Q.   Who has been preparing --

1    A.    Well, that -- I do not know.  I
2  don't know the answer to that question.  They are
3  preparing our tax filings for us.  I'm not sure
4  what all is involved in that.  I try to let them
5  run with what they need to do.
6    Q.    Up until recently, who has been
7  preparing the payroll tax forms, the 940, 941 or
8  944 forms?
9    A.    Those would be being prepared by
10 Simple Startup.
11   Q.    You said --
12   A.    I am not familiar with those forms,
13 but I assume they would be the ones handling it.
14   Q.    You said prior to recently that you
15 handled payroll yourself; is that right?
16   A.    I handled payment, yes.
17   Q.    Okay.  So how are you distinguishing
18 payroll and payment?
19   A.    We didn't use a formal payroll
20 system early on, so people were paid based on
21 submitting hours directly to me and receiving
22 payment for that.
23   Q.    How did you manage the withholding
24 and other tax requirements regarding those
25 payments?

1    A.    All of our team members have been
2  1099'd.
3    Q.    Okay.  Have you prepared 1099 forms
4  for all team members?
5    A.    They have not been fully prepared
6  yet, no.
7    Q.    Okay.  So from 2017 to today, you've
8  never issued a 1099?
9    A.    To the best of my knowledge, we have
10 not.  That's been one of the things that Simple
11 Startup was hired to catch us up on.
12   Q.    Okay.  When setting up accounts with
13 the Department of Labor, are you aware of
14 receiving any particular guidelines or resources
15 from them regarding how to make payroll payments,
16 how to onboard employees and that kind of thing?
17   A.    I am not aware of any of that.  We
18 have people that are handling that now and
19 getting us into good standing.
20   Q.    Are you aware yourself of having any
21 received any guidelines regarding the
22 classification of employees as independent
23 contractor employee -- versus employee?
24   A.    I am aware of differences between
25 employees and independent contractors.

1    MR. ANDERSON:  I'll just ask the
2  court reporter.  For me, you glitched during that
3  answer.
4    Court reporter, did you get that all
5  the way through.
6    (At which time the following was
7  read back:
8    "Answer:  I am aware of differences
9  between employees and independent contractors.")
10   MR. ANDERSON:  Okay.  Thank you.
11 BY MR. ANDERSON:
12   Q.    How did you become aware of the
13 differences between employees and independent
14 contractors?
15   A.    I've been aware for some time.
16   Q.    Okay.
17   A.    It's obviously been clarified by our
18 attorney, further clarified by our attorney in
19 the course of these events.
20   Q.    As we sit here today, what's your
21 understanding of the difference between an
22 independent contractor and an employee?
23   A.    An employee is someone who is
24 salaried and works for the company full-time.
25   Q.    Versus what for an independent

1  contractor?
2    A.    Goes up, you know, on a
3  predetermined schedule to the office with a, you
4  know, dedicated outline of, you know, tasks and
5  responsibilities.
6    Q.    Was that your understanding of it,
7  let's say, a year ago?
8    A.    I'd say a year ago my understanding
9  would be that an employee is someone that has
10 filled out their W-2 paperwork, has received and
11 signed an offer letter, is a full-time employee
12 that shows up to work at the company's physical
13 location every day.
14   Q.    How did you come to that
15 understanding that you had a year ago?
16   A.    I guess just basic knowledge.
17   Q.    Okay.  So in the past, when you've
18 described that you -- well, let me ask you this
19 first:  In the past, do you recall ever
20 describing that you pay people that work eight
21 hours a day in a warehouse $20 an hour to keep
22 the product going out the door?
23   A.    Sorry.  Can you repeat the question?
24   Q.    Yeah.  Do you remember describing
25 that Drive pays some people that work eight hours

1 a day in a warehouse $20 an hour to keep the
2 product going out the door? Do you recall
3 describing people working for Drive in that
4 manner?
5         A.   I do.
6         Q.   Okay.  And were those people
7 employees of Drive?
8         A.   Those people were contractors.
9         Q.   Okay.  At the time, you were
10 treating them as contractors?
11        A.   That is correct.
12        Q.   Okay.  In your current understanding
13 of the difference between an employee and a
14 contractor, would you still describe them as
15 contractors?
16        A.   Yes.
17        Q.   Why?
18        A.   Because they are not given
19 predetermined schedules.  They --
20        Q.   Are they -- I'm sorry.  I didn't
21 mean to interrupt you.  Please go ahead.
22        A.   They are given the autonomy to
23 decide when, how and where they do their work.
24 They have never received formal offer letters.
25 They have not filled out W-2s.  And they are not

1 salaried through any sort of payroll system.
2         Q.   So these people that work eight
3 hours a day in a warehouse, like, they do have to
4 do that work in the warehouse, right?  So they do
5 have to go to a specific location?
6         A.   They do not.  In fact, our team
7 members typically will often do quite a bit of
8 work from home, when and where they please, on
9 their own schedules.  So -- and I would say, too,
10 that as things at the company change, their
11 classification may also change with that.
12        Q.   Sure.  But I just want to make sure
13 I understand who we're talking about.  Like, when
14 you were talking -- when you had previously
15 discussed people that work eight hours a day in a
16 warehouse for $20 an hour to keep the product
17 going out the door so the business doesn't shut
18 down, what were those people actually doing?
19        A.   Those people would be handling our
20 backlog of orders and --
21        Q.   What do you mean by handling?
22        A.   -- would help package boxes.
23        Q.   Oh.  Package boxes.  Okay.
24        A.   Sure.  Yeah.
25        Q.   And what else?

1         A.   I mean, their work was primarily
2 around that.
3         Q.   Okay.  And those boxes were, in
4 fact, at a warehouse were they not?
5         A.   Correct.  But employees have from
6 time to time taken their work home and done it
7 from home.
8         Q.   And they can come and go into the
9 warehouse as they please?
10        A.   Yes.
11        Q.   Do you provide keys or a means of
12 access, I guess?  These days we have --
13        A.   Yeah.  They have means of access.
14        Q.   Okay.
15        MS. NOBLES:  Christopher we've been
16 going for almost an hour here, so I am going to
17 request a break when you come to a stopping point
18 if you have one close.
19        MR. ANDERSON:  I do, yeah.  If it's
20 all right, I can go about another three minutes
21 or so and then we'll hit a good spot.
22        MS. NOBLES:  Yeah, that would be
23 perfect.
24        MR. ANDERSON:  Fantastic.
25 BY MR. ANDERSON:

1         Q.   In connection with setting up Drive
2 Coffee, Inc., did you rent any office or
3 commercial space?
4         A.   I did.
5         Q.   Where was that?
6         A.   Well, let me be clear.  That was not
7 at the time of setting up the company that we
8 have rented commercial space.  It was much
9 further down the road.
10        Q.   Okay.  Yeah.  So let's go with that.
11 When was that?
12        A.   I believe we signed our lease in
13 February or March of 2019, to the best of my
14 knowledge.
15        Q.   That's fine.
16        A.   Approximately around then.
17        Q.   And is that the same location you
18 have now?
19        A.   Correct.
20        Q.   And where is that, again?  Just -- I
21 think you've given the address, but if you don't
22 mind --
23        A.   3801 Race Street, Denver, Colorado,
24 80205.
25        Q.   I've just got to ask.  Did you

1 actually find a place on Race Street or did you
2 name it Race Street just for Drive Coffee, Inc.?
3      A.   We happened to find a place that was
4 actually on Race Street.  And that was a big
5 motivation to getting the space locked down.
6      Q.   Fantastic.  In connection with
7 building Drive from the inception till today,
8 have you purchased any software packages or
9 software programs to help run the business?
10      A.   Yes.
11      Q.   What kind of software have you
12 purchased?
13      A.   Google apps, Shopify, e-mail
14 marketing platforms.  There was a whole host of
15 apps within Shopify that we use, but I'm not
16 aware of everything that we use.  It's handled by
17 somebody else.
18      Q.   Who handles that?
19      A.   His name is Niko.
20      Q.   N-I-K-O?
21      A.   Correct.
22      Q.   And what's his last name?
23      A.   Kavallar, K-A-V-A-L-L-A-R.
24      Q.   What is Niko Kavallar's role with
25 the company?

1      A.   He handles our technology needs.
2      Q.   And is he located in Denver?
3      A.   He is.
4      Q.   Okay.  And is he an employee of
5 Drive?
6      A.   No, he is not.
7      Q.   How -- has he been also paid as a
8 contractor?
9      A.   He has not.
10      Q.   He is not paid -- is he compensated
11 in any way?
12      A.   He received stock right around when
13 the company was formed.
14      Q.   Okay.  So he's received stock early,
15 but -- and has continued work without any further
16 compensation; is that correct?
17      A.   Yes.  He has received some
18 compensation that's essentially been paid out as
19 bonus.
20      Q.   Okay.  How much --
21      A.   Well, I shouldn't say that.  It has
22 not been formally classified yet, so that's one
23 of the things that we will be going through with
24 our accountants.
25      Q.   How much has --

1      A.   But he received no cash payments
2 until, I believe, 2020.
3      Q.   How much has he been paid?
4      A.   I'm not sure what that number is.  I
5 would estimate it to be around $20,000.  He was
6 short $10,000 on the down payment for a house he
7 and his wife were trying to purchase, their first
8 home.  So we gave him $10,000 so he could meet
9 the down payment on his house.
10      Q.   To your knowledge, is Niko employed
11 elsewhere?
12      A.   Niko is employed elsewhere.
13      Q.   In connection with the start-up of
14 Drive, did you purchase any coffee-related
15 equipment?  Let me just leave it at that.
16      A.   I don't understand the question.  I
17 mean, was equipment purchased, you know,
18 literally at the time that we formed or since the
19 company has been formed?
20      Q.   Since the company has been founded,
21 have you purchased any coffee-related equipment,
22 whether it be roasting, grinding, preparation,
23 packaging or anything else related to your
24 product?
25      A.   Well, yes, we are coffee business so

1 we have purchased coffee equipment.
2      Q.   I asked -- I mean, you could
3 outsource all of that, right?  So I don't know if
4 you bought the equipment or not.  So your answer
5 is yes, you have?
6      A.   Yes, we have.
7      Q.   Okay.  And in connection with that,
8 have you acquired any financing on that
9 equipment?
10      A.   To the best of my knowledge, none of
11 our equipment is financed right now.
12      Q.   To the best of --
13      A.   We have certainly not gotten any
14 financing directly related to our equipment.
15      Q.   Okay.  So would that be fair to say
16 then that, to the best of your knowledge, there
17 are no UCC liens on any equipment at Drive?
18      A.   To the best of my knowledge, that
19 would be correct.
20      Q.   Okay.
21           MR. ANDERSON:  That's a good
22 stopping point, Ms. Nobles, if that's okay with
23 you.
24           MS. NOBLES:  Yeah, that's good.
25 Thank you.

Page 58

1      MR. ANDERSON:  How long are you
2  requesting?
3      MS. NOBLES:  Let's do ten minutes.
4      MR. ANDERSON:  Very good.  Ten -- is
5  that all right with you?
6      MS. NOBLES:  Is that okay with you,
7  Alex?
8      THE WITNESS:  That's fine with me.
9      MS. NOBLES:  Okay.
10     (Whereupon, a break was taken.)
11 BY MR. ANDERSON:
12     Q.   When we left, we had been talking
13 about equipment, whether there were UCC loans.
14 You had said no.  Did you acquire any funding to
15 purchase this equipment?  What was the sources of
16 funding to purchase this equipment?
17     A.   It all depends which equipment you
18 are talking about.
19     Q.   In this circumstance, we're talking
20 about the coffee manufacturing, packaging,
21 roasting, grinding, whatever equipment you did
22 buy.  Were these funded out of revenues?  Were
23 they funded out of investments?  A combination?
24     A.   We've made so many purchases related
25 to coffee equipment, it just -- it's impossible

Page 59

1  to generalize.  And every single thing is
2  different.  And to the best of my knowledge, I
3  don't recall exactly where the funds came from
4  each time we have made a purchase.
5      Q.   Okay.  Let's just start with the
6  initial purchases, then.  The first purchases of
7  any equipment, where did that funding come from?
8      A.   I can't answer that question if I
9  don't know what equipment you're talking about.
10     Q.   All right.  Well, let's see if you
11 can help me with that.  What's the first piece of
12 equipment you bought?
13     A.   I do not recall.
14     Q.   Okay.  Then that will make it hard.
15 When do you think you started buying equipment
16 for Drive?
17     A.   Equipment for Drive or coffee
18 equipment?
19     Q.   Coffee equipment for Drive.  Let's
20 start there.
21     A.   2018.
22     Q.   Okay.  And you don't recall what the
23 first piece of equipment or pieces of equipment
24 you would have bought in 2018 would have been for
25 coffee?

Page 60

1      A.   I do not recall.  I mean, what are
2  we classifying as coffee equipment?  I mean, we
3  bought shelves from Home Depot to store things
4  on.  So...
5      Q.   Let's say anything involved in the
6  production -- we'll skip storage -- production
7  and packaging of the coffee.  So let's stick with
8  roasting, grinding, packaging of coffee.
9      A.   Packaging, does that include, you
10 know, raw inventory?
11     Q.   If you repackage it, then yes; if it
12 comes in the packaging, then no.
13     A.   So do you want me to include beans,
14 green beans?
15     Q.   Again, did you repackage green
16 beans?
17     A.   Well, we roast coffee and package
18 it.
19     Q.   Okay.  So whatever you use to
20 package it, like, what's the first piece of
21 equipment you bought involved in packaging,
22 roasting, grinding or producing the coffee beans?
23     A.   I mean, we don't sell ground coffee.
24     Q.   So no grinding.
25     A.   And we contracted with someone to

Page 61

1  roast our coffee.
2      Q.   So no roasters.
3      A.   Pardon?
4      Q.   So no roasters.  You didn't buy any
5  roasters?
6      A.   Not until much later in the
7  business.
8      Q.   Okay.  So pretty much it would be
9  packaging then?
10     A.   Yeah.  And packaging, there is no
11 equipment that does it.  It's all done by hand.
12     Q.   Okay.  All right.  Are you an
13 employee of Drive?
14     A.   I would need to check with my
15 accountants on my exact classification as of
16 right now.
17     Q.   Have you received a W-2 from Drive
18 yourself?
19     A.   I have not.
20     Q.   Have you completed a W-4 for Drive
21 yourself?
22     A.   I have not.
23     Q.   But you are not certain at this
24 moment in time whether you are, in fact, an
25 employee for Drive?

1    A.   No.  We're doing a lot of cleanup
2  right now with our accounting and with other
3  outside consultants that are helping us get
4  things in order.
5          And, you know, in the process of
6  getting everything into good standing, I am not
7  sure how I will be classified.
8    Q.   Okay.  So -- but up until recently,
9  you have not been an employee of Drive Coffee?
10   A.   I'm not comfortable answering that
11 question because I know that there are specific
12 classifications related to CEOs and founders in
13 start-ups, and I want to consult with our
14 advisors, attorneys and accountants on how I will
15 be classified since we are in the process of
16 bringing everything into good standing and caught
17 up.
18   Q.   Okay.  I understand that you are
19 trying to get everything in good standing going
20 forward.  My question was, going backward, in the
21 past -- sorry about the blurriness there; I don't
22 know what happened -- in the past, have you
23 considered yourself to be an employee of Drive
24 Coffee?
25   A.   I haven't put much thought to how I

1  refer to myself.  My thought goes into getting
2  the work done and trying to move the company
3  forward and ensure that the company is also in
4  good legal standing.
5    Q.   Have you ever received a W-2 from
6  Drive Coffee?
7    A.   I believe you just asked me that
8  question, and no, I have not.
9    Q.   Okay.  And I'm just making sure
10 that -- I don't think I used the word "ever"
11 before.
12   A.   Okay.
13   Q.   And so during its existence, have
14 you ever completed a W-4 for Drive Coffee?
15   A.   I have not.
16   Q.   Okay.  And have you completed your
17 personal taxes for the year 2020 yet?
18   A.   I have not.
19   Q.   Have you completed your personal
20 taxes for the year 2019 yet?
21   A.   I have not.
22   Q.   Okay.  Have you completed your
23 personal taxes for the year 2017 or 2018 yet?
24   A.   I have not.
25   Q.   Okay.  And by "completed," I mean,

1  you know, submitted any forms regarding those
2  taxes, any 1040s to the IRS, whether subject to
3  revision or not.
4    A.   I understand.
5    Q.   Okay.  And the answer is still that
6  you have not?
7    A.   The answer is I have not.
8    Q.   Okay.  Have you received a W-2 or
9  1099 -- in the years 2017, '18, '19 or '20, have
10 you received a W-2 or 1099 from any other company
11 other than Drive Coffee, Inc. or Drive Coffee,
12 LLC?
13   A.   I received a W-2 from Altvia
14 Solutions.
15   Q.   What years did you receive that?
16   A.   During the years that I was employed
17 there.
18   Q.   So -- and we established earlier you
19 said that you left Altvia in 2017?
20   A.   Correct.
21   Q.   Okay.  So in the years 2015, '16 and
22 '17 you did get W-2s from Altvia?
23   A.   That is correct.
24   Q.   With the exception of Altvia, then,
25 have you received W-2s or 1099 from any other

1  company -- withdrawn.
2          Have you received a W-2 -- since
3  Altvia, have you received a W-2 from any other
4  company at all?
5    A.   I have not.
6    Q.   Okay.  Have you received a 1099 --
7  since leaving Altvia, have you received a 1099
8  from any company at all?
9    A.   I have not.
10   Q.   Okay.  Have you received any
11 monetary compensation from Drive?
12   A.   I have.
13   Q.   Okay.  In what forms did you receive
14 that compensation?
15   A.   In payments from the company.
16   Q.   Okay.  Cash payments?
17   A.   That is correct.
18   Q.   And when --
19   A.   I assume you're -- not literal cash,
20 correct?
21   Q.   Cash or check, yeah, but not in kind
22 in any way, not -- you received money payments,
23 not stock, not options.  I'll ask about those
24 separately.  This question has to do with money
25 payments.

1    A.    Yes.
2    Q.    Okay.  Do you -- are you able to
3  tell me how much in each year, 2017 through
4  today, you've received in -- monetary
5  compensation from Drive?
6    A.    I do not know that number.
7    Q.    Okay.  Do you know what the total
8  number is?
9    A.    I do not know that number.
10    Q.    How much would you say you've
11  received from Drive in the past year?
12    A.    I do not know that number.
13    Q.    Would you be able to get that
14  number?
15    A.    Eventually.
16    Q.    Where would you get it?
17    A.    Through our accountants.
18    Q.    And by "our accountants" would you
19  mean Simple Startup in Boulder?
20    A.    That's correct.
21    Q.    Okay.  They would be able to
22  calculate that number for the years 2017 through
23  today?
24    A.    We are in the process of calculating
25  that.

1    Q.    Very good.
2          Would you require any other source
3  other than Simple Startup to obtain that number?
4    A.    To the best of my knowledge, they
5  have everything they need to calculate that
6  number.
7    Q.    Very good.
8          How many employees are on Drive
9  payroll today?
10    A.    We don't have employees.
11    Q.    Has Drive ever had an employee on
12  Drive payroll through today?
13    A.    We have not.
14    Q.    Okay.  When did you hire the first
15  person who did work for Drive specifically?  Not
16  using the word "employee," since you said you
17  don't have any, when did you obtain the services
18  of somebody to work for Drive for the first time
19  other than yourself?
20    A.    Can you define "work for Drive"?
21    Q.    Perform any services to the benefit
22  of Drive.
23    A.    I do not recall when the first time
24  we hired somebody is, or when the first time we
25  have paid anybody for services.

1    Q.    What would you need to refer to in
2  order to answer that question?
3    A.    Bank or credit card records.
4    Q.    And would those all be -- would
5  Simple Startup have all the information that is
6  necessary to answer that question?
7    A.    I'm not sure that they would.
8    Q.    So your own personal -- what bank
9  and credit card records are you talking about
10  that would be needed to answer that question?
11    A.    I am not sure, you know, what I
12  would have to go back to find that.  I mean,
13  we've -- I mean, we paid a roasting company to
14  roast for us, I would say, in 2017.
15    Q.    More discussing individuals, because
16  that would be a commercial relationship.
17    A.    Oh, individuals?  Then that would
18  probably be February of -- well, probably
19  December of 2018.
20    Q.    Who would that be?
21    A.    I don't recall their names.  We had
22  some short part-time day labor come in to help
23  package some coffee.
24    Q.    How would you have paid them?  In
25  what method?  Cash, check, money order?

1    A.    Cash, check, something like that,
2  yeah.
3    Q.    Okay.  And so your banking
4  records -- you said you've been with Bank of
5  America the whole time.  Those banking records
6  should include the payments to those people?
7    A.    I'm not entirely sure because
8  requests, you know, could have been sent through
9  other areas, but...
10    Q.    By "other areas," do you mean, like,
11  some sort of electronic payment facility, like
12  PayPal, Venmo, Zelle, those kind of things?
13    A.    Something like that.  It could be --
14    Q.    Do you have access to the records of
15  PayPal, Zelle, whatever other payment platforms
16  you've used in the past?
17    A.    Yes.
18    Q.    Okay.  Would those hat have been
19  accounts -- personal accounts or would those have
20  been accounts held by Drive?
21    A.    I believe that everything during
22  that month of December was cash.
23    Q.    Okay.
24    A.    But I don't want to give you a
25  definitive answer in the, you know, interest of

1  being, you know, 100 percent truthful.
2      Q.    So as of December 2018, going into
3  2019, did you begin paying in a different way?
4      A.    I do not recall, you know, exactly
5  how we paid, but yes, I believe, you know, we've
6  paid people using Venmo and PayPal as well.
7      Q.    Okay.  And would those be your
8  accounts or Drive's accounts or somebody else's
9  accounts?
10     A.    Some accounts have merged, but I
11 believe it would be through my account.
12     Q.    Do you have access to those accounts
13 still today?
14     A.    I do.
15     Q.    So if we asked you to go back and
16 find that information, you would be able to do
17 that?
18     A.    I could go back as far as the
19 application allows me.
20     Q.    What steps, if any, have you taken
21 during the existence of Drive to make sure that
22 Drive was in compliance with all applicable laws
23 relating to employees?
24     A.    I mean, we have now hired an
25 employment attorney to assist us.

1      Q.    And prior to that?
2      A.    We had a corporate attorney.
3      Q.    And did the corporate attorney --
4  without telling me anything the corporate
5  attorney said, did the corporate attorney advise
6  you on the topic of compliance with applicable
7  laws relating to employees?
8      A.    No.
9      Q.    Okay.  Did you seek any other advice
10 from the Department of Labor or -- of the State
11 of Colorado or the federal government or any
12 other sources to determine --
13     A.    No.
14     Q.    -- whether you were in compliance?
15     A.    No.
16     Q.    Okay.  Does Drive own any vehicles?
17     A.    No.
18     Q.    And do you own any vehicles that are
19 used by Drive for Drive's business?
20     A.    I own a vehicle that I have used for
21 work-related tasks, yes.
22     Q.    But you consider that your personal
23 vehicle?
24     A.    Yes, and it is registered in my
25 name.

1      Q.    Okay.  So no trucks, no boats, no
2  airplanes, no other vehicles are used by Drive,
3  whether owned by Drive or not?
4      A.    No.
5      Q.    Okay.  Are all shipments made by
6  Drive through a common carrier?
7      A.    What do you mean by a common
8  carrier?
9      Q.    Sure.  When Drive makes shipments,
10 do you use commercial shipping companies, like
11 UPS, FedEx, United States Postal Service,
12 et cetera?
13     A.    Yes.
14     Q.    You don't have -- you don't deliver
15 anything yourself?
16     A.    We do not deliver anything
17 ourselves.
18     Q.    Okay.  So --
19     A.    There's been -- there's been one
20 case where, you know, we've rented a truck to
21 deliver some stuff to wholesale customers.  But
22 no, at scale or anything other than once or twice
23 when something has been -- had to have been taken
24 from point A to point B, no, there is no fleet.
25     Q.    Okay.  Other -- well, let me ask it

1  this way:  Who are the officers of Drive Coffee,
2  Inc.?
3      A.    To the best of my knowledge, I am
4  only officer.  Our attorney may be
5  technically considered a secretary, but to the
6  best of my knowledge, I am the only officer at
7  Drive.
8      Q.    Okay.  Does Drive have a board of
9  directors?
10     A.    Yes.
11     Q.    Okay.  Who are the directors of
12 Drive?
13     A.    Me.
14     Q.    Okay.  So the board of directors has
15 a population of one?
16     A.    Again, I believe there is a
17 secretary which counts as being on the board of
18 directors, which I believe is held by our
19 attorney.  But yes, other than myself and the
20 attorney, that's it.
21     Q.    Did you elect yourself chairman?
22     A.    I was put down as the chairman when
23 the company was formed.
24     Q.    Okay.  Who are the shareholders of
25 Drive Coffee?

1      A.   At what point in time?
2      Q.   Today.
3      A.   We have multiple shareholders in
4  Drive.
5      Q.   How many?
6      A.   I don't know off the top of my head.
7      Q.   Okay.  What would you have to refer
8  to to answer this question?
9      A.   A cap table.
10      Q.   Okay.  Do you have access to a cap
11  table?
12      A.   I do.
13      Q.   Okay.  Would you mind referring to
14  it in answering the question?
15      A.   I mean, it would take me some time
16  to reconcile where we're at.  But I would say
17  there's probably at least 35 shareholders.
18      Q.   Would you be able to tell me the top
19  ten shareholders by percent of ownership?
20      A.   As a matter of habit, we do not
21  disclose our -- publicly disclose our
22  shareholders.
23      Q.   I understand.  That makes sense.
24  However, in this deposition, I am requesting that
25  you provide the names of the top ten

1  shareholders.
2           THE WITNESS:  I mean, Lisa, is this
3  something we have to provide?  Because we just
4  don't disclose that.
5           MS. NOBLES:  I understand.  You
6  know, I think that you do need to provide it.
7           I think that we can have a
8  discussion separately, Christopher, about the use
9  of that information and, you know, keeping it
10  confidential and not being part of a public
11  record.  And, you know, we may have to file a
12  motion for protective order to keep it
13  confidential.
14           But you do need to answer the
15  question.
16           THE WITNESS:  Okay.  Top ten
17  shareholders are myself, Stockholm Design, Inc.,
18  Jim Bauer (phonetic) and Roslyn Ramacciato.
19  That's one entry.
20  BY MR. ANDERSON:
21      Q.   So those are held jointly?
22      A.   Yes.
23      Q.   Could you please spell that?
24  Roslyn...
25      A.   R-O-S-L-Y-N, R-A-M-M-A-C-I-A-T-O

1  [sic].
2      Q.   Okay.
3      A.   Daniel Berg.  Michael Danner.
4  Jonathan Lloyd Jones --
5      Q.   Can you spell that last name?  I'm
6  sorry.  Michael...
7      A.   D-A-N-N-E-R.
8      Q.   Okay.
9      A.   Jonathan Lloyd Jones.
10      Q.   I think that's six.
11      A.   Robert Allen.  Jonathan Lee.
12      Q.   Is that L-E-E?
13      A.   Correct.
14      Q.   Okay.
15      A.   Sarah Jilla.
16      Q.   And how do you spell Jilla?
17      A.   J-I-L-L-A.
18           And Eugene Bayani.
19      Q.   Is that B-I-O-N-E?
20      A.   B-A-Y-A-N-I.
21      Q.   Wow, I didn't even come close.
22           Okay.  I think that's ten.  Thank
23  you.
24           And upon request, just -- I don't
25  want to eat the deposition time or have you look

1  for that, but upon request, you would also be
2  able to provide the addresses for these people;
3  is that correct?
4      A.   Upon request.
5      Q.   Yes.  But, I mean, you wouldn't have
6  any -- there is no obstacle to you providing that
7  other than if your attorney has an objection to
8  you doing so?
9      A.   Yeah, other than confidentiality.
10      Q.   Okay.  But you have the information.
11  I just want to be absolutely clear.
12      A.   I don't have that information
13  offhand for all these people, no.
14      Q.   Who does?
15      A.   I mean, we would have to get it from
16  them.
17      Q.   How do you contact these people?
18      A.   By phone or by e-mail.
19      Q.   Okay.  So you have the e-mail
20  addresses for all and phone for all?
21      A.   I do.
22      Q.   Okay.  All right.  Does Drive own
23  interest in any other corporations?
24      A.   No.
25      Q.   Other than Drive, LLC.  I think you

1  said it is a member of Drive --
2      A.   Yes.  Other than that, yes.  That's
3  the only one that we...
4      Q.   And other than Stockholm Design,
5  Inc., are you aware of any shareholders that are
6  corporate entities, shareholders in Drive?
7      A.   Yes, various people have used LLCs
8  and whatnot.
9      Q.   In this top ten list that you gave
10  me, are any of those through LLCs?
11      A.   Yes.  Jonathan Lee.
12      Q.   Okay.  And are you aware of what
13  state that LLC is incorporated in?
14      A.   I am not.
15      Q.   Okay.  And is the name of the LLC
16  Jonathan Lee, LLC, or is there a different name?
17      A.   There is a different name.
18      Q.   Can you tell me the name of the LLC,
19  please?
20      A.   I don't know it off the top of my
21  head.
22      Q.   Okay.  Would you be able to get that
23  information upon request?
24      A.   I would be able to get that
25  information.

1      Q.   I'm sorry.  You said yes, you would
2  be?
3      A.   I would be.
4      Q.   Okay.  Excellent.  Thank you.
5          All right.  Earlier you said you are
6  not too big on titles.  You described yourself as
7  the CEO and founder of Drive, and I understand
8  that.  But -- so how would you describe your
9  roles?  Like, what do you do for Drive on a
10  day-to-day basis right now?
11      A.   I manage fundraising.  I manage
12  partnerships.  I manage our advertising efforts,
13  marketing efforts, inventory purchasing, accounts
14  payable, accounts receivable, investor relations.
15      Q.   Okay.  Do you have the authority to
16  hire people?
17      A.   I do.
18      Q.   Do you have the authority to fire
19  people?
20      A.   I believe I do.  And I should say
21  that I -- I mean, believe that I have the
22  authority to hire people as well.  I guess I
23  should quadruple-check that, but I believe I do.
24  And I believe the authority to fire as well.
25      Q.   And, I mean, in the past -- I

1  understand you say you have not had any
2  employees -- first of all, let me confirm that.
3  Your statement is that you've never had any
4  employees for Drive?
5      A.   That is correct.
6      Q.   Okay.  But people who have done work
7  for Drive, whether compensated or not, you have
8  been person to hire them?
9      A.   That is correct.
10      Q.   Okay.  And --
11      A.   You know, to confirm a working
12  relationship in whatever context it was in.
13      Q.   Got it.  And have you had the
14  occasion to terminate a working relationship with
15  anybody during the time of Drive?
16      A.   Yes.
17      Q.   Okay.  And has that been something
18  that you have yourself done, terminated those
19  relationships?
20      A.   Yes.
21      Q.   For people that have performed
22  services that you have not considered to be
23  employees but have done services for Drive that
24  have been compensated, have you been the person
25  to determine how much they are compensated?

1      A.   Yes.
2      Q.   Okay.  And do you believe that you
3  have the authority to set rates of pay going
4  forward?
5      A.   Yes.
6      Q.   Are you a signatory -- you said
7  there is only one bank account with Bank of
8  America; is that right?
9      A.   That is correct.
10      Q.   And are you a signer on that
11  account?
12      A.   I am.
13      Q.   Are there any others?
14      A.   Yes.
15      Q.   Who are the other signers?
16      A.   Alyssa Neumann as of, basically, one
17  week ago.
18      Q.   Okay.  Yeah, because you said she
19  started in March?
20      A.   Somewhere around then, correct,
21  yeah.
22      Q.   Okay.  Has the company -- withdrawn.
23          During the time from the
24  inception -- the formation of Drive till today,
25  has the company filed any taxes with the federal

1  or state governments?
2       A.   They are in the process of being
3  filed.
4       Q.   So up until now, have any been
5  filed?
6       A.   No.
7       Q.   Okay.  So the next question I was
8  going to ask, who signed them?  And -- they
9  haven't been filed, so that's not relevant; is
10  that correct?
11       A.   That's correct.
12       Q.   Okay.  Do you have authority to
13  enter into contracts on behalf of Drive?
14       A.   I do.
15       Q.   And you have the authority to
16  terminate contracts on behalf of Drive?
17       A.   I do.
18       Q.   Okay.  And do you have the authority
19  to direct the activities of people who do perform
20  services for Drive?
21       A.   Can you clarify what you mean?
22       Q.   Sure.  So you've said that there are
23  people that have performed various services for
24  Drive.  I think we've talked about people who
25  package things, we have talked about people who

1  have done -- I forget what other work -- software
2  work.  Various people who have performed services
3  as individuals for Drive, have you told them what
4  to do so that they knew what to do for the
5  company?
6       A.   Generally, people decide on their
7  own how to handle, you know, whatever the
8  relationship requires at the time.
9       Q.   Sure.  How to handle it, certainly,
10  but I'm saying, what to do.  So, I mean, you
11  don't just say, hi, welcome aboard, go do
12  something.
13       A.   I don't understand what you're
14  asking.
15       Q.   All right.  Let's -- I am going to
16  hold that and we'll talk about specific people
17  here in a moment.
18            Who has administrative access to
19  Drive -- the Drive Coffee URL, the website?
20       A.   Niko.
21       Q.   And Niko -- what was Nick's last
22  name again?
23       A.   Kavallar.
24       Q.   Right.  So Niko Kavallar, he is for
25  instance, a person that does some work for Drive,

1  correct?
2       A.   Correct.
3       Q.   And would you describe again what
4  work he does for Drive?
5       A.   Technology/administrative tasks.
6       Q.   Okay.  So for instance, if you want
7  to make a change to the hosting of where Drive
8  is, would Niko be the person to do that?
9       A.   That is correct.
10       Q.   And who would tell him to do that?
11       A.   I would.
12       Q.   Okay.  That's what I meant by direct
13  the activities of individuals working for Drive.
14  You'd tell him to go change it -- you are not
15  going to tell him everything about how, because
16  that's why you hired him, but you would tell him
17  that needs to be done, correct?
18       A.   Well, I've never hired Niko.
19       Q.   Understood.  You have occasion to
20  agree with Niko to do work on behalf of Drive,
21  and you've already described that he's not been
22  paid, but he had to get some stock.  I understand
23  all that.  But I'm saying, as far as the work
24  that he does, you've directed those activities?
25       A.   From time to time, depending on

1  which time you're talking about.
2       Q.   Is there anybody else who directs
3  his activities?
4       A.   Yes.
5       Q.   Who else directs his activities?
6       A.   I'm not sure of everyone that's
7  given direction to Niko before, but I'm sure
8  there's other people that have asked Niko for
9  help.
10       Q.   I will understand that the answer is
11  not comprehensive, but who else do you believe
12  has given Niko instructions?
13       A.   Probably Sarah Mortzfield.
14       Q.   Okay.  Anybody else?
15       A.   Probably her.  I mean, anybody could
16  have asked him for something.  I'm just unaware
17  of who all has asked Niko for things from time to
18  time.
19       Q.   Okay.  So you're certain that she
20  has, and possibly other people have as well?
21       A.   Yes.
22       Q.   Who has administrative access to the
23  e-mail -- well, first of all, I believe you said
24  that the e-mail address Drive -- that's just a
25  messy question.

1    What is the URL of the e-mail for
2    Drive?  What's after the "at" symbol?
3         A.    DriveCoffee.com.
4         Q.    Okay.  Do you -- and where -- is
5    that hosted -- is that a Google account or where
6    is that hosted?
7         A.    I believe so.
8         Q.    Okay.  Do you have administrative
9    access to that account?
10        A.    I do not go in there, no.
11        Q.    I didn't ask if you did go in there,
12   but do you have administrative access?
13        A.    I believe I have access.  I don't
14   know because I don't do anything in the e-mail.
15        Q.    And is that also -- would be that --
16   would that also be Niko?
17        A.    That's Niko who handles that.
18        Q.    And so, for instance, when there is
19   a request that no e-mails be destroyed in that
20   e-mail account, does that instruction go to Niko?
21        A.    Yes.
22        Q.    Okay.  Do people that perform
23   services for Drive consider you to be their boss?
24        A.    I don't ever refer to myself as the
25   boss.  I believe people see me as the CEO of

1    Drive.
2         Q.    I believe Drive has listed somebody
3    else as president of Drive; is that true?
4         A.    Not to my knowledge.
5         Q.    Okay.  Who do you consider to be the
6    president of Drive?
7         A.    It would be me, if anyone.
8         Q.    Okay.  All right.  Let's find out
9    who actually is there doing stuff.  I understand,
10   again, that you do not consider anybody to be
11   employees at this moment in time.  But who is
12   doing services and work -- and/or work for Drive?
13   We'll start with you.  So you, Alex, are CEO and
14   possibly president and founder.  Who else is on
15   the team?
16        A.    At what point in time?
17        Q.    Today.  We'll start with today.
18        A.    Sarah Mortzfield.
19        Q.    Okay.  And that is
20   M-O-R-T-Z-F-I-E-L-D?
21        A.    That is correct.
22        Q.    And what do you consider Sarah's
23   role to be?
24        A.    Coffee roaster.
25        Q.    Okay.  And do you compensate Sarah

1    in any way?
2         A.    Sarah is compensated.
3         Q.    How is she compensated?
4         A.    Through payments.
5         Q.    That is what compensated means.  How
6    is she paid?
7         A.    I mean, we'll send her money through
8    any one of a number of ways.
9         Q.    Okay.  A certain amount of money on
10   a regular basis?  Ad hoc?  Whenever you feel like
11   it?  What is the -- like, how often is she paid?
12   How much is she paid?
13        A.    She bills me generally every two
14   weeks.
15        Q.    So she actually sends you invoices?
16        A.    Yes.
17        Q.    And then on what terms do you pay
18   those invoices?
19        A.    Generally, as they're received.
20   Some days it takes a few extra days for there to
21   be money in the account to be able to pay her,
22   but generally it's, you know, I'd say -- it's
23   fair to say that she's generally paid within
24   seven days of submitting her invoice.
25        Q.    To your knowledge, does she perform

1    services for any other companies?
2         A.    To my knowledge, she does not.
3         Q.    Okay.  She lists herself as director
4    of coffee.  Would you agree with that description
5    of her role?
6         A.    I've given people the autonomy to
7    call themselves whatever they want.
8         Q.    Would you agree with that
9    description of her role?
10        A.    I'd say that's an accurate
11   description of some of the services she performs
12   for us.
13        Q.    And you said -- you describe her as
14   coffee roaster.  Is that the only service she
15   provides for Drive or does she do other things
16   for Drive?
17        A.    She has done other things from time
18   to time.
19        Q.    What other things has she done from
20   time to time?
21        A.    Provided suggestions on coffees to
22   acquire.
23        Q.    What else?
24        A.    Serve coffee during in-person
25   functions.

1    Q.   Anything else material?
2    A.   At some point she would help with
3  the shipping of product.
4    Q.   Okay.  When she bills you, does
5  Sarah Mortzfield charge for time?  In other
6  words, does she bill you a certain amount per
7  hour or does she just bill you a set amount or --
8  on what basis does she bill you?
9    A.   It depends on the invoice.
10 Generally, it would be invoiced for time.
11   Q.   Okay.  And what rate per hour does
12 she invoice?
13   A.   To be honest, I don't recall her
14 rate.  I believe $30 an hour.
15   Q.   And do you have possession and
16 access to these invoices should we request them?
17   A.   I have access to them, yes, I
18 believe so.
19   Q.   Okay.  All right.  So we've got one.
20 You and Sarah.  Who else is on the team?
21   A.   Define "on the team."  Do you mean
22 provides contract work for us?
23   Q.   Provides services for compensation
24 to Drive Coffee.
25   A.   We have Jazmine Porras, P-O-R-R-A-S.

1  And that's Jazmine with a Z.
2    Q.   Okay.  J-A-Z-M-I-N-E?
3    A.   Correct.
4    Q.   Okay.  What does Jazmine Porras do?
5    A.   Assists in getting product shipped.
6    Q.   Okay.  Who else?
7    A.   Marisol Dominguez.
8    Q.   And what does Marisol do?
9    A.   Same thing.
10   Q.   Okay.  Next?
11   A.   Evan Peter.
12   Q.   Evan Peter.  What does Evan do?
13   A.   Evan assists with design work as
14 well as fulfillment from time to time as well.
15   Q.   Who else?
16   A.   Andrew Berg.
17   Q.   Okay.  What does Andrew do?
18   A.   Fulfillment and assisting with
19 customer e-mails.
20   Q.   Okay.  Who else?
21   A.   Alex -- I believe his last name is
22 also Dominguez.  It's Marisol's brother.
23   Q.   Okay.  What does he do?
24   A.   He does fulfillment as well.
25   Q.   Okay.  And just so I'm clear, you

1  described Marisol as doing shipping of product,
2  and you described him as fulfillment.  Is this
3  the same thing?  Or does it --
4    A.   Sorry.  Same thing.
5    Q.   All right.  Who else?
6    A.   Alyssa Neumann.
7    Q.   Right.  And you said Alyssa is a
8  recent hire, and she's serving as executive
9  coordinator, I think you said.
10   A.   Yes.
11   Q.   And what does she actually do?
12   A.   She's working with our accounting
13 team on creating a new payroll system, assisting
14 in our taxes and bookkeeping, and procuring basic
15 supplies for the office, the warehouse.
16   Q.   All right.  Who else?
17   A.   Eric Luba.
18   Q.   How do you spell -- is Eric with a C
19 or a K?
20   A.   C.
21   Q.   And how do you spell Luba?
22   A.   It's L-U-B-A.
23   Q.   Okay.  What does Eric do?
24   A.   Fulfillment.  So assists in shopping
25 product.

1    Q.   Yep.  Who else?
2    A.   To the best of my knowledge, that's
3  really our team --
4    Q.   Okay.
5    A.   -- of people that we work with.
6    Q.   Describe the facility on Race Street
7  in Denver.  What's there?  Is that a warehouse?
8  Is it an office?  Is it both?  Like, what -- how
9  many square feet?
10   A.   It's a warehouse.
11   Q.   It's a warehouse?
12   A.   Yes.
13   Q.   Okay.  Are there offices in the
14 warehouse?
15   A.   What do you mean by offices?
16   Q.   So are there closed-off areas that
17 are climate controlled inside?
18   A.   No.
19   Q.   Okay.  So it's most -- like, are
20 there desks sitting in the warehouse where people
21 can get some work done?
22   A.   There are some desks.
23   Q.   Is there WiFi available in the
24 office -- in the warehouse?
25   A.   There is WiFi.

1    Q.   There is WiFi?  Okay.
2         Is there a phone system other than
3    people's cell phones in the warehouse?
4    A.   Not one that's operational.
5    Q.   Okay.  What activities actually take
6    place in the warehouse?
7    A.   At what point in time?
8    Q.   On a given week.  In the past week.
9    A.   At what point?
10   Q.   Well, why don't you just -- like,
11   how does it change then?  Give me the past week
12   and then tell me what's different.  So in the
13   past week, what activities have taken place in
14   the warehouse?
15   A.   Packing up boxes of coffee and
16   shipping them to customers.
17   Q.   What other types of activities take
18   place there at other times?
19   A.   Green coffee storage, inventory
20   storage.
21   Q.   Anything else?
22   A.   And now, as of recently, coffee
23   roasting from time to time.
24   Q.   Does the warehouse have operating
25   hours?

1    A.   No.
2    Q.   How -- what do you tell shippers as
3    to when they can deliver product?
4    A.   We generally ask them when they can
5    deliver, and I'll make sure -- usually I'm there.
6    Q.   And like UPS and FedEx, how do they
7    deliver product if you're not there?
8    A.   We share the building with other
9    tenants, so they deliver it usually to the other
10   tenants.
11   Q.   So there is like a central receiving
12   area or -- I'm sorry.  I didn't catch that.
13   A.   I said, so they will often deliver
14   things to the other tenants who will then bring
15   it to our space.
16   Q.   Okay.  Do some of the people you
17   listed work remotely rather than in the
18   warehouse?
19   A.   Yes.
20   Q.   Okay.  Do some of them work
21   exclusively remotely?
22   A.   No.
23   Q.   So everybody that you've listed,
24   Sarah -- yourself, Sarah, Jazmine, Marisol, Evan,
25   Andrew, Alex, Alyssa, Eric -- all come to the

1    warehouse from time to time?
2    A.   That is correct.
3    Q.   Okay.  Other than this warehouse on
4    Race Street, are there any other offices or
5    locations?
6    A.   Yes.  We have a WeWork office in
7    downtown Denver.
8    Q.   Who goes to the WeWork office?
9    A.   I used to go there.  I haven't gone
10   there, really, anymore.
11   Q.   Who else?
12   A.   Nobody really goes there anymore.
13   Q.   Okay.  Do you still pay the lease,
14   though?
15   A.   Yes.  It's included.  Because I
16   believe it's basically free or we pay $60 a month
17   for another mailing address.  So it's included as
18   a benefit with one of my credit cards.
19   Q.   Do you receive mail there?
20   A.   Yes.
21   Q.   What do you consider to be your
22   primary mailing address?
23   A.   Depends on what we're using it for.
24   Q.   Where do you receive bills?
25   A.   Both locations.

1    Q.   Okay.  Where do you receive checks?
2    A.   Both locations.
3    Q.   Okay.  Is there a system as to why
4    one versus the other or is it just kind of when
5    you filled it out?  Like, what --
6    A.   Generally speaking, anything that's
7    customer-facing we like to keep at our WeWork,
8    given that it's a key-coded building.  We
9    generally -- given the nature of our business, we
10   have a lot of very passionate customers who would
11   try and find us if they saw an outward-facing
12   idea, and just given the nature of our business,
13   we just don't want, you know, people that we are
14   not aware of coming by or -- you know, we're not
15   set up to be, you know, customer-facing or for
16   visits, et cetera.  So that's generally the
17   system in place.
18   Q.   Do you have in front of you or do
19   you have access to your responses to
20   interrogatories that you sent to us?
21   A.   I don't have them in front of me
22   right now, no.
23   Q.   Okay.  The -- interrogatory number 7
24   asked the following question:  Identify each
25   individual by -- including their name, telephone

1  number, e-mail address, regular address, position
2  and title who was employed by or worked for Drive
3  in any capacity from January 1, 2019 till the
4  present and note which ones are considered
5  management.
6          Your response to that included an
7  objection, and then stated that Alex Grappo was
8  the only full-time employee during the requested
9  period.  Drive Coffee utilized daily contractors
10  in its warehouse intermittently when an order
11  needed to be prepared for delivery to a wholesale
12  customers.  In addition, there were a few
13  individuals who provided services on a contract
14  basis.  Those individuals, who are not employees,
15  are Lindsay Orridge, Becky Moody, Remmy Castillo,
16  Sarah Mortzfield, Marisol Dominguez, and Jazmine
17  Porras.
18          Do we need to add the names that
19  you've just given me to that response?
20      A.   My impression was that that was
21  specific to a time period.  You asked for our
22  current list of people.
23      Q.   The question was actually from
24  January 2019 to present.  I just now asked you
25  for current.  So from January 2019 to present,

1  the ones that you listed as current should be
2  included; would that be fair to say?
3      A.   I would need to consult with Lisa to
4  determine if they need to be included in that or
5  not.
6      Q.   But there is nothing inaccurate
7  about what you told me, right?
8      A.   No, but I think there's different
9  times when people have started.
10      Q.   Okay.  The -- in this response you
11  listed Lindsay Orridge, but that's not a person
12  that you named when we were just talking.  Why
13  did you not include Lindsay in our discussion
14  just now?
15      A.   Because Lindsay is not currently
16  performing any services for us.
17      Q.   Okay.  When did she stop performing
18  services?
19      A.   Technically, it wouldn't be Lindsay;
20  it would be a company that she owns called The
21  Motorsport Collective.
22      Q.   Okay.  When did Lindsay and/or The
23  Motorsport Collective stop performing services
24  for Drive?
25      A.   I would have to go back and find

1  that date.
2      Q.   When do you think it was?  Like --
3  is it, like last week?  Is it a month ago?  A
4  year ago?
5      A.   Some time ago, so that's why I want
6  to make sure you get an accurate answer.
7      Q.   I mean, so you think it's at least
8  several months ago?
9      A.   Several months for sure.
10      Q.   Okay.  Lindsay, on LinkedIn, lists
11  herself as CMO from September 2019 to present.
12  So that would be inaccurate, according to you?
13      A.   That would be inaccurate.
14      Q.   Okay.  You did not list, in our
15  conversation, Becky Moody.  Why did you not list
16  Becky Moody?
17      A.   Because Becky performs no services
18  for Drive.
19      Q.   Has she never performed services for
20  Drive?
21      A.   We have discussed performing
22  services for Drive with Becky.
23      Q.   But -- so in your interrogatory
24  response, you do list her as a person who
25  performed services for Drive between January 2019

1  and the present.  Are you correcting that to say
2  that that is not, in fact, true?
3      A.   I would want to consult with Lisa to
4  determine the exact definition of providing
5  services and whatnot.
6      Q.   I will give you the definition
7  that -- I mean, the question is what you're bound
8  by; it's not a legal question.  Did she do work
9  for the benefit of Drive during the time from
10  January 2019 till today?
11      A.   I do not believe she has.
12      Q.   Okay.  Remmy Castillo.  Same
13  question.  You didn't list him before, but he's
14  on your list in the interrogatory.
15      A.   Remmy went rogue at times and, on
16  his own accord, attempted to perform tasks for
17  Drive without my knowledge and against my will.
18  But it would be accurate to say from time to time
19  or on one or two occasions he may have performed
20  a service in the name of Drive.
21      Q.   Okay.  Did you ever compensate Becky
22  Moody for services performed for Drive?
23      A.   I have made a cash transfer to
24  Becky.
25      Q.   In what amount?

1    A.   I don't recall off the top of my
2  head.  I believe it was $4,000.
3    Q.   Okay.  Have you ever compensated
4  Remmy Castillo for his rogue activities or any
5  other services for Drive?
6    A.   No.  To the best of my recollection,
7  no.
8    Q.   The other names do match.
9         In your interrogatory, you did not
10  include Eric Luba, but you did list him with me.
11  Do you know -- why did you not include him in the
12  interrogatory?
13    A.   He recently began performing
14  services for us.
15    Q.   Okay.  Same question --
16    A.   Same with Alex Dominguez.
17    Q.   What's that?  Okay.  Same question
18  as to Alex Dominguez, and is that the same
19  answer; he recently started?
20    A.   Yes, correct.
21    Q.   And Andrew Berg, the same question.
22    A.   Yes.
23    Q.   The same answer, he just recently --
24    A.   [Technical interference] --
25  performing services for Drive.

1    MR. ANDERSON:  Ms. Stotz, did you
2  catch that?
3    THE COURT REPORTER:  No, I'm sorry.
4    MS. NOBLES:  He cut out for me.  I
5  didn't hear that.
6    THE COURT REPORTER:  Can you repeat
7  the answer?  You cut out.
8    THE WITNESS:  He also recently began
9  with us.
10  BY MR. ANDERSON:
11    Q.   And the same question as to Evan
12  Peter.
13    A.   He also recently began working with
14  us.
15    Q.   All right.
16    A.   Is it okay if we take a bathroom
17  break?
18    Q.   Yeah, that would be just fine.
19    MR. ANDERSON:  Ms. Nobles, do you
20  want to go ahead and take this as our combined
21  break?
22    MS. NOBLES:  We can do that.  Alex,
23  are you ready for a lunch break at this point?
24    THE WITNESS:  That's fine.
25    MS. NOBLES:  Okay.

1    MR. ANDERSON:  Okay.  So we'll --
2  how long would you request, Ms. Nobles?
3    MS. NOBLES:  45 minutes.
4    MR. ANDERSON:  45.  It's 1:20.
5  We'll pick up at -- sorry.  It's 11:20 for you.
6  We'll pick up at 12:05?
7    MS. NOBLES:  Well, I should ask --
8  make sure -- is that enough time for you, Alex?
9    THE WITNESS:  Yeah totally.
10    MS. NOBLES:  Okay.
11    MR. ANDERSON:  12:05.  We'll see you
12  then.
13    (Whereupon, a lunch break was
14  taken.)
15  BY MR. ANDERSON:
16    Q.   All right.  So we left off -- we
17  were going through people and addresses.  I think
18  we left off there.  So I'm going to just go
19  through a couple other -- or a few other names
20  that I have I just want to make sure I understand
21  who these people are in relation to Drive.  Chris
22  Hall.  Who is Chris Hall in relation to Drive?
23    A.   He's become a personal friend, but
24  other than that, there is no other relationship
25  to Drive.

1    Q.   Okay.  He's never done work for or
2  with Drive for the benefit of Drive?
3    A.   Neither.
4    Q.   Okay.  Lindsay -- we've already
5  talked about Lindsay Orridge.  You said that she
6  actually didn't provide any services directly,
7  but through a company called Motorsports
8  Collective?
9    A.   The Motorsport Collective.
10    Q.   The Motorsport Collective.  Thank
11  you for the correction.  And that she's not doing
12  that work currently.
13    A.   That is correct.
14    Q.   To your knowledge, does Drive still
15  owe motor -- The Motorsport Collective money for
16  services rendered?
17    A.   No.
18    Q.   And she lists herself as CMO, or I
19  guess The Motorsport Collective as CMO.  Was that
20  an accurate description of her role from
21  September 2019 to present?
22    A.   I let people choose what they want
23  to call themselves.
24    Q.   I understand.  That -- that wasn't
25  the question.  The question was, to your

1  estimation, would that be an accurate
2  representation of the role that she played?
3       A.   I would say that she performed some
4  services that would be consistent in a CMO-type
5  role.
6       Q.   Okay.  But not all services
7  consistent with a CMO-type role?
8       A.   Not all.
9       Q.   Okay.  We've talked about Becky
10  Moody.  We've talked about Remmy.  I think the
11  best thing to do at this point would be to put up
12  another exhibit.  Let me just find it on my part.
13  I apologize.  I'm just jumping a little bit.
14            Let me start this way so you don't
15  have to, like, watch me do this.  Can you tell me
16  who Brent Knudsen is?  K-N-U-D-S-E-N.
17       A.   He's been a personal friend and
18  mentor to me.
19       Q.   Okay.  And as far as relationship
20  with Drive?
21       A.   I call him from time to time for
22  advice.
23       Q.   Okay.  Has he ever been compensated
24  for services regarding Drive?
25       A.   Not in any way whatsoever.

1       Q.   Okay.  And does he -- has he
2  requested compensation for services --
3       A.   Not in any way --
4       Q.   -- on behalf of Drive.
5       A.   -- whatsoever.
6       Q.   So you said friend and mentor?
7       A.   That is correct.
8       Q.   Okay.  And let's go -- Shayan
9  Bokaie.  That's S-H-A-Y-A-N, last name
10  B-O-K-A-I-E.  Can you tell me who that person is?
11       A.   Personal friend that I had hoped to
12  one day be involved in Drive, but at no point has
13  he ever performed any services for Drive or had
14  any formal involvement with the company.
15       Q.   Matt Tuccillo, T-U-C-C-I-L-L-O.
16       A.   A friend of Lindsay Orridge's that
17  she wanted to hopefully have work for Drive one
18  day.  He was never formally hired.
19       Q.   And never performed services on
20  behalf of Drive?
21       A.   No, he's never performed services on
22  behalf of Drive.  To my knowledge, he's come up
23  with a few people that we should send coffee to
24  and he found a basic product photographer to take
25  some white box photos for us.

1       Q.   Has he been compensated for any
2  those services or --
3       A.   No, he has not.
4       Q.   Okay.  Luke Byington.  Luke is
5  L-U-K-E.  Byington, B-Y-I-N-G-T-O-N.
6       A.   Yep.
7       Q.   What's that?
8       A.   He owned the roasting company that
9  initially contract roasted for us.
10       Q.   Okay.  So -- and what's the name of
11  that company?
12       A.   Queen City Coffee.
13       Q.   Okay.  And did -- did you
14  compensate -- or did Drive compensate Luke for
15  those services?
16       A.   Drive compensated Queen City Coffee.
17  We were invoiced by Queen City Coffee, and Queen
18  City Coffee was compensated.  There's never been
19  any direct compensation to Luke Byington.
20       Q.   Okay.  And to your knowledge, is
21  Drive still doing business with Queen City
22  Coffee?
23       A.   At present, technically, no.
24       Q.   To your knowledge --
25       A.   We're very friendly.  I mean, we're

1  all friends, so we hang out from time to time,
2  but, no, right now we have no formal working
3  arrangement.
4       Q.   Okay.  And to your knowledge --
5       A.   I think we might -- we might buy one
6  or two green coffees from them.
7       Q.   Okay.
8       A.   But, again, nothing, I think, that's
9  happened in the last 30 days.
10       Q.   To your knowledge, does Drive owe
11  any money to Queen City Roast -- Queen City
12  Coffee?
13       A.   We may have one outstanding invoice,
14  although I think it has been paid.  So other than
15  that, no.
16       Q.   And then same last name -- Scott
17  Byington.  S-C-O-T-T Byington.
18       A.   His brother.  So he is a co-owner of
19  Queen City Coffee.
20       Q.   Okay.  And same -- no direct
21  relationship, just relationship as an owner of
22  Queen City Coffee?
23       A.   That is correct.
24       Q.   Okay.  And how would you describe
25  the relationship of Keith Clingman to Drive

1  Coffee?
2      A.   Somebody that one day, conditional
3  upon funding, should we have ever reached a
4  funding amount where we can afford it, that we at
5  one point wanted to hire.
6      Q.   Okay.  Who is responsible for
7  content of the Drive Coffee website?
8      A.   The Drive Coffee website?
9      Q.   Yes.  Who puts stuff on the website?
10      A.   At what point in time?
11      Q.   In 2019, 2020, who directed the
12  content of --
13      A.   Niko.
14      Q.   What's that?
15      A.   Niko.
16      Q.   Niko.  Niko exercised independent
17  judgment as to what was put on that website?
18      A.   That is correct.
19      Q.   Okay.  So when people were added to
20  the website as members of the Drive Coffee team,
21  that was completely within Niko's discretion?
22      A.   I don't recall anyone ever being
23  added to the Drive Coffee website as a team
24  member.
25      Q.   Okay.  I'm going to show now

1  Exhibit 3.  This is --
2           MS. NOBLES:  I'm sorry.  What was
3  Exhibit 2?  Oh, Exhibit 2 was the
4  interrogatories.  Sorry.  I'm caught up.  I'm
5  with you.
6           MR. ANDERSON:  Actually, Exhibit 2
7  is the 30(b)(6) notice.
8           MS. NOBLES:  That's right.  That's
9  right.  That's right.
10  BY MR. ANDERSON:
11      Q.   Exhibit 3 now is also in discovery
12  as Plaintiff's 81 and 82.  Bear with me while I
13  get that up the right way.
14           (Whereupon, Exhibit 3, Excerpt of
15  slide deck, was marked for identification.)
16  BY MR. ANDERSON:
17      Q.   So first of all, Mr. Grappo, I'm
18  going to ask if you are able to see this on the
19  screen clearly.
20      A.   Yes.
21      Q.   Okay.  Do you recognize this
22  document?
23      A.   I do.
24      Q.   Okay.  Where do you recognize it
25  from?

1      A.   That it's a deck that we've put
2  together at one point.
3      Q.   Okay.  So this is a deck.  And what
4  was this deck used for?
5      A.   I can't speak to the exact deck that
6  this was pulled from, so I don't know what that
7  deck was used for at the time.
8      Q.   Okay.  When you say the deck that we
9  put together, who is "we"?
10      A.   You, that -- whatever this was
11  pulled from, I don't know what particular deck
12  this came from or how it was used.  We go through
13  different versions of the deck almost -- multiple
14  times a week sometimes.
15      Q.   I understand.  But -- I'm sorry.  In
16  your first answer, you said, this is a deck that
17  we put together.
18      A.   Oh, sorry.  Well, when I say "we," I
19  mean, I refer to as the company, Drive.  But I
20  handle putting together the deck with the help of
21  a designer.
22      Q.   Got it.  And then have you used this
23  deck for presentation to, let's say, investors
24  and others?  Who would you present this deck to?
25      A.   Again, to -- at what point in time?

1  I mean, the deck -- I do not know the version of
2  this deck -- the rest of it because this is one
3  page of many pages in a deck.  So it's -- you
4  know, I can't speak to exactly what this version
5  was used for, if ever.
6      Q.   Okay.  But it does look like
7  something from a deck that you put together?
8      A.   Correct.  Yes.
9      Q.   Okay.  And you will note that you
10  are listed in this deck as founder and CEO.
11      A.   Correct.
12      Q.   But some of the other people we
13  talked about just now are described somewhat
14  differently than the way that we've just gone
15  over them.  So for instance, Brent Knudsen -- and
16  I hope I'm saying that right -- you said is a
17  friend and mentor, but he is listed here as a
18  founding advisor.
19      A.   Yeah, he advises me.
20      Q.   Okay.  So -- but is he a founder?
21      A.   It says founding advisor, not
22  founder.
23      Q.   I understand.  So you consider
24  someone who --
25      A.   He has been an advisor since the

1  company was formed.
2      Q.   Okay.  Fair enough.
3           And Shayan Bokaie -- and again, am I
4  pronouncing that anywhere near correctly?
5      A.   Yeah.
6      Q.   Okay.  So Shayan you also told me
7  was a friend, but on here he's listed at a
8  contracted social media manager.  Can you explain
9  the difference between what --
10     A.   Yeah, you are touching precisely
11  with the use cases of decks in starts-ups is to
12  paint a potential picture of the future, not in
13  any way to serve as an organizational chart of
14  what is in the moment.
15          The purpose of a deck is to show
16  people what it would look like upon funding, if
17  the company reached its fundraising objectives,
18  which we did not.
19     Q.   Okay.  But you will agree with me
20  that, on this deck, it doesn't say potential
21  social media manager, for instance, or anything
22  of that nature; it just says social media
23  manager, right?
24     A.   I think everything in the deck is
25  technically a potential or an optimistic look at

1  what the future could look like.
2      Q.   Okay.  But for instance, for Shayan,
3  what's interesting is unlike everybody else on
4  the deck -- or on these two pages of the deck, I
5  should say -- has, in parentheses, contracted, as
6  opposed to everybody else.  Would you agree with
7  that?
8      A.   Yeah.  As I've just described to
9  you, you know, multiple people on this list have
10  been contracted.  This is a document that is not
11  meant to be an organizational chart or a legal
12  depiction of the current structure and roles of
13  the company.  This is a vision board.  This is
14  what's designed to paint a picture, unless
15  otherwise stated as fact, of what the future
16  would look like.
17          So this is -- and in that case,
18  there are reasons for putting things like that.
19  For example, in Shayan's case, if this were to be
20  circulated, he currently has other -- or at the
21  time, had engagements where anything he listed
22  anywhere would legally, to protect himself, have
23  to include that.  And I was happy to oblige.
24     Q.   All right.  So you did that to
25  protect Mr. Bokaie?

1      A.   Yes.
2      Q.   Okay.  Matt Tuccillo you described
3  also as a friend of Lindsay's.  And -- but he's
4  listed here as director of content and
5  activation.
6      A.   This is all lists of people who we
7  had hoped to fill roles had we gotten the
8  funding.
9      Q.   Okay.  And it describes the kind of
10  work that you would expect him to do at that
11  point in time if he was to join the team, then?
12     A.   Yep.
13     Q.   Okay.  And similarly, you described
14  Luke Byington and Scott Byington -- I will join
15  them together -- as the owners of Queen City
16  Coffee who -- with whom Drive contracted to roast
17  some coffee, but they are listed on here as head
18  roaster and head of sourcing.
19     A.   Yes, because at that point in time
20  they were assisting with roasting and sourcing.
21  But they were contracted through Queen City, and
22  as we talked about too before with Markus and
23  Joakim, it was also through Stockholm Design, not
24  through Markus and Joakim.
25          Same thing with Lindsay.  It was all

1  through The Motorsport Collective and not
2  Lindsay.
3      Q.   Right.  But that's not mentioned on
4  here.  It does mention that --
5      A.   It's not supposed to be mentioned
6  there.  That's not the purpose of this document
7  to define employees or company structure at a
8  certain point in time.
9      Q.   Right.  Though, interestingly, on
10  this document, it says that prior to Drive she
11  was director of Motorsport at Monster Energy, but
12  it doesn't mention at all The Motorsport
13  Collective.
14     A.   Sure.
15     Q.   Okay.  And as far as Keith Clingman
16  is concerned, again, it describes Keith on this
17  document as chief marketing and sales officer; is
18  that right?
19     A.   Yeah.  It was a role that we had
20  hoped to be able to fill once the company was
21  funded, which Keith was well aware of.
22     Q.   Looking at this chart, these two
23  pages from this deck that you put together for
24  presentation to prospective relationships, who on
25  this chart on these two pages has been

1  compensated for work with Drive?
2      A.   Myself of course.
3      Q.   Yes.
4      A.   Lindsay has been compensated.
5      Q.   Okay.
6      A.   Queen City Coffee has been
7  compensated.
8      Q.   Right.
9      A.   And are you referring to cash or
10 stock compensation?
11     Q.   Let's talk about them separately, so
12 let's start with cash.  So do you want to start
13 over?
14     A.   Sure.  I've been compensated with
15 cash.  And Queen City Coffee has been compensated
16 with cash, as has Sarah.
17     Q.   And just so we're clear, Sarah is
18 Sarah Mortzfield?
19     A.   That is correct.
20     Q.   Okay.  And has anybody else on this
21 list been compensated with cash?
22     A.   No.
23     Q.   Actually, Keith Clingman has been
24 compensated with some cash; isn't that right?
25     A.   Keith has been paid cash.

1      Q.   Okay.
2      A.   I would not necessarily call it
3  compensation.
4      Q.   Okay.  We'll get to what he's been
5  paid before.  Has anybody else on here been paid
6  cash, but not considered compensation?
7      A.   Becky.
8      Q.   And what were the circumstances of
9  Becky being paid cash but not considered
10 compensation?
11     A.   She needed money at the time and
12 several of these people were my friends and I
13 wanted to do what I could to help them at the
14 time, which clearly was -- is proving to be the
15 wrong choice.
16     Q.   Okay.  The -- well, let's talk about
17 other non-cash compensation.  Who on this list
18 has received non-cash compensation?
19     A.   I have received stock.  And Markus
20 and Joakim, through Stockholm Design, have
21 received stock.
22     Q.   Markus -- okay -- and Joakim here
23 have received stock.  Anybody else?
24     A.   There is -- part of your thing is
25 blocking it.

1      Q.   Sorry.
2      A.   No, nobody else on this list has
3  received stock.
4      Q.   Okay.  Does this look like a true
5  and accurate depiction of two pages of a deck
6  that you have created?
7      A.   That looks accurate.
8      Q.   Okay.  Would you consider any of
9  these people -- did you have discussions with
10 anybody on this chart, or on these two pages I
11 should say, as having agreed to be volunteers for
12 Drive Coffee?
13     A.   I do not recall a conversation in
14 which the term "volunteer" was used.
15     Q.   Okay.  Have you discussed the
16 situation with Keith and this lawsuit with any of
17 these individuals on these two pages since the
18 spring of 2020, in the past year?
19     A.   Yes.
20     Q.   With whom have you discussed Keith
21 and/or this lawsuit?
22     A.   Lindsay --
23     Q.   Okay.  What have you discussed with
24 Lindsay?
25     A.   -- Becky.

1      Q.   Lindsay.  Becky.  Sorry.  Go ahead.
2      A.   Markus and Joakim, as well as Sarah
3  Mortzfield.
4      Q.   What did you discuss with Lindsay?
5      A.   The fact that there was litigation
6  around this issue.
7      Q.   Okay.  And what was the purpose of
8  discussing with her that there was litigation
9  around this issue?
10     A.   Lindsay is a close personal friend
11 of mine as well at this point, was someone who
12 was intimately familiar with the situation at
13 Drive.  And so I was sharing the utterly
14 preposterous nature of what was occurring with
15 both a friend as well as somebody who was
16 intimately familiar with the situation.
17     Q.   Okay.  So you were discussing with
18 her your perception that this situation as
19 preposterous?
20     A.   Yes.
21     Q.   Okay.  What did you discuss with
22 Becky?
23     A.   Given that Becky was the one that
24 introduced us to Keith, I mainly addressed to
25 Becky my extreme disappointment that this is the

1  way this was occurring and my frustration that
2  this was occurring.
3       Q.   What did you discuss with Markus and
4  Joakim -- or Joakim?  I'm sorry.  I know I'm
5  saying it wrong, but you know who I'm talking
6  about.
7       A.   The fact that the company was being
8  sued by Keith who they had met.
9       Q.   Why did you want to tell them that?
10      A.   Because not only were they my first
11 investors, they are close personal friends and
12 they are people that have met Keith.
13      Q.   Okay.  And what did you talk with
14 Sarah about Keith and this situation?
15      A.   Similar.  Sarah was familiar with
16 Keith and the situation, so we discussed it.
17      Q.   Okay.  What do you find preposterous
18 about this?
19      A.   That it was very clear the situation
20 that the company was in, which is that we were
21 fundraising.  I spent since 2019 trying to save
22 this company with no back-up funding on my own or
23 no funding at the time or help I could go and get
24 from my family or anything like that.  It was 100
25 percent relying on myself to keep this company

1  from failing.
2            So the situation was extraordinarily
3  clear that the company did not have the money,
4  that the one investor who had committed to
5  investing was stuck in an ugly divorce, in which
6  case -- in which situation no investment was
7  allowed to be made until the divorce was
8  finalized.  And everyone was well aware of that
9  situation.  And to my knowledge, to me, at no
10 point was anyone referring to themselves as
11 full-on official employees of Drive Coffee.
12           So that this comes up months later
13 now that there is an employee, someone who's
14 under the impression they are an employee, who
15 was getting into -- or who was privy to the
16 struggles of a start-up trying to obtain funding,
17 now attempting to use that as an attempt to claim
18 employment, that is why I feel that way.
19           It was very clear to everybody
20 involved, given our difficulty even paying small
21 bills and things like dinners out, that there was
22 no money available.  In my final meeting with
23 Keith in New York, he was unable to reach me when
24 I spoke with Keith in New York because my phone
25 had been shut off because I didn't have money to

1  pay my own cell phone bill.  That's how behind it
2  was.
3            So it was very clear to everybody
4  involved that there was no money and that all
5  hiring was conditional -- all future hiring was
6  conditional upon our ability to fundraise and get
7  investment that would sustain that.
8       Q.   I understand.  And, like -- I mean,
9  I think -- something that stood out to me in your
10 conversation with the Drive Yeah podcast was the
11 quote -- and I forget who the quote was from,
12 but -- I think it was from Skunk Works; I'm not
13 sure -- but it was focused on attracting
14 believers instead of convincing skeptics.
15           Did you feel like, in this team that
16 you put together, that you had people that
17 believed in Drive?
18      A.   I don't think it's my position to
19 imagine what other people were thinking because
20 clearly some of my assumptions about
21 understandings we considered to be basic have
22 been proven to be false.  So I am not going to
23 theorize as to what anybody else was thinking at
24 this point.
25      Q.   I'm just trying to understand the

1  situation.  Because you've explained, I think,
2  quite clearly and passionately about why you
3  think it's preposterous, and I get it.  But you
4  had this team around you -- and we will go into
5  exactly who, but Keith was among them,
6  Mr. Clingman -- who came to meetings with you in
7  Denver and Aspen, right?
8       A.   At what point in time are you
9  referring to?
10      Q.   Last year, when all this was going
11 on.  Did Keith and the team --
12      A.   I don't recall any meetings that
13 occurred in 2020.
14      Q.   In 2019.  I keep thinking we're
15 still in 2020; its never ending.  But in 2019,
16 when Keith was -- when you had first connected
17 with Keith, you held a meeting in Denver and then
18 in Aspen with him and other members of the team
19 that you were assembling; isn't that right?
20      A.   Yes, with people we were interested
21 in one day having as part of our team, that's
22 correct.
23      Q.   And from that point forward -- in
24 fact, during that meeting, you had promised to
25 have employment documents ready, but you couldn't

1 put those together because of the impossibility
2 of this investment, right?
3      A.   I don't recall ever promising to
4 have employment documents put together.
5      Q.   Okay.  Do you recall explaining why
6 they weren't there?
7      A.   I do not recall.
8      Q.   Okay.  But you had these people come
9 to Denver and Aspen; you do remember that?
10     A.   I remember, yes.
11     Q.   Okay.  And then, subsequent to that,
12 the people that had joined you -- some of the
13 people who had joined you in Denver and in Aspen
14 continued to perform services on behalf of Drive
15 subsequent to that meeting, right?
16     A.   Which people are you referring to?
17 And what services?
18     Q.   Well, let's talk about Keith.  Keith
19 Clingman, he continued to perform marketing
20 services at ten meetings with potential investors
21 and otherwise do some work on behalf of Drive.
22     A.   Which marketing services did he
23 perform?
24     Q.   I'm asking you.  Did he or didn't
25 he?

1      A.   No.
2      Q.   Okay.  He did not meet with
3 investors?
4      A.   He had a meeting with -- he had
5 meetings with a few of our investors, a few
6 potential investors I should say, actually, not
7 even investor.
8      Q.   We will go into what each person
9 subsequent to that meeting did and what your
10 expectations were here in a minute.
11          Up till -- from inception, from the
12 creation of Drive, from the incorporation of
13 Drive, from when you started the business, have
14 there been any written policies, handbooks or
15 standard operating procedures provided to people
16 who performed services for Drive?
17     A.   No.
18     Q.   Has Drive -- during the time from
19 inception, from the beginning of Drive until
20 today, has Drive done anything as a business to
21 track the time and/or attendance by people
22 performing services on behalf of Drive?
23     A.   Yes.  Every single person that we've
24 paid has tracked their hours that they've
25 committed.  Or --

1      Q.   How have they done so?
2      A.   [Technical interference] -- it was
3 tracked on a per pound basis or a per bag basis.
4          THE COURT REPORTER:  Sorry.  Could
5 you repeat that?  You cut out in the beginning of
6 the answer.
7          THE WITNESS:  Everyone that has
8 provided services to Drive has accounted for
9 their hours that they have put into that.
10 BY MR. ANDERSON:
11     Q.   And then you said something about
12 poundage.  That's what I think Ms. Stotz missed.
13     A.   Yeah.  And Queen City Coffee has
14 accounted for every pound of coffee that they
15 have roasted for us or pound of coffee that they
16 have sold us.
17     Q.   In what system do people account for
18 their hours?
19     A.   Usually in sending me either a
20 written spreadsheet or sending it in some other
21 form, like --
22     Q.   Okay.  So --
23     A.   -- e-mail or in a money request
24 hours are listed.
25     Q.   So you're saying that everybody

1 that's been paid has provided you with an
2 accounting of their hours, but they've tracked it
3 in their own system?  Is that what you're saying?
4      A.   Yes, which are provided to me.  And
5 I would say everyone, with the exception of
6 myself -- I don't submit hours to myself --
7 and -- I mean, I really -- I struggle to think of
8 anyone that has not -- that has been compensated
9 and not submitted hours to us.
10     Q.   So Sarah Mortzfield has submitted
11 hours?
12     A.   Yes, that is correct.
13     Q.   Okay.  And Jazmine Porras has
14 submitted hours?
15     A.   That is correct.
16     Q.   And Marisol Dominguez has submitted
17 hours?
18     A.   That is correct.
19     Q.   And Evan Peter has submitted hours?
20     A.   That is correct.
21     Q.   And Andrew Berg has submitted hours?
22     A.   That is correct.
23     Q.   And Alex Dominguez has submitted
24 hours?
25     A.   That is correct.  His hours are

1  submitted through his sister, so he has not
2  submitted them directly, but yes they --
3       Q.   I'm sorry.  You broke up again.  You
4  said Alex's hours were submitted through what?
5       A.   His sister.
6       Q.   His sister --
7       A.   Marisol.
8       Q.   -- Marisol.  Got it.
9            Alyssa Neumann submits hours?
10      A.   That is correct.
11      Q.   And Eric Luba?
12      A.   That is correct.
13      Q.   Okay.  And when you said that
14 Lindsay Orridge had been compensated in the past,
15 but she is not working currently -- am I correct,
16 first of all, in recalling that she had been
17 compensated?
18      A.   She's been compensated through her
19 company.
20      Q.   Through her company.  And were hours
21 submitted on behalf of that company as well?
22      A.   Yeah, that is the only one where I
23 am unsure about.  I have to review how her formal
24 invoices are created.
25      Q.   Okay.  And you said -- you also

1  indicated that you have, in fact, paid Keith
2  Clingman on occasion.  Did he submit hours?
3       A.   Pardon?  Can you repeat the
4  question.
5       Q.   My first question is, you have said
6  that you have compensated Mr. Clingman in the
7  past; is that correct?
8       A.   I have sent money to Keith Clingman
9  in the past, correct.
10      Q.   Has he submitted hours?
11      A.   I do not recall ever receiving hours
12 from Keith Clingman.
13      Q.   Okay.  But -- so fair to say,
14 throughout this, that Drive has not tracked any
15 of these people's time, there is no system at
16 Drive to do so, but they have submitted through
17 their own systems?
18      A.   Well, collectively, yes, Drive
19 tracks it, and like everything else, it becomes
20 an individual responsibility.
21      Q.   So to put a point on it, Drive
22 itself does not have a system for collecting and
23 tracking time?
24      A.   The system is that the written hours
25 are submitted to us.

1       Q.   Do you provide forms for the written
2  hours?
3       A.   I do not.
4       Q.   Do you provide any sort of -- there
5  is software like TSheets or Gusto or --
6       A.   No, not at this point in time.
7       Q.   Okay.  Prior to --
8       A.   It's in a traditional hard-written
9  format.
10      Q.   Okay.  Prior to the involvement of
11 Simple Startup in your accounting, did you use
12 any accounting software to track financials for
13 Drive Coffee?  Did you use QuickBooks or
14 something?
15      A.   You have to ask our accountant at
16 the time that we were using who -- they wanted to
17 get into start-up accounting.  They didn't do a
18 very good job.  We had to terminate our
19 relationship with them in the middle of the
20 start-up.
21      Q.   Okay.  Who was the prior accountant?
22      A.   Let me try and pull that up for you.
23           It was called Withum, W-I-T-H-U-M.
24      Q.   And where are they located?
25      A.   New York.

1       Q.   New York, New York?
2       A.   Yes.  They're an accounting --
3       Q.   I'm sorry?
4       A.   They are an accounting and
5  outsourced financials firm.
6       Q.   Okay.  Is that -- to your knowledge,
7  is that WithumSmith & Brown?
8       A.   Yes.
9       Q.   Okay.  And when did they perform
10 accounting services for Drive?
11      A.   From sometime in the winter of 2018
12 until probably the beginning of last summer is
13 when we formally terminated the relationship with
14 them.
15      Q.   Sometime this summer, you said?
16 Summer of 2020?
17      A.   I believe so.  To the best of my
18 knowledge.
19      Q.   Are you familiar -- or do you know
20 what software they kept your books in?
21      A.   QuickBooks.
22      Q.   Okay.  And did they turn those
23 QuickBooks accounts back over to you?
24      A.   To Simple Startup.
25      Q.   So they transferred them directly to

Simple Startup?

A.   I believe that's the case, yes.

Q.   Okay.  During the time from inception through today, has Drive ever paid any of the people providing services for holidays?  Have you provided any holiday pay?

A.   Everyone has been paid hourly, so I don't know.  I would have to consult with how that was done.

Q.   So why I'm specifically asking -- since you said -- you just said everybody has been paid hourly; I'm asking whether they were paid for not working during a holiday?

A.   Yeah, we've definitely given people paid time off.

Q.   Okay.  Who did you provide --

A.   We have had people bill us when they weren't working, given whatever situation was going on in their life.  Again, we've tried to do the right things for people.

Q.   You're not suggesting that they defrauded you by claiming to bill when they weren't working?

A.   With everyone that is currently at the company, no.

Q.   Has somebody done that that's not working at the company?

A.   Not that I am aware of.

Q.   Okay.  But you made a point of saying that everybody that is, so I just didn't know -- that kind of signals that there had been --

A.   Yeah, sure.  If somebody is looking to bill us for work or achieve some sort of pay for work they never achieved, I would consider that us being defrauded.

Q.   Right.  But you're saying that hasn't happened, to your knowledge.

A.   We're getting into the details of our current situation, so I would prefer to just leave it at that, is that if somebody was trying to bill me for work that has not occurred, I would consider that illegitimate.

Q.   Okay.  Well, let's say with the exception of your -- any disagreements we have Mr. Clingman -- let's take him out of the picture for the moment --

A.   Then no, nobody has billed me for time that they haven't --

Q.   Got it.  But you did pay for -- you

said you did pay for some holiday or PTO, paid time off -- I think is what you said -- from time to time, but it was clear -- an understanding between you and the people paid that that was PTO, not a lie, not --

A.   I mean, to call it a formal PTO classification -- again, that -- the classification of pay is something that I leave to other talented experts.  I would say that -- what I can say to you is that I have encouraged people to take time for themselves, be it vacation or sick leave, and told them to bill me for hours during that time, knowing that they needed the money or needed a break.

Q.   Okay.  That's the answer -- that's the question I was trying to get answered.  That's a perfectly acceptable answer.  I wasn't trying to have you answer a legal question.  So that's -- that's very good.  Thank you.

So prior to setting up the current payroll system, is it fair to say that you haven't really consulted anybody or worked to set up a payroll system prior to that?

A.   I have consulted extensively with multiple people in trying to do it.  I would

remind you that our company just went through one of the biggest -- most difficult economic periods in 100 years, and that I was in a start-up where we didn't have some major venture capital firm backing us, or a rich family I could fall back on.

My primary focus was not letting the company fail and making sure that people that were performing services received payment for those services.

Q.   Not necessarily focused on making sure that you were dotting all the "I"s and crossing all the "T"s regarding --

A.   It was always the concern, but, you know, it's -- much like in any emergency, you're forced sometimes to pick priorities.

Q.   Let's talk about the plaintiff in this case, Keith Clingman, specifically.  We've talked about the company.  We've talked about other people.  Let's talk about Keith.  How did you come to meet Mr. Clingman?

A.   I was introduced by one of our investors and a close personal friend of mine, Jonathan Lloyd Jones, to Becky Moody.  Becky Moody suggested I speak with Keith.

1    Q.    Okay.  And do you remember when that
2  was?
3    A.    Summer of 2019, I believe.
4    Q.    And again, how long had you known
5  Becky by that time?
6    A.    I don't recall exactly how long I
7  had known Becky.
8    Q.    Years and years or --
9    A.    No.  Only a few months.  A couple of
10  months.
11    Q.    So not a deep, long personal
12  relationship, but somebody that had been
13  introduced to you by John Lloyd Jones?
14    A.    Correct.
15    Q.    And how long had you known John?
16    A.    I don't recall exactly.  Anywhere
17  from 6 to 12 months at that time.
18    Q.    Okay.  And did you -- what was your
19  understanding at the time of the introduction
20  with -- about how Becky knew Keith?  How was she
21  introducing him to you?
22    A.    That they had worked together at
23  Recess.
24    Q.    Okay.  I'm going to show --
25  actually, let me get it put upright.  Let's see

1  if I can do this as a side by side.
2        All right.  I'm going to show you
3  what's been -- what I'm calling and we've
4  supplied to the court reporter as Exhibit 4.
5        (Whereupon, Exhibit 4, E-mail chain,
6  was marked for identification.)
7  BY MR. ANDERSON:
8    Q.    This is an e-mail.  There we go.
9        All right.  This is an e-mail,
10  Exhibit 4.  This is the first page.  I'll show
11  you the second page in a minute, but I will just
12  give you a moment to tell me if you recognize
13  this e-mail thread.  And just you tell me when
14  you want me to flip to the next page.
15    A.    Sure.  Go to the next page.
16        Yes, I recognize that.
17    Q.    All right.  What do you recognize
18  these two pages to be?  And it reads from the
19  bottom to the top, I think.  But what do you
20  recognize them to be?
21    A.    An intro from Becky Moody.
22    Q.    To?
23    A.    To Keith.
24    Q.    To Mr. Clingman.  Okay.  So she, in
25  the first e-mail -- again, starting from the

1  bottom -- on July 23rd, 2019 at 11:22 a.m., she
2  sends you this introduction.  Prior to this, I
3  take it you had never heard of Keith Clingman.
4    A.    That is -- there may have been
5  mention of Keith by Becky from time to time.
6    Q.    Okay.
7    A.    I honestly don't recall.
8    Q.    Okay.  But you consider this to be
9  your introduction?
10    A.    Sure.
11    Q.    Okay.  And then you reached out
12  relatively quickly, within a couple of hours, to
13  Keith, just acknowledging the intro and inviting
14  further contact.
15    A.    It appears that's how I responded.
16    Q.    Okay.  And then it looks like the
17  remainder of this e-mail thread is Keith also
18  acknowledging the introduction and you guys going
19  back and forth on a time to meet, finally
20  settling on 4:00 p.m. Mountain Time, 2:00 p.m. --
21  it says 4:00 p.m. Mountain Time, 2:00 p.m.
22  Mountain Time, but I think it's 4:00 p.m. Eastern
23  Time, 2:00 p.m. Mountain Time on the date
24  July 25th, 2019; is that right?
25    A.    It appears to be so.

1    Q.    Okay.  Did you guys meet subsequent
2  to that?
3    A.    I don't recall when our very first
4  meeting was, but yes, we did meet in person at
5  some point following that e-mail chain.
6    Q.    Okay.  Actually, I meant, this
7  was -- was this trying to schedule an in-person
8  meeting or a telephone meeting or some other kind
9  of meeting?
10    A.    Pre-COVID world, so it was just
11  phone call.
12    Q.    Okay.  And to your recollection, at
13  4:00 p.m. Eastern, 2:00 p.m. Mountain Time on
14  the 25th did that meeting occur, to your
15  recollection?
16    A.    I remember an introductory phone
17  call.  I would think it would be safe to assume
18  that that was the time that it occurred.  I do
19  not remember.  It was a long time ago.  And I
20  take tens of phone calls every day --
21    Q.    Sure.
22    A.    -- and every day since then.
23    Q.    Do you recall finally meeting in
24  person as well?
25    A.    I recall meeting in person, yes.  I

1  am not sure when the first one was, but I do know
2  that we met in person.
3       Q.   And do you remember what you talked
4  about?
5       A.   During that first meeting?
6       Q.   Yeah, or the first couple of
7  meetings -- overall, what was the topic of
8  conversation between you and Keith?
9       A.   I do not recall what we talked
10  about, but I think it would be safe to assume I
11  probably told him a little bit about Drive and
12  asked him to tell us a little bit about himself.
13      Q.   Okay.  Were you looking to add
14  members to the Drive team at that point in time?
15      A.   I was looking for people that could
16  join the team if our next fundraising went well.
17      Q.   Do you recall discussing
18  compensation salary ranges and that kind of thing
19  with him?
20      A.   No.
21      Q.   Okay.  All right.  I'm going to --
22  have you -- I've got a long exhibit here.  It's
23  Plaintiff's 136 through 200.  It's Exhibit 5.
24  Would you -- do you have a copy of that in front
25  of you right now?

1       A.   I do not have a copy in front of me
2  right now.
3       Q.   Okay.
4       MR. ANDERSON:  Has that been --
5  Ms. Nobles, may I just ask you, has that been --
6  I think Ms. Dodson sent that to you.  Has that
7  been supplied to Mr. Grappo?  I just don't want
8  to flip through that for him.
9       MS. NOBLES:  Yeah, I shared with him
10  the links that Ms. Dodson sent to me.
11      MR. ANDERSON:  Okay.  Because --
12      MS. NOBLES:  But I didn't -- but I
13  was not under the understanding that he would
14  have to actively access those absent some
15  technological snafu with --
16      MR. ANDERSON:  Yeah.  I just -- at
17  this point in the deposition, I just want don't
18  want to have to flip forward -- I just want to
19  put him through asking me to flip through 64
20  pages.  So it would be better -- I think it would
21  go better if -- and I can e-mail again right
22  now -- but if I just gave Mr. Grappo --
23      THE WITNESS:  Yeah.  If you want to
24  e-mail me the right link, I am happy to open it.
25  BY MR. ANDERSON:

1       Q.   I am just going to e-mail you the
2  document itself if that's all right.  That way,
3  we don't have to deal with links.
4       MS. NOBLES:  Yeah, I think that
5  would be better, just the straight document.
6       MR. ANDERSON:  Yeah.
7       MS. NOBLES:  And then you can -- if
8  you can identify it by Bates numbers --
9       MR. ANDERSON:  That's exactly
10  what --
11      MS. NOBLES:  The number at --
12      MR. ANDERSON:  -- I want to --
13      MS. NOBLES:  -- the bottom so that
14  we are all certain that we are on the same page.
15      MR. ANDERSON:  Exactly.  And I am
16  going to copy you, Ms. Nobles, just so you know
17  what I have sent your client.
18      MS. NOBLES:  I appreciate that.
19      MR. ANDERSON:  My --
20      MS. NOBLES:  I figured you would.
21      MR. ANDERSON:  I can't always be
22  relied on.
23  BY MR. ANDERSON:
24      Q.   Would you, Mr. Grappo, provide me
25  with an e-mail that I can do that --

1       MR. ANDERSON:  Or, Ms. Nobles, would
2  you rather I e-mail it to you and you forward it
3  to your client?  You tell me.
4       MS. NOBLES:  You can e-mail it
5  directly to him.  So long as I am cc'd, I think
6  that's fine.
7       MR. ANDERSON:  Okay.
8  BY MR. ANDERSON:
9       Q.   Mr. Grappo --
10      A.   Just alex@DriveCoffee.com
11      Q.   All right.
12      THE COURT REPORTER:  Do you want all
13  this on the record?  We're still on the record.
14      MR. ANDERSON:  We're still on the
15  record.  That's fine right now, yep.
16      And Ms. Nobles, would you tell me
17  your e-mail, please.
18      MS. NOBLES:  It's
19  LNobles@SussexLawFirm.com.
20      MR. ANDERSON:  And that's two S's,
21  SussexLawFirm.com?
22      MS. NOBLES:  That's right.
23      MR. ANDERSON:  Okay.  And I'm just
24  going to make the subject of this Exhibit 5.
25      (Whereupon, Exhibit 5, Text messages

1  Bates stamp P00136 through 200, was marked for
2  identification.)
3  BY MR. ANDERSON:
4       Q.   Okay.  That is sent.
5            If you will, Mr. Grappo, just take
6  as much time as you need to just flip through it.
7  I am going to tell you the question I'm going to
8  ask so that you can tell me when you are ready to
9  answer the question.  The question I'm going to
10  ask you about it is, do you recognize this
11  document?  And then I'm going to ask you, do you
12  recognize this to be the text exchange between
13  you and Mr. Clingman?
14           So whenever you're ready to answer
15  that question, just let us know.
16       A.   I'm not seeing an e-mail from you.
17           MS. NOBLES:  Yeah, I haven't
18  received it yet either.
19  BY MR. ANDERSON:
20       Q.   Okay.  It's a megabyte, so it might
21  take a minute.
22       A.   Oh, never mind.  It's in spam for
23  some reason.
24           MS. NOBLES:  Mine just came through.
25           THE WITNESS:  Here, I just

1  un-spammed it.
2            MR. ANDERSON:  It looks like Alex
3  has a better spam filter.
4            THE WITNESS:  It's just Gmail.
5            MS. NOBLES:  My e-mail recognizes
6  your e-mail address.
7            MR. ANDERSON:  Yeah.
8            THE WITNESS:  So what is the
9  question?
10  BY MR. ANDERSON:
11       Q.   The question is, do you recognize
12  this as an e-mail -- as a text message or SMS
13  conversation between you and Mr. Clingman?
14       A.   Yes, I recognize it.
15       Q.   Okay.  And is your -- just to be
16  sure -- your phone number 424-644-4104?
17       A.   That is my number.
18       Q.   Okay.  And have you had a chance to
19  flip through the whole thing to make sure it's
20  all part of the same -- of a continuing
21  conversation?
22       A.   Do I recognize it all as part of a
23  continued conversation?
24       Q.   Between you and Mr. Clingman, yes.
25       A.   I'm not sure if there is anything in

1  between that's missing.  I haven't memorized the
2  entire chain.  I mean, everything here -- I mean,
3  I recall having these conversations.  I can't
4  speak to the sequence or if anything is missing.
5       Q.   Okay.  I'm not asking, yeah, if it's
6  complete, but rather that there is nothing in
7  there that isn't a conversation between you and
8  Mr. Clingman.
9            MS. NOBLES:  Objection.  To be fair,
10  that's 64 pages.  So -- but I don't know -- Alex,
11  answer if you believe you can, but if you can't,
12  then --
13           THE WITNESS:  No, I mean, it's a
14  little hard to tell if there is anything in here
15  that's not a conversation, unless you want me to
16  go through the whole thing, which I am happy to
17  do.
18  BY MR. ANDERSON:
19       Q.   Yeah, I think -- at this point, I do
20  want to authenticate the entirety, so if you will
21  just take as long as you need.
22       A.   I mean, maybe -- if you want to get
23  straight to what your question was, I think, in
24  interest of everyone's time, we could say -- if
25  that's contingent upon something in here that may

1  not be accurate -- you know, if you want to jump
2  to that question, maybe we can do that rather
3  than just confirming that the entire thing is
4  true and accurate and not missing anything or
5  have anything additional added.
6       Q.   I'm not asking if it's missing
7  anything, but I am asking if everything that is
8  in these pages is part of a conversation between
9  you and Mr. Clingman.
10       A.   Everything here appears to have been
11  part of our conversation that I've seen so far.
12  I am only on page 14.
13       Q.   Would you like to take a little bit
14  more time to take a look through the rest of it?
15       A.   Okay.
16           (Discussion held off the record.)
17           THE WITNESS:  All right.  I have
18  reviewed it.  I mean, everything in there, yes,
19  looks to be accurate.
20  BY MR. ANDERSON:
21       Q.   I appreciate that.  One of the
22  reasons I needed to do that, just so you
23  understand, Alex, is that the numbers don't
24  appear at the top of each page, the phone
25  numbers, so I just wanted to make sure that it

1  seemed consistent that it was between just the
2  two of you.  I'm sorry about --
3      A.   Yes, this seems to be.
4      Q.   Okay.  I definitely appreciate that.
5          All right.  So let's now look at a
6  specific part of that that I want to talk about
7  now.  There is another part we'll talk about
8  later.  This -- and I'll call this Exhibit 6 just
9  so we're clear as to which part we're talking
10 about.  And I am going to put this up on the
11 screen, but just -- if you prefer, Mr. Grappo,
12 you can look at pages 136 to 148 or you can look
13 up on the screen.  Your choice.  Whatever works
14 best for you.  But I am going to put it up here
15 right now.
16          (Whereupon, Exhibit 6, Text messages
17 Bates stamp P00136 through 148, was marked for
18 identification.)
19          THE WITNESS:  Sorry.  Which -- okay,
20 go ahead.
21 BY MR. ANDERSON:
22      Q.   Yeah, so this is 136.  I'm going to
23 be talking to you about 136 through 148, which
24 are -- those numbers are listed in the bottom
25 right-hand corner of each page.  And just -- you

1  can either read yours -- I know you've already
2  read through this, so -- my question to you --
3      A.   I --
4      Q.   What's that?
5      A.   I can read this just fine here on
6  the screen.
7      Q.   Okay.  Great.  So my question to you
8  is, what is going on -- can you explain the
9  context of these texts that begin on July 27th,
10 2019, which would be, I think, two days after the
11 e-mails that we talked -- the introduction on
12 July 25; you had communicated that 4:00 p.m.
13 Easter, 2:00 p.m. Mountain works great for you.
14 So that was the 25th.  So these now begin on the
15 27th.  What are the context -- what's going on
16 with this text exchange between you and
17 Mr. Clingman?
18      A.   Just trying to find a time to meet
19 in person.
20      Q.   Okay.  And were you in New York City
21 at that time?
22      A.   I think I was in New York.  I don't
23 know.  I haven't checked my travel schedule.  I
24 don't remember.  I mean, I know that we had a
25 dinner with Becky and John and Keith in New York.

1      Q.   Okay.  And -- all right.  So you're
2  communicating with him to set up that personal
3  meeting.  I can flip -- that was page 136 --
4      A.   Yeah, yeah, yeah.  This is what
5  I'm -- yeah, correct.
6      Q.   Okay.  And did you -- I'm sorry.  I
7  will wait for you to tell me to flip.
8      A.   No, it's good.  Continue.
9      Q.   Okay.  And I notice here on
10 August 10th, the top of page 139, you do ask him
11 send a resume.  And he says he sent it through.
12 Do you recall him sending you a resume?
13      A.   I believe he did, yeah.
14      Q.   Okay.  And then you ask him for some
15 market information from Red Bull.  Tell me when
16 you're ready to flip on.
17      A.   Yeah.  Go ahead.
18      Q.   And then towards September 7th -- so
19 you said part of this was arranging a personal
20 meeting.  And then you are -- around
21 September 7th on page 142 here you begin talking
22 about a plan to fly Keith to Colorado the
23 following Friday.
24      A.   Sure.
25      Q.   Is that your recollection also?

1      A.   Sure.
2      Q.   Okay.  And did you purchase those
3  tickets for him to come to Colorado?
4      A.   Drive Coffee did.
5      Q.   Okay.  That's what I meant, I'm
6  sorry.  So Drive bought those tickets for him.
7          And then you all met.  And in the
8  conversation goes on.  And then it seems to be
9  that you are talking about a location in Aspen as
10 well.  Would these be the dates that I was
11 talking about earlier, September 17th and on,
12 about the meeting in Denver and Aspen where you
13 met with Mr. Clingman and other members that you
14 were considering for Drive Coffee?
15      A.   Yeah.  Those dates appear to line
16 up.
17      Q.   Okay.  And you encourage here, on
18 the top of page -- middle of page 145 that
19 Mr. Clingman and Becky -- who I'm presuming is
20 Becky --
21      A.   Moody.
22      Q.   -- Moody -- to actually try to be on
23 the same flight.
24      A.   Yes.
25      Q.   Okay.  And also interspersed in here

1 are marketing ideas, ways to position Drive
2 successfully, both for investment and in the
3 market?
4      A.   I'm not going to speculate as to the
5 purpose of the recommendations, but sure, it
6 appears there's some comments made about company
7 positioning.
8      Q.   Okay.  The reason I'm asking is that
9 he -- I think this is Mr. Clingman on the right.
10 You're on the left with these; he is on the
11 right.  Is that correct?
12      A.   Let's see here.  Yeah, he appears to
13 be on the right and I am on the left.
14      Q.   Okay.  So here he is just mentioning
15 that he had dinner with a friend tonight that --
16 I'm looking at the middle of page 146.
17      A.   Yep.
18      Q.   -- that shares investors, and then
19 the conversation goes on to discuss some
20 positioning around that.
21      A.   It appears to do so.
22      Q.   And then on page 148 the
23 conversation continues about how to -- 147 and
24 148 -- on how to position perhaps some social --
25 what's the phrase that was used here? -- social

1 good angle for positioning Drive as opposed to,
2 for instance, energy drinks.
3      A.   It appears so.
4      Q.   Okay.  And this is all -- and you
5 recognize all this as back-and-forth e-mails over
6 a period of several weeks between you and
7 Mr. Clingman?
8      A.   Back-and-forth text messages, not
9 e-mails.
10      Q.   Yeah.  Did I say e-mails?  I'm
11 sorry.  Back-and-forth text messages.
12      A.   Yes.
13      Q.   Okay.  In this -- at the early part
14 of it, I did mention that you asked him for his
15 resume, and he says, I sent it through.
16           Do you recall getting his resume?
17      A.   I already answered that question.  I
18 believe that, yes, at some point I saw his
19 resume.
20      Q.   Okay.  Very good.
21           So I'm just going to show you an
22 e-mail now as Exhibit 7.  I'm going to share --
23 let's see if I can flip without going through.
24 There you go.
25           (Whereupon, Exhibit 7, E-mail from

1 Clingman to Grappo dated 8/11/19, was marked for
2 identification.)
3 BY MR. ANDERSON:
4      Q.   Exhibit 7 is an e-mail from Keith to
5 you dated August 11th, 2019 at 1:44 p.m.  and It
6 seems to show an attachment of a resume with
7 Keith Clingman.  Do you recall getting this
8 e-mail?  I am going to go full page so you can
9 see the whole thing.
10      A.   Do I recall that e-mail?  No.
11      Q.   Do you recall receiving -- but you
12 have said that you do recall receiving his
13 resume?
14      A.   I told you, yes, I seem to recall
15 seeing his resume at some point.  I don't
16 remember what it looked like or when that
17 happened, but yes, I vaguely remember him sending
18 over a resume.
19      Q.   Okay.  Now that we've talked about
20 sort of that organization of getting people
21 together and getting airplane tickets and
22 organizing Mr. Clingman to come to Denver and
23 Aspen in and around September 17th, do you recall
24 bringing more than just Mr. Clingman to that
25 event in Denver and in Aspen in September of

1 2019?
2      A.   I do.
3      Q.   Okay.  Who all was there?  Who all
4 did you have come to that event?
5      A.   Remmy Castillo, Lindsay Orridge --
6 hang on, I'm sorry -- Becky Moody, Keith
7 Clingman, and myself.
8      Q.   All right.  And just so I'm sure we
9 didn't miss anything, you said Remmy, Lindsay,
10 Becky, Keith and yourself?
11      A.   Remmy, Lindsay, Keith, Becky and
12 myself, yes.
13      Q.   Okay.  How did you decide who was to
14 come -- that these were the people you wanted to
15 have at this meeting?
16      A.   Potential people that we'd want to
17 bring on if we got to our funding targets and
18 people that, if they were hired, would have to
19 work with each other.  So I wanted to get a feel
20 for what everybody thought of each other.  Given
21 that nobody had made any decisions yet and was
22 not employed by Drive, I figure part of any
23 process of evaluating an opportunity is
24 evaluating who your colleagues would look like.
25      Q.   What did the group do while you were

1  in Denver?

2      A.    Met with a few potential and
3  existing investors, went out to dinner a few
4  times.  And that's basically all we did down in
5  Aspen.

6      Q.    I asked in Denver.

7      A.    Yeah.  And in Denver -- yeah, we
8  went out to dinner with potential investors --
9  well, one dinner with a potential investors.
10  They met a few of my existing investors.

11      Q.    Did the group visit the warehouse?

12      A.    They did.

13      Q.    Okay.  And did the group also meet
14  at the WeWork location?

15      A.    I cannot remember if that occurred
16  during that trip.

17      Q.    Okay.  Do you remember what was
18  talked about during --

19      A.    There were a couple of times we met
20  at WeWork, and so I am not entirely sure who was
21  there during that time.

22      Q.    Okay.  Do you remember what the
23  group talked about during these meetings in
24  Denver specifically?  I'll ask about Aspen in a
25  minute.

1      A.    Sure.  What the company would look
2  like if we got funding and if everything was
3  formalized.

4      Q.    Do you recall any conversations
5  about not providing employment documents and
6  reasons for not providing employment documents at
7  that meeting?

8      A.    I do not recall any of that.  I know
9  what any reason for lack of employment documents
10  was, was no capital to hire or pay people.

11      Q.    Do you recall explaining that
12  actually was a specific investor who was having a
13  divorce issue that was holding up his ability to
14  invest in the company?

15      A.    I know that I've mentioned that to a
16  few people on several occasions.

17      Q.    And did you indicate to the team
18  that was meeting there in Denver that that
19  situation should resolve itself within a short
20  amount of time?

21      A.    I recall saying that at multiple
22  points.  I don't remember specifically that
23  weekend, but I recall saying that on multiple
24  points, at --

25      Q.    So it wouldn't be --

1      A.    -- multiple points in --

2      Q.    -- inconsistent with what you had
3  been saying to have said that?

4      A.    Yeah, it was consistent with the
5  truth.

6      Q.    Okay.  And then the group went to
7  Aspen.  Why did you take the group from Denver to
8  Aspen subsequent to meeting in Denver?

9      A.    Well, the group from Aspen to
10  Denver.  They were in Aspen first and then we
11  went to Denver.

12      Q.    My mistake, I'm sorry.  Okay.  So
13  you went to Aspen -- why Aspen first and then
14  Denver?

15      A.    Because I just wanted everybody to
16  have some fun.

17      Q.    Okay.  What did you do in Aspen?

18      A.    Drove people around the mountains,
19  showed them the area, ate at Nobu.

20      Q.    The -- Drive doesn't have any
21  facilities or business in Aspen, does it?

22      A.    We do not.

23      Q.    Okay.  So it was just simply a
24  pleasure trip to spend some time as a group?

25      A.    Correct.

1      Q.    Okay.  When did -- when, according
2  to your recollection, did Mr. Clingman first
3  perform services on behalf of Drive?

4      A.    I don't have any recollection of
5  him -- and I would say define what you mean by
6  services.

7      Q.    Any work or -- I mean, I don't think
8  the word "services" needs much of a description.
9  Any work or services performed to the benefit of
10  Drive, whether they be marketing services, sales
11  services, advising services, consulting services,
12  whatever.  On behalf of Drive, when did
13  Mr. Clingman first perform services on behalf of
14  Drive, according to your recollection?

15      A.    Again, I think the definition of
16  services is really important.  It -- you know, I
17  don't really recall -- I can recall some e-mails
18  being sent.  For example, there were some e-mails
19  that were sent.  I mean, there is a record of it
20  in that text train, and I think the date stamps
21  are there of when that occurred.  I cannot come
22  up with a date for you right now.  I don't know
23  that off the top of my head of when he sent a few
24  e-mails on our behalf.

25      Q.    Okay.  Would it be consistent with

Page 162

1 your recollection that it was shortly after this
2 meeting in Denver?
3     A.    Yeah.  At some point after Keith had
4 visited Denver, yes, he sent a few e-mails.
5     Q.    Okay.  And would you -- like, I
6 don't want to -- I am not trying to trap you in
7 some tricky definition of services.  Like, would
8 you consider that, by your definition of
9 services, to be services rendered on behalf of
10 Drive?
11     A.    In my personal definition?  No, I
12 would not.
13     Q.    Okay.  What would your definition of
14 services be?
15     A.    I think I would answer that another
16 way of saying that, you know, I was getting
17 messages at the time from his friends saying that
18 he was bored and just really wanted some things
19 to be able to just keep him busy until funding
20 was achieved and he could be hired, and that he
21 really desired some things to do.
22         And so there was a few simple
23 things, like sending e-mails, that he wanted to
24 do.  And I don't know, I mean, when those were
25 sent.  I think you have time and date stamps in

Page 163

1 that text thread.
2     Q.    Okay.  And you know -- so you did
3 discuss with him and were aware of the fact that
4 he was doing those -- sending those e-mails,
5 doing those things on behalf of Drive?
6     A.    I was aware of certain things, yes.
7 I was aware that, you know, he had logged into
8 our barcode system, which you can see in that
9 text thread at some point.  I was aware that a
10 couple of e-mails had been sent with Macy's.  And
11 by "a couple," let's say a few.  I don't want to
12 say it was exactly two or whatever it was.
13     Q.    Sure.
14     A.    Those things I was aware of.
15     Q.    And when you talk about Macy's,
16 just -- does that -- did that result in the
17 placement at Macy's that we talked about earlier
18 today?
19     A.    No, absolutely not.  I mean, they
20 reached out to us because of everything we had
21 done prior to ever being introduced to Keith
22 Clingman.  They had been introduced to us through
23 another customer prior to ever meeting Keith
24 Clingman that was -- in fact was a -- the person
25 at Macy's was a former colleague of one of our

Page 164

1 previous clients, and in no way did he -- in no
2 way, shape or form did he effect the outcome of
3 that.  They were menial e-mails that had been
4 sent along the way that were basic coordination
5 that, frankly, could have been handled by anybody
6 with a Drive Coffee e-mail address.
7         So the deal -- I mean, they had
8 already proposed the deal to us.  I spoke with
9 them on the phone.  I coordinated how much it
10 would be.  And the team here in Denver packed and
11 shipped all the coffee.
12     Q.    Okay.  So Mr. Clingman was
13 attempting to provide some assistance during
14 that, but he wasn't -- you're saying he wasn't
15 instrumental in landing that deal?
16     A.    Not in any way, shape or form.
17     Q.    Okay.  But it was in an effort and
18 on behalf of that deal.  Fair enough?
19     A.    It was related to that deal, sure.
20     Q.    Got it.  Okay.
21         Did you discuss a title with
22 Mr. Clingman?
23     A.    Titles had been discussed for -- if
24 the right amount of funding was achieved and if
25 we were able to hire people, what kind of title

Page 165

1 someone would carry.  As I have discussed before,
2 too, I try and take a hands-off approach, so I
3 let people figure out what they want to be
4 called.  I never really cared too much about
5 titles.  So...
6     Q.    Did there come a time when the
7 portfolio for Mr. Clingman increased from just
8 marketing and sales?
9     A.    There was a time where we had
10 discussed that that might be something that he
11 would take on --
12     Q.    When was that?
13     A.    -- had he been hired.
14     Q.    When did you --
15         MS. NOBLES:  I'm sorry.  You cut
16 out -- that last part of your answer cut out
17 there.
18         MR. ANDERSON:  Thank you,
19 Ms. Nobles.
20 BY MR. ANDERSON:
21     Q.    Could you --
22     A.    I said there were some times --
23 there was a time where that had been discussed as
24 something that he might handle once he was
25 employed, if the company got any funding, which

Page 166

1  we didn't.  So hands-off yeah, people -- titles
2  were talked about.
3      Q.  Okay.  When --
4      A.  But titles are exactly that.
5  They're words, not work.
6      Q.  When did the conversation change
7  from being -- the portfolio being just marketing
8  to his portfolio including sales?
9      A.  Keith had made it very clear that --
10 as well as several of Keith's friends made it
11 clear that he did not like the person that we had
12 wanted to eventually handle sales.  And so it was
13 discussed, again, that if we had been funded, if
14 we had the money to do all this, then it would be
15 something that Keith could potentially take on.
16     Q.  And --
17     A.  As a result of, you know, coming to
18 learn more about another person that we had been
19 interested in.
20     Q.  From the time period from September
21 of 2019 through April, roughly, of 2020, what did
22 you expect Mr. Clingman to achieve on behalf of
23 Drive?
24     A.  Absolutely nothing.
25     Q.  Did you measure his performance in

Page 167

1  any way?
2      A.  No, his performance was not formally
3  measured in any way.  There was nothing for him
4  to perform on.
5      Q.  Prior to there being a conversation,
6  an e-mail conversation or otherwise between you
7  and him about money he claimed you owed him, how
8  would you rate his performance with Drive?
9      A.  There was no performance to rate.
10 We had given -- we had allowed him to sink his
11 teeth into a few things that his friends were
12 telling me he really wanted to do.  Again,
13 everyone was friends there, so as I'm learning
14 through this process -- unfortunately, sometimes
15 we have to distinguish friends from,
16 quote/unquote, employees.
17         But in trying to do the right thing,
18 which is giving him what he was asking at the
19 time while he was looking for things to keep busy
20 with, allowing him some menial things to be
21 involved with was in no shape or form something
22 that would require a performance analysis or
23 review.  There was nothing to review.
24     Q.  How much time did you understand
25 that Mr. Clingman was spending working on behalf

Page 168

1  of Drive during this time from September 2019 to
2  April 2020?
3      A.  I was not under the impression and
4  don't believe Keith was working on behalf of
5  Drive.  In terms of time that he was committing,
6  given that there was virtually no results other
7  than a couple of e-mails of whatever may have
8  been claimed or is being claimed that was done, I
9  would imagine it was a few hours, other than the
10 hours he spent here, you know, having fun with a
11 few other candidates.
12     Q.  What rate of pay did you discuss
13 with Mr. Clingman that he would be paid?
14     A.  I do not recall.
15     Q.  Do you recall discussing how
16 frequently he would be paid?
17     A.  I don't believe that was ever
18 discussed.
19     Q.  Okay.  I'm going to show you now
20 what's Exhibit Number 8.  This is a spreadsheet
21 with pie charts, two pages.  It's also marked as
22 Plaintiff's 126 and 127.  I'm going to put it up
23 on the screen here.
24         (Whereupon, Exhibit 8, Spreadsheet
25 Bates stamped P000126 and 127, was marked for

Page 169

1  identification.)
2  BY MR. ANDERSON:
3      Q.  And are you on sufficiently a large
4  screen that you can actually read this?
5      A.  Yes.
6      Q.  And I can actually make it a little
7  bit bigger, so bear with me.  I'll bring that up
8  a little bit in size.  How is that?
9      A.  That's fine.
10     Q.  Okay.  Can you describe what this
11 is?
12     A.  It's a budget and projections.  I'd
13 say -- well, to be very clear, projections if the
14 company had been fully funded of potentially how
15 money would have been spent.
16     Q.  Okay.  And the target month column,
17 what does that target month mean?  Is that the
18 month --
19     A.  That would be --
20     Q.  -- that the role would be added?
21     A.  That would be when we had $5 million
22 in the bank account.
23     Q.  Target month 1, target month 4,
24 target month 1, target month 1, what does that
25 mean?

1    A.    That would be when that pay would
2  start occurring after $5 million had been
3  collected in the authorized investment that we
4  were trying to raise in our series A.  We had
5  authorized $6 million in shares to be raised.  We
6  had set the target as 5.  We had budgeted an
7  additional million in case the round was
8  oversubscribed above our initial targets.
9          And so this is what expenditures
10  would look like once we had reached our target of
11  $5 million, and at which point, when there was
12  $5 million in the account, from then on, when we
13  would start making those expenditures.
14     Q.    Okay.  And once that had been hit,
15  the CMO role would start month 1 and be at
16  $150,000; is that --
17     A.    That was a rough number that had
18  been thrown in to conservatively budget, again,
19  after we had had $5 million.  I'm -
20     Q.    I understand.
21     A.    -- sure you can assume that, you
22  know, at many points in this, with a thousand
23  dollars in the bank account, we had no intent of,
24  you know, having monthly salary expenditures of
25  $116,000.  So yes, it was once $5 million had

1  been raised.
2     Q.    Okay.  And -- sorry about that.
3  So -- but the line for CMO, that role -- was that
4  the role being considered for Mr. Clingman, the
5  CMO role?
6     A.    I don't know which excerpt this was
7  taken from, which version.  Again, there's
8  multiple versions of this document.  So I can't
9  speak to which version this was pulled from.  And
10  I would say that, generally speaking, it was a
11  generic placeholder.
12     Q.    Okay.  Do you recall speaking to
13  Mr. Clingman about a salary range of $150,000?
14     A.    In the general range, yes.
15     Q.    Okay.  I'm going to switch now to
16  Exhibit 9.  Switching now to Exhibit 9.
17          (Whereupon, Exhibit 9, Spreadsheet
18  Bates stamped P000125, was marked for
19  identification.)
20  BY MR. ANDERSON:
21     Q.    This is also a spreadsheet.  This
22  one has a title.  It's marked as
23  Plaintiff's 00125.  I am also going to try to
24  make that bigger.  The title is, "Drive series A
25  budget and projections, October 2019."

1          Do you recognize this spreadsheet?
2     A.    If you can zoom in.  I can't really
3  see it.
4     Q.    Yeah, I will try.  I will tell you
5  what.  I am going to go wide and -- just give me
6  a second to resize this.  It will make it better.
7          Okay.  Is that visible for you now?
8     A.    Yes, I can see it.
9     Q.    Okay.  Do you recognize this
10  spreadsheet?
11     A.    Yes, I recognize it as a spreadsheet
12  that's been created at some point.
13     Q.    Okay.  That was a lot of passive
14  tense.  Who do you think created this
15  spreadsheet?
16     A.    I mean, we give access to several
17  people in the company to play with spreadsheets.
18     Q.    Are you personally familiar with
19  this one?
20     A.    I don't recall this one exactly.
21  This is a very old spreadsheet.
22     Q.    Okay.  Well, it says it's from
23  October 2019, so that would be, in fact, a year
24  and a half ago.
25     A.    Yeah.  Also, if you look from the

1  screen shot, that -- this is under Keith's Google
2  account.  It has his photo on there.  So I can't
3  really speak to any of the content in there
4  and --
5     Q.    Okay.
6     A.    -- who put that in there.
7     Q.    Do you have access to this document
8  call Drive series A budget and projections,
9  October 2019 that's on --
10     A.    I would have to look for it.
11     Q.    Okay.  But would you have access to
12  one that is not on his account but would be on
13  your account?
14     A.    I can try and find it.
15     Q.    I'm not asking you to right now.
16     A.    I think the answer is going to
17  remain the same, which is there is lots of
18  scratch work that's put together in Google Docs.
19  But I'm happy to pull it up if you'd like me to.
20     Q.    So you think that this is scratch
21  work?
22     A.    Yeah.  I've got any one of a number
23  of 20 different versions of spreadsheets and
24  projections from different times and different
25  places to model different scenarios.  Part of my

Page 174

1  role as the CEO is to model and try and take a
2  poke at what the future might look like and come
3  up with some rough numbers in my head.
4      Q.   Okay.  And you do see that on this
5  spreadsheet it does indicate Alex Grappo,
6  150,000; Keith, 150,000; Becky, 150,000; Lindsay,
7  150,000; Sarah, 70,000; Marisol, 50,000.  Do
8  those numbers seem like numbers you were
9  considering at that time?
10     A.   Sure, they seem like numbers that
11 were being considered at the time.
12     Q.   Okay.  How much did you end up
13 paying to Mr. Clingman, all told?
14     A.   I believe the total is $30,000.
15     Q.   Okay.  And you said the total is
16 $30,000.  How did that come -- from what kinds of
17 payments did you total that?
18     A.   I believe you have exhibits
19 documenting every means that the funds were
20 transferred.
21     Q.   Yeah, I'm just trying -- from your
22 recollection.  We will go over the exhibits in a
23 minute.
24     A.   Zelle, PayPal, Venmo, and direct
25 wire.

Page 175

1      Q.   Okay.  But you think the total was
2  30,000?
3      A.   Somewhere between 25 and 30.
4      Q.   Okay.  All right.  So I'm going to
5  show you then just to -- this is going to be
6  Exhibit 10.  And I'm going to show the whole
7  thing and then I'll zoom in so it's actually
8  readable again, if it's not readable now.  So let
9  me share it first.  This is 10, also
10 Plaintiff's 131.  It looks like evidence of a
11 wire transfer.
12          (Whereupon, Exhibit 10, Document
13 Bates stamped P000131 and 132, was marked for
14 identification.)
15 BY MR. ANDERSON:
16     Q.   Do you recognize this?
17     A.   Yes.
18     Q.   Okay.  And is this a wire transfer
19 of $13,300 from you to Mr. Clingman?
20     A.   It appears to be.
21     Q.   Okay.  And --
22     A.   I mean, I see 14,609 there.  I mean,
23 maybe that's total after fees or something,
24 but...
25     Q.   Okay.  I do see that the amount says

Page 176

1  13-3, and then there's two numbers to the right
2  that say 13,300 and 14,609.58.  And I don't know
3  what the two differences are, but you think that
4  might be fees?
5      A.   Potentially.
6      Q.   Okay.  I do note that it looks like
7  about 10 percent, but anyway -- and then the
8  second page of this, which is Plaintiff's 132 --
9  this one, by the way, was dated November 27,
10 2019.  And then Plaintiff's 132, which is the
11 second page of Exhibit 10, is a line item showing
12 a QuickPay with Zelle from Grappo, Alexander,
13 which is -- I guess is you, for $3500.  Does
14 that -- do you recognize that?
15     A.   Yes.
16     Q.   Okay.  And are these two payments
17 that you made to Mr. Clingman?
18     A.   Yes.  It appears so.
19     Q.   And I'm going to show now an e-mail
20 thread that's your exhibit -- or not your
21 exhibit, I'm sorry, but it's your document
22 produced by Drive, which constitutes DRIVE pages
23 2 through -- and I'm scrolling -- through 10,
24 DRIVE pages 2 through 10.  I am just going to ask
25 you first if you recognize this e-mail thread.

Page 177

1          (Whereupon, Exhibit 11, E-mail chain
2  Bates stamped DRIVE 0002 through 10, was marked
3  for identification.)
4  BY MR. ANDERSON:
5      Q.   And I can scroll through it if you
6  want me to so that you can review it.
7      A.   Sure, I recognize this.
8      Q.   And I am just going to scroll
9  through all of it and see if you recognize the
10 whole thing and then we'll talk about it.  So
11 this is -- this next page, DRIVE 3.
12     A.   Okay.  Yeah.
13     Q.   DRIVE 4.
14     A.   Okay.  Yeah.
15     Q.   DRIVE 5.
16     A.   Okay.
17     Q.   And DRIVE 6.
18     A.   Yeah.
19     Q.   And 7.
20     A.   Yes.
21     Q.   Okay.  And 8.
22     A.   Yeah.
23     Q.   9.
24     A.   Yeah.
25     Q.   And 10.

1  A.  Yes.

2  Q.  Okay.  And what do you recognize

3 this document, Drive -- which is our Exhibit 11

4 now and it's also labeled DRIVE produced pages 2

5 through 10 -- what do you recognize it to be?

6  A.  A conversation between Keith and

7 myself.

8  Q.  By e-mail, right?

9  A.  Correct.

10  Q.  Okay.  And on page 8 -- does it seem

11 to be complete and accurate as to this e-mail

12 thread?

13  A.  As far as I can see.

14  Q.  Yeah.  And you guys produced it, so

15 I would hope so.  Here on page DRIVE 8, which is

16 page 7 of the exhibit, is you -- an e-mail from

17 you dated May 7th, 2020, doing an accounting of

18 what you believe has been paid to Mr. Clingman to

19 that date.  Does that seem accurate from where

20 you stand today?

21  A.  I'm trying to remember.  I mean, I

22 believe we submitted a total of our transfers --

23 Lisa would have that probably in our exhibits --

24 and how those occurred.  So yeah, between --

25 somewhere between 25 and 30, yeah, that seems

1 about right.

2  Q.  Okay.  So -- yeah.  This one totals

3 it up to 24,950 at that time.  Do you have any

4 reason to believe that at that time that was not

5 accurate?

6  A.  I have no reason to believe that was

7 not accurate.

8  Q.  And then you offered -- in addition

9 to reimbursement of expenses, you would like to

10 offer an additional 10,000 to him.  Do you

11 remember making that offer to him on that date in

12 that e-mail?

13  A.  I recognize that as an e-mail that I

14 sent.

15  Q.  And why were you offering another

16 $10,000?

17  A.  To try and defuse and move on from

18 the situation.

19  Q.  What did you consider the situation

20 to be?

21  A.  Somebody making very much off-base

22 claims and acting in an extremely irrational

23 manner.

24  Q.  Okay.  So in this e-mail exchange

25 you don't indicate back to him that these are

1 extremely irrational -- would that be fair?

2  A.  Well, I have some level of --

3  Q.  What's that?

4  A.  I said I have some level of common

5 courtesy.  I would say that -- I did see a

6 message in here where I said we have a very

7 different view on things.  I forget exactly which

8 page that was on.

9  Q.  I think we're looking at it, right?

10 "We have a strong difference of opinion about the

11 current situation"?

12  A.  Yeah, there you go.

13  Q.  Okay.  When you -- when Mr. Clingman

14 sent you his resume, do you know what you did

15 with it?  Did you store it somewhere?  Did you

16 send it on to anybody?

17  A.  My e-mail inbox.

18  Q.  It would be in your e-mail inbox?

19  A.  Yes.

20  Q.  Okay.  You mentioned earlier that

21 for some people you did pay PTO or vacation.  Was

22 there any understanding between you and

23 Mr. Clingman about PTO or vacation that he would

24 have?

25  A.  Going back to my previous statement,

1 I told you that I paid people to take time off

2 and I would like to stick with that wording.

3  Q.  Okay.  Did you --

4  A.  In terms of -- Keith was never

5 hired, so there was never a discussion about PTO

6 or time off.

7  Q.  But you guys had lots of discussions

8 about the future, you said, so in the

9 conversations about the future --

10  A.  I don't recall what conversations we

11 may or may not have had about PTO or time off.  I

12 mean, most of his time where we were

13 corresponding about Drive from the time we were

14 introduced to the time of the last e-mail that

15 you just put in front of me was essentially time

16 off.

17  And, you know, the majority of the

18 time that he even spent in the company of people

19 related to Drive Coffee was, you know, flying

20 first class and going to nice places and getting

21 to go to nice dinners without requiring any sort

22 of performance or delivery or things to get done.

23  So I guess -- I think the whole

24 thing would be his own time off, but no, I don't

25 recall that ever being a conversation.  I don't

1  recall what may or may not have been mentioned
2  about time off.
3      Q.   I just want to also ask you, in this
4  e-mail -- I am going to put the e-mail thread
5  back up real quick.  We're now looking at page
6  DRIVE 6.  It's page 5 of the exhibit.
7           Up until that point, until
8  April 23rd, 2020, the e-mails from Keith are
9  coming from Keith@DriveCoffee.com.  Do you agree
10 with that?
11     A.   I agree with that.
12     Q.   Okay.  And on that date, you suggest
13 to him any further communications should now
14 occur through your personal Gmail.
15          What did you mean by that?
16     A.   I meant that he should use his
17 personal e-mail to correspond with us.
18     Q.   Okay.  How did Mr. Clingman come to
19 have a DriveCoffee.com e-mail address?
20     A.   To the best of my recollection, he
21 was asking for one.
22     Q.   And who made the decision to give
23 him one?
24     A.   Niko handles all that.
25     Q.   Okay.  Niko had independent

1  authority to make that decision without any input
2  from you?
3      A.   I probably said it was okay.  I
4  understand that Keith was eager to be involved
5  with Drive Coffee at some point in time and,
6  again, dealing with people as friends where
7  everyone is acting as friends and in an friendly
8  manner, and they think that's something that
9  would help while we are trying to get things
10 together, then, yeah, I probably signed off on it
11 at that time.
12     Q.   At any time did you ask Mr. Clingman
13 to sign any contract or agreement with Drive?
14     A.   To the best of my recollection I've
15 never asked Keith to sign any agreements with
16 Drive Coffee or with anyone on behalf of Drive
17 Coffee.
18     Q.   Okay.  And no independent contractor
19 agreement?
20     A.   [Technical interference] -- given
21 that he was not an employee of Drive Coffee.
22     Q.   Could you repeat that, Alex?  I'm
23 sorry, you cut out.
24     A.   So I said at no point -- to the best
25 of my recollection, at no point did he ever sign

1  a contract with us or on behalf of us, and
2  certainly not on behalf of us because he would
3  not have had the authority to do that --
4      Q.   Got it.
5      A.   -- given that he was not an employee
6  of Drive.
7      Q.   Understood.  And to your
8  recollection, just to be more specific, no
9  independent contractor agreement either with
10 Mr. Clingman.
11     A.   I don't recall ever signing an
12 agreement with Keith Clingman.
13     Q.   Okay.  And did you ever ask him to
14 enter into a nondisclosure agreement, or NDA?
15     A.   To the best of my recollection, we
16 have not.
17     Q.   Okay.  And to the best of your
18 recollection, he never --
19     A.   That does not negate that at some
20 point in time we probably mentioned certain
21 things are confidential and may have verbally
22 asked for certain things to be confidential.
23     Q.   But to your recollection, no written
24 NDA?
25     A.   No formal NDA was signed.

1      Q.   Okay.  And to your recollection
2  also, no W-4s, W-9s or I-9s were submitted by
3  Mr. Clingman to Drive?
4      A.   I've never seen any of that come
5  from Keith.
6      Q.   And neither did Drive request him to
7  do so, correct?
8      A.   To the best of my recollection,
9  we've never requested that he do that.
10     Q.   Okay.  Is it accurate to say now
11 that Mr. Clingman is no longer providing any
12 services on behalf of Drive?
13     A.   I don't think Mr. Clingman has ever
14 provided any services on behalf of Drive.
15     Q.   Well, you mentioned he -- I think
16 you mentioned he's made some in- -- I don't
17 remember your exact words, but inconsequential,
18 or menial I think you said, e-mails on behalf of
19 Drive.  When did he stop doing anything --
20     A.   [Technical interference] -- at this
21 point, no.
22     Q.   I'm sorry.  Could you -- the
23 question was -- let me just finish the question
24 real quick.
25     A.   You asked if it would be safe to say

Page 186

1  at this point that he's no longer providing any
2  services, and I'm saying, no, he is not providing
3  any services --
4       Q.   Okay.
5       A.   -- at this point.
6       Q.   Very good.
7            What do you think was the last date
8  that he did anything on behalf of Drive?
9       A.   We can go back and look when the
10  last e-mail was sent from his account.  I
11  wouldn't know that offhand.
12       Q.   Okay.  Well, we just covered that
13  you asked on April 23rd that he stop that
14  communication through Drive Coffee.  Would that
15  be a reasonable date?
16       A.   No.
17       Q.   Okay.  When do you think?  Before
18  that or after that?
19       A.   Again, I can't speak to the last
20  time he took action on his e-mail account, using
21  that to communicate with anyone outside of the
22  company.  That's something I believe we have
23  preserved, so we can look into that.
24       Q.   Did there come a time where you
25  asked Niko or anybody in the company to prevent

Page 187

1  Mr. Clingman from using Drive Coffee e-mail or
2  systems?
3       A.   Yes.
4       Q.   When was that?
5       A.   Around the time of the e-mail you
6  put before me.
7       Q.   Okay.  And would that have also
8  locked him out of the Google Drive that we were
9  talking about earlier where he had access to
10  those Google docs and Google sheets?
11       A.   Niko knows more about the technical
12  aspects of what removing access to the e-mail
13  would do, but I believe it would also eliminate
14  access to documents.
15       Q.   Okay.  But did you make an
16  instruction to Niko at some point to remove
17  Mr. Clingman from access to company resources?
18       A.   I did.
19       Q.   Okay.  And when about -- do you
20  think that was about the time of that e-mail?
21       A.   Yes.
22       Q.   Okay.  Other than that action, did
23  there come a time where Mr. Clingman communicated
24  to you that he resigned from his service at
25  Drive?

Page 188

1       A.   I don't know what he would have
2  resigned from.
3       Q.   Regardless of whether you believe he
4  had anything to resign from, did there come a
5  time where he indicated that resignation?
6       A.   I don't recall ever receiving
7  anything along those lines.
8       Q.   And did you ever communicate to him
9  an e-mail or a document or a text message or a
10  phone call that would be considered a
11  termination?
12       A.   There would be nothing to terminate
13  him from.
14            MS. NOBLES:  Hey, Christopher, if
15  you could let us know when we can take a quick
16  break here, because we've been going for almost
17  two hours straight.
18            MR. ANDERSON:  This would be a fine
19  moment.
20            MS. NOBLES:  Sure.  Okay.  Let's
21  take ten, then.
22            MR. ANDERSON:  Okay.  It's almost
23  4:00, so we'll say -- I mean, it's almost 2:00.
24  So let's say 2:10.
25            MS. NOBLES:  That works.

Page 189

1            (Whereupon, a break was taken.)
2  BY MR. ANDERSON:
3       Q.   All right.  Mr. Grappo, we have
4  reviewed the e-mails between you and
5  Mr. Clingman.  We are going to skip -- just so
6  everybody is on the same page, I am going to skip
7  over Exhibit 12.  Those are just the same e-mails
8  from Mr. Clingman's account.  And I just -- I've
9  reviewed them.  They are the same content.
10            So I'm going to ask you, Mr. Grappo,
11  to please look with me at Exhibit 13.  And you --
12  I can, and I will, put this up on the screen.
13  But this is, again, from the same set of texts
14  that we looked at earlier, pages 136 to 200.  And
15  this will now be -- Exhibit 13 is starting on
16  page 19 to 200.
17            (Whereupon, Exhibit 13, Text
18  messages Bates stamped P00190 through 200, was
19  marked for identification.)
20  BY MR. ANDERSON:
21       Q.   And I am also going to put them up
22  on the screen here.  And these exhibits -- sorry.
23  This continuing text exchange begins in March --
24  on March 15th of 2020 and covers -- basically,
25  this is sort of the similar time frame to when

1  these e-mails were going back and forth with you
2  and Mr. Clingman.
3          I want to look particularly about
4  some of the actions that are being talked about
5  in these e-mails [sic]. So we'll start here on
6  page 190 other than -- we'll skip over the part
7  where you're not feeling well.
8          Where you are suggesting to
9  Mr. Clingman that you need to hire a part-time
10 hourly designer to help with the e-mails and he
11 says, "Yeah, we'll need a livery."
12         What does that mean, a livery?
13     A.   A livery is a paint scheme usually
14 on a car.
15     Q.   Do you know why he would have been
16 requesting or suggesting that we need a livery?
17     A.   No.
18     Q.   Because up here you say, "Let's do
19 the fridge. Do you need us to come up with
20 livery?"
21         And then -- do you remember what
22 that was about?
23     A.   Oh. Oh. Maybe for the fridge.
24 Yeah, like a paint scheme for the fridge.
25     Q.   And what fridge are we talking

1  about? Like, is this a fridge that --
2      A.   A fridge that --
3      Q.   Sorry. Go ahead.
4      A.   A fridge that would be at Macy's.
5      Q.   Okay. All right. So this is part
6  of the Macy's display?
7      A.   Yes.
8      Q.   And, for the e-mails, he says --
9  Mr. Clingman is asking, for e-mails, "are you
10 thinking someone to design newsletter e-mails?"
11         And he says, "Yes, I can definitely
12 tackle that."
13     A.   Yeah, I believe he's referring to
14 finding a designer that could handle that.
15     Q.   Okay. And you then responded, "I
16 think some [sic] help with product photography
17 and designing e-mails."
18         And he suggested he's got a good
19 network there.
20     A.   It appears that way.
21     Q.   Okay. And then he also indicates
22 that -- he is asking you whether you have product
23 photos of LeMans, Targa, Imola and Cold Brew.
24         Are those Drive Coffee products?
25     A.   That is correct.

1      Q.   Okay. Macy's -- he writes that
2  Macy's wrote him asking for this. And he's
3  asking if you have them or if he needs to get
4  someone to knock them out. And you suggested
5  that you could share them, that you do have them,
6  correct?
7      A.   Correct.
8      Q.   All right. Then he's talking about
9  the mail platform. You inform him that you're
10 not using MailChimp; you're using Campaign
11 Monitor. Is that an e-mail platform?
12     A.   It is.
13     Q.   Okay. And then he asks you, again,
14 to shoot over product photos with white
15 backgrounds.
16         And you wrote, "Let me know if that
17 works for you."
18         Does that mean that you had sent him
19 something?
20     A.   Potentially. I can't remember
21 whether I did or not.
22     Q.   Okay. Then he's asking, "Do we have
23 any with a solid white background?" Otherwise,
24 he'll Photoshop them. And he's asking about the
25 other products as well. And I'm going to flip

1  pages.
2          And you told him, "That should be at
3  the top in the folder."
4          So I am guessing you shared a series
5  of folders with him on your shared Google Drive?
6      A.   Presumably so.
7      Q.   Okay. That's when he then says some
8  of the folders are empty. And then he indicates
9  he's got them, other than Cold Brew.
10         But basically back and forth you
11 guys are talking about the photos for use at
12 this -- for this particular campaign at Macy's;
13 is that fair to say?
14     A.   Yes.
15     Q.   Okay. And then he indicates that he
16 will send what we have to Macy's.
17         Is this part of what you consider to
18 be the -- I keep forgetting the word you use -- I
19 keep thinking inconsequential, but you said --
20     A.   Menial.
21     Q.   -- menial e-mails?
22     A.   Yes.
23     Q.   Okay. And then he's indicated that
24 Macy's has sent an e-mail and he talked to Sarah
25 and he thinks that the product hasn't been

1 roasted yet.  And he's suggesting that
2 strategically it might be in the "best interest
3 to delay that order (which is what they're
4 asking) so that we're in stores when people are
5 actually there."  Otherwise, we'll just sit in a
6 closet.
7           And you agree that you should, in
8 fact, hold off.
9     A.    Yeah.  I believe -- because this is
10 when COVID stuff was occurring, and it became
11 evident that everything was shutting down so it
12 probably wasn't going to happen.
13    Q.    Got it.  All right.  And then he
14 says, so -- okay, he is going to let them know
15 that you guys have already purchased to fulfill,
16 but you are willing to hold off if they will
17 commit to fulfilling the PO at a later date.
18    A.    It appears that way.
19    Q.    Yeah.  And you concur and tell him
20 that you think that's good thinking, right?
21    A.    It appears I did.
22    Q.    Okay.  And then so -- so that we
23 don't waste product, I guess, he suggests at this
24 point that we should look at donating some of
25 this product to the hospital workers in Seattle

1 and New York; that's a big opportunity -- I guess
2 as a PR opportunity, and asks you to let him know
3 what you think.
4           And I don't see a response from you,
5 but do you remember that suggestion?
6     A.    I don't remember it, but I see it
7 before me right now.
8     Q.    Okay.  And then there is a
9 conversation about Crop to Cup.  Do you
10 remember -- do you have any idea what that's
11 about?
12    A.    Yeah, it's one of our green coffee
13 suppliers.
14    Q.    Okay.  And he says it's literally
15 down the street and asks you for contact.  And
16 you said the contact is this guy in Chicago, but
17 you will look for a local contact.
18           Why was he looking for a contact
19 from Crop to Cup, by your recollection?
20    A.    Because he was wanting things to get
21 involved in.
22    Q.    Okay.
23    A.    Wanting things to spend his --
24    Q.    Then he asked for an e-mail, and you
25 said, "Yup."  I am guessing that you probably

1 sent it to him.
2     A.    I guess.  I don't recall doing that,
3 but it appears I did, based on this conversation.
4     Q.    All right.  And then he tells you
5 the same day about -- the concept of -- he is
6 suggesting that -- or asking whether you're
7 bringing caffeine content down because he's
8 worried about first impressions with shipping
9 through Amazon.
10           Do you recall that conversation?
11    A.    I remember this text.
12    Q.    Okay.  What was your thought about
13 that?
14    A.    It's an idea, of which we've gotten
15 thousands from everyone, from friends to
16 customers.  We get plenty of ideas every day from
17 all kinds of random people.
18    Q.    Okay.  But this was an idea from
19 Keith.  I mean, did you consider it?  Was this a
20 good idea?  Is this something you did?  Didn't
21 do?  Ignored?  What was your reaction to it?
22    A.    No, none of our products are sold on
23 Amazon right now, so this literally had no effect
24 on anything that we're doing.
25    Q.    Okay.  What did -- to your

1 recollection, what did he mean by, "We're leaning
2 into Amazon"?
3     A.    I mean, he says, "If we're leaning
4 into Amazon."
5     Q.    Okay.  So --
6     A.    So, once again, Keith was theorizing
7 about what the future might look like.
8     Q.    Okay.  So by your recollection,
9 there had not been a conversation around that
10 time about you, in fact, leaning into Amazon or
11 considering selling through Amazon?
12    A.    I mean, every business in the world
13 these days considers selling on Amazon.  It's no
14 secret.  And that idea was around long before
15 Keith came around and will be long -- around long
16 after Keith is around.
17           He had an idea about how to sell on
18 Amazon.  I would say it's not a particularly good
19 one, given that Black Rifle Coffee is doing
20 $170 million a year, leaning into Amazon and
21 pushing the boundaries of caffeine content rather
22 than reducing it.
23           So it's one of a thousand ideas I
24 deal with a week from any one of a number of
25 people.

1    Q.    Okay.  And in fact, you didn't
2  respond --
3    A.    It has no effect on anything that we
4  have done or will do.
5    Q.    Okay.  The next text from you,
6  though, on the next day starts with, "Hey, Dan's
7  money came in today."  You are holding on to the
8  cash "for another day or two as we are waiting to
9  hear back on an credit line that will really
10  help."
11          And then you talk about a latte can
12  design.  He asks, "How much was this for?"
13          And you said 30,000.  Is that the
14  amount of money that came from Dan?
15    A.    Yeah.  I mean, I don't recall the
16  exact amount, but to be very clear, it wasn't a
17  really large amount.  It was a small amount that,
18  to be honest, didn't even allow us to fully pay
19  our bills at the time.
20    Q.    I mean, but you decided to inform
21  Keith about it.
22    A.    Yeah.  Sure.  I mean, we were still
23  on friendly terms.  I mean, I think you -- it's
24  very important to remember here -- at least as
25  far I'm he concerned, the majority of the

1  conversations that you are seeing were between
2  friends, you know, friends who were excited about
3  something in the future.
4          So, you know, I share news and
5  update with friends and I cared at the time how
6  he was feeling about what the future would look
7  like, so of course I shared an update.
8    Q.    Then the texts are about UPCs, and
9  this is about putting product codes -- bar codes
10  on your products?
11    A.    Something around there, yeah.
12    Q.    And he makes a suggestion regarding
13  oat milk latte and being worried about brand
14  confusion between dairy and oat milk.
15          And you thought that was a good idea
16  and -- and had them made the edits on that?
17    A.    I don't recall this in particular.
18  We've always called out that it was an oat milk
19  latte.  And part of my job as the CEO to anybody
20  that gives me an idea, including our customers,
21  is to say, hey, that's a good idea.
22    Q.    Okay.  But you didn't say it's a
23  good idea when he talked about, on March 18th,
24  about the -- bringing down the caffeine content,
25  leaning on Amazon, but you did say that with the

1  oat milk latte, so you did respond to him on this
2  one.
3    A.    Yeah.  I mean, I get hundreds of
4  messages a day from all kinds of people.  I could
5  be running through an airport, driving my car,
6  walking my dog, making dinner, any one of a
7  number of things, as you can see by some of these
8  where I don't respond.
9    Q.    And then he texts you that he's
10  trying to plan out the Amazon listing content.
11  And you ask him, do you want to share info -- do
12  you want to share into the Facebook ads with me
13  tomorrow?"
14    A.    Yeah, this must be right around the
15  time when he stopped responding and, you know,
16  couldn't even be gotten ahold of.
17    Q.    I'm sorry.  So he -- this is on
18  March 20th.  He asks you about the Starbucks
19  thing and you say, yeah, "Do you want to
20  screen-share into Facebook ads with me tomorrow?"
21          You send that at 9:30 p.m.
22          Then the next morning he says,
23  "Yeah.  What time are you thinking?"
24          Right?
25    A.    Yeah.  I don't recall the Facebook

1  ads call ever occurring.  To the best of my
2  recollection, I don't, but sure, yeah, I
3  responded to that.
4    Q.    Okay.  And then a day -- like --
5  then he responds to that a few hours later.  You
6  suggest that you connect that weekend to do -- to
7  go through the ads, correct?
8    A.    Sure.
9    Q.    Okay.  And then all these texts on
10  page 197 that we're looking at, which is the
11  eighth page of the exhibit, just have to do with
12  logistics around getting the barcodes done.  And
13  you are working with him on that.  But you said,
14  "Call me today and let me know what you need
15  dollar wise."
16          What -- what was going on there?
17  Were you having trouble paying for the barcode
18  issues?  Or -- like, what was the situation here
19  that you were trying to work on?
20    A.    I don't recall what that message was
21  about.
22    Q.    Okay.  And then you said that you
23  were on hold with AmEx.  Was that about paying
24  for the barcodes or was that an unrelated issue?
25    A.    I don't recall what I was on the

Page 202

1 phone with them about.
2     Q.    Okay.  On March 26th you text, "I'm
3 really sorry for the added stress this has
4 caused.  I'm doing everything I can to figure
5 something out."
6           What added stress?  What was going
7 on?
8     A.    Do you have that in front of me?
9 I'm not seeing that.
10     Q.    I'm sorry.  Do you see page 198?
11     A.    Yeah.
12     Q.    Okay.  So I'm looking at the
13 March 26th --
14     A.    Oh, okay.  Yeah, yeah, yeah, yeah.
15           Yeah, waiting for funding to come in
16 so that we could actually get the company going.
17     Q.    All right.  And then six days later,
18 on April 1st, you start -- you reinitiate a
19 conversation.  It says, "Hey, man.  Have not
20 wanted to bother you for a few weeks since I feel
21 pretty bad about the way things have gone down.
22 Definitely want you involved in things, but just
23 don't feel like it's fair to ask anything of you.
24 If you want -- if you still want some stuff to
25 do, I'm finalizing mochas and lattes are going to

Page 203

1 be ready May 1."
2           So here you're indicating that you
3 are not willing to ask him to do anything else
4 because you are feeling pretty bad about the way
5 things have gone down.  By that, do you mean not
6 paying?
7     A.    About not being able to hire him,
8 about not being able to employ him.
9     Q.    So this indicates, though, that you
10 want to no longer ask him to do things.
11     A.    I never felt like it was fair from
12 day one to ask him to do anything.  And to my
13 original point, I was pressured not only by
14 Keith's friends, but to the best of my
15 recollection, by Keith himself who was asking for
16 things that he could sink his teeth into, you
17 know, so that he could become more familiar with
18 the company if and when he ever started with the
19 company.
20     Q.    And this is --
21     A.    And he was well aware of that.
22     Q.    Okay.  This is --
23     A.    He was well aware of that.
24     Q.    This is where he indicates that his
25 number one priority at this point is getting

Page 204

1 paid.  Here -- sorry, the bottom of page 198.
2     A.    I see that.
3     Q.    Okay.  And then he says he saw your
4 e-mail.  And I'm guessing at that point we're
5 talking about the e-mail chain that you and I
6 just finished reviewing.  Does that make sense?
7     A.    Presumably.
8     Q.    Yeah.  And it's at this point that
9 you said, "Send wire details or Zelle."
10           And he just e-mailed, "Not seeing
11 anything."  He tried again.
12           Is this when you sent the initial
13 money through Zelle and -- I think you said it in
14 two ways, Zelle and PayPal was it?  Or -- you
15 sent 3500 through --
16     A.    I'm not --
17     Q.    -- Zelle and then 15 --
18     A.    I am not sorry which transfer on
19 that date.
20     Q.    Okay.  To go -- if I recall, the --
21 let me just go back to -- so we can keep
22 everything sort of together.  So I'm going to go
23 back to Exhibit 11 for a moment.  So on
24 Exhibit 11, page 7 of the exhibit, DRIVE 8, you
25 indicated that you sent $3500 by Zelle and $1500

Page 205

1 by Venmo on April 10th.  Is that consistent with
2 the text that we were just looking at?
3     A.    I mean, I guess the text was on -- I
4 mean, if it was on that date, then yes, that's
5 what I was referring to.
6     Q.    Okay.  And I'll put that back up.
7 And so here we are on April 10th, and that's what
8 we were talking about here.
9     A.    It appears to coincide.
10     Q.    Okay.  And that's the conclusion of
11 it.  So do you recall having these conversations
12 with Mr. Clingman at that time?
13     A.    Sure.
14     Q.    Okay.  From September, when you had
15 people out to Aspen and then Denver that we
16 discussed -- that you had Remmy, Lindsay, Becky,
17 Keith and yourself at that meeting -- to this
18 time in April of 2020, who did you consider to be
19 on the management team of Drive?
20     A.    One person, and his name is Alex
21 Grappo.
22     Q.    You didn't consider anybody else to
23 be on the management team?
24     A.    No.
25     Q.    Did you continue communications

Page 206

1  during that time with Becky -- I'm sorry -- with
2  Remmy, Lindsay, Becky and Keith, during that
3  six-month period that I just outlined from
4  mid-September to mid-April of 2020 --
5  mid-September 2019 to mid-April 2020?
6      A.   I don't know how long conversations
7  continued with everybody there but, you know,
8  it's important to recognize that it was my
9  impression that genuine friendships had formed,
10 so we talked regularly.
11     Q.   And with Mr. Clingman in particular
12 you communicated with him by e-mail, correct?
13     A.   Yes.  Some e-mail.
14     Q.   Okay.  And by text also?
15     A.   Yes.
16     Q.   And also by phone?
17     A.   Yes.
18     Q.   Did you communicate by WhatsApp?
19     A.   I believe Keith was involved in some
20 WhatsApp group chats.
21     Q.   That included you as well?
22     A.   Yes.
23     Q.   And who else?
24     A.   Lindsay and Becky.
25     Q.   Okay.  And what were the topics of

Page 207

1  these group chats?
2      A.   Oftentimes, good memes and gifts.
3  And other times general ideas and brainstorming
4  about Drive.
5      Q.   Do you have any of this group chat
6  saved or -- on your phone or available?
7      A.   That was in our exhibits.
8      Q.   Okay.  Do you still have it?
9      A.   I believe so.
10     Q.   Okay.  And other than e-mail, text,
11 phone calls, WhatsApp, did you have any formats
12 or forms or platforms that you communicated with
13 Mr. Clingman on?
14     A.   Not to the best of my recollection.
15     Q.   Other than an e-mail address and
16 access to Google Drive, did Drive provide any
17 other software access to Mr. Clingman?
18     A.   To the best of my recollection and
19 according to the text chain that you sent over,
20 he had access to GS1 which is just -- frankly,
21 was set up by a friend of ours trying to do us a
22 favor.  So I believe at one point he had access
23 to that system.
24     Q.   Okay.  What is GS1?
25     A.   It is the platform that issues

Page 208

1  barcodes for all retail products.
2      Q.   Okay.  And that's what he was trying
3  to establish those barcodes -- that's what that
4  part of the text --
5      A.   And I can't remember exactly if
6  he -- and I am not familiar entirely if he ever
7  got access to the Amazon account.  But he may
8  have, so to be extra cautious, yeah, maybe he had
9  access to Amazon as well.  I am not at this point
10 familiar with anything outside of our Google
11 apps, GS1 and Amazon that he had access to --
12     Q.   Okay.
13     A.   -- off the top of my head.
14     Q.   I got you.
15          All right.  We are going to turn our
16 attention now to Exhibit 15.  I am going to go
17 ahead and put up that exhibit on the screen.
18          (Whereupon, Exhibit 15, Defendants'
19 Responses to Plaintiff's First Interrogatories,
20 was marked for identification.)
21 BY MR. ANDERSON:
22     Q.   This is Defendants' Responses --
23 that's your responses to Plaintiff's
24 Interrogatories.  I'm going to look here at
25 page 2 to begin with, and the response to

Page 209

1  interrogatory number 1, which was, basically,
2  what were plaintiff's dates of employment?  You
3  can read the whole thing.  The response was,
4  Plaintiff did not have dates of employment with
5  Drive, but was an independent contractor
6  providing marketing services for approximately 20
7  weeks from mid-September to mid-February 2020.
8  Plaintiff agreed to work on a
9  contractor/consultant basis due to Drive Coffee's
10 status as a start-up.  Until the initiation of
11 this lawsuit, plaintiff never asserted a claim to
12 employee status to the Drive parties.
13          During the deposition today you have
14 stated that he was, in fact, not working as a
15 contractor or consultant and not really working
16 at all.  How do you reconcile that with your
17 answer here in the interrogatories?
18     A.   I think that our belief is that
19 Keith in any capacity, whether he was hired or
20 not, was an independent contractor, as was
21 evidenced by his claims to me on several
22 occasions that he was also providing services to
23 other companies and that, you know, as he's
24 claiming to do services for us, that anything
25 that he's even claiming -- it was addressing his

1  claims, which is what he believes, which is that,
2  if anything is claimed, you know, it was
3  certainly not as an employee.
4      Q.   Okay.  So we have reviewed the
5  e-mails -- and we are just going to bounce back
6  to Exhibit 11 for a second, page DRIVE 9, which
7  was page 8 of the exhibit.  In this -- this is an
8  e-mail from Keith to you.  I'm dropping back here
9  to DRIVE 8.  It starts here on May 13th, 2020 at
10  the bottom of page DRIVE 8.  It continues on
11  DRIVE 9.
12          Calling your attention to
13  specifically the first full paragraph at the top,
14  beginning, "Your last e-mail stated that we have
15  differing opinions, but this is a matter of fact
16  and not opinion" -- this is Keith in an e-mail to
17  you.  "Starting in September, you hired me to be
18  the chief marketing officer for Drive with an
19  agreed-upon salary of $150,000 per year," with
20  benefits and equity.  "From that point ... I
21  continued to perform my job full-time and even
22  declined other job offers.  During this time, I
23  was asked to take an even broader role in the
24  company by overseeing the sales function of the
25  business and attending several key meetings."

1          So when you answer in the
2  interrogatory that he never made a claim to be an
3  employee prior to the lawsuit, here, in May of
4  2020, he's making exactly that claim.  Do you
5  agree with that assessment of this e-mail?
6      A.   Yeah, and it's probably right around
7  the time he was talking with you all.
8      Q.   All right.  So -- in fact, at the
9  end of this e-mail, he says, "I was an employee
10  who had agreed to perform a job" and "I am in the
11  process of securing legal counsel."
12          But -- so I just want to just be
13  clear, at this point, there was not yet a
14  lawsuit.
15      A.   Okay.  I don't want to speculate as
16  to what he was doing on the flip side.  I mean,
17  again, it's highly coincidental that claims are
18  made as the world is shutting down and his job
19  prospects aren't looking too great and he's been
20  waiting.  So I don't -- you know, the fact that
21  this claim is made long after anything else -- I
22  mean, it proves the point -- right? -- that the
23  claim is only made months and months and months
24  beyond when the money would be useful.  So -- and
25  that was the first, to my recollection, that I've

1  seen of that claim.
2      Q.   Okay.  But -- so when you answer
3  that the initiation -- that he -- plaintiff never
4  asserted a claim to employee status prior to the
5  initiation of the lawsuit, that's not entirely
6  accurate, is it?
7      A.   Well, with all due respect, I
8  believe we're referring to different time
9  periods.  And if we need to amend something to
10  correspond with the right time periods -- again,
11  you know, it's not -- I'm learning through this
12  process, so if that -- but, you know, during
13  the -- you know, that question was answered based
14  on a certain time period.
15      Q.   All right.  And in your response to
16  interrogatory number 3 -- I'll just refer you to
17  the last sentence -- "Plaintiff was unemployed at
18  the time and told Mr. Grappo he would like
19  to start working on projects on the company until
20  the company was able to employ him full-time.
21  Mr. Grappo agreed to pay him what he could on a
22  contract basis until the company either secured
23  investor financing or generated sufficient
24  sales."
25          Can you explain that in light of the

1  earlier conversation that he didn't do anything
2  of value for the company?
3      A.   Can you repeat the question?
4      Q.   Yeah.  My question is, can you
5  explain your response to interrogatory number 3
6  indicating that the company would agree to pay
7  him on a contract basis until the company either
8  secured investor financing or generated
9  sufficient sales on its own with your earlier
10  statements during the deposition?
11      A.   Yeah, I think that was meant to
12  cover the payments that were made to him.  So at
13  several points we agreed to give him money to try
14  and help him through that time period, being very
15  clear that no employment was possible until
16  investor financing had been secured.
17      Q.   But you did agree to pay him on a
18  contract basis until full-time employment was
19  possible?
20      A.   I think I was looking for a term
21  there to cover some form of how it was accounted
22  for, paying for him in some way during that time,
23  paying him, you know, money that he said that he
24  needed which, again, was paid purely because he
25  was in a situation where he was not employed, he

1 needed money to get by, he made it very clear
2 that he was struggling financially.
3      Q.   I'm going to jump to page 6,
4 interrogatory 21:  State all factual bases for
5 your eighth affirmative defense, and -- which
6 was, on what basis does defendant -- that means
7 Drive -- contend that plaintiff --
8 Mr. Clingman -- was exempt from state or federal
9 overtime laws.
10           In your response to that
11 interrogatory, flipping to page 7, you write, As
12 stated above, the Drive parties dispute that
13 plaintiff was an employee.  However, to the
14 extent that a court determines that he is, he was
15 exempt as the services he performed were directly
16 related to marketing and general business
17 operations.
18           And then you go on to state in this
19 response that his marketing efforts consisted of
20 contacting buyers at Macy's to coordinate the
21 placement of Drive Coffee in a store within a
22 store, and communicating with Amazon to
23 coordinate the sale of Drive Coffee on the
24 website and participating in brainstorming
25 sessions with other prospective employees and

1 independent contractors to determine how to best
2 place Drive Coffee in a position to grow.
3           Do you still stand by this answer?
4      A.   I'm sorry.  Which area?
5           MS. NOBLES:  Objection.  If you're
6 asking for -- this as a response to interrogatory
7 number 21, that calls for a legal conclusion, so
8 objection to form.
9           MR. ANDERSON:  All right.  So let me
10 be more specific with the question, and please
11 renew your objection if you still have it.
12 BY MR. ANDERSON:
13      Q.   I'm asking for -- are you -- my
14 question is whether you still stand by the
15 portion of the answer that is "his marketing
16 efforts consisted of" all the way through the
17 end?
18      A.   Yeah, this needs to be corrected.
19      Q.   How would you correct this?
20      A.   There was no initial contact to
21 buyers at Macy's.  It was communicating with
22 existing buyers at Macy's as well as, I believe,
23 again, potentially at one point logged into
24 Amazon, but at no point was communicating with
25 Amazon to coordinate the sale of anything on

1 their website.
2      Q.   Okay.  In connection with the
3 response, we, the plaintiffs in this case,
4 submitted requests for production of documents.
5 And you have responded to that request, as you've
6 indicated a couple of times that you've sent
7 those documents.  My question to you is, were you
8 involved in collecting and providing the
9 documents involved in the response to production
10 of documents?
11      A.   I was.
12      Q.   Okay.  Did anybody else assist you
13 with that?
14      A.   I was responsible for most of the
15 documents.  I had -- Niko, our CTO, I believe
16 helped me with a few things -- well, acted in the
17 CTO-type role, handles technical duties.
18      Q.   And what all did you do to collect
19 these documents?
20      A.   Scanned through all my e-mails, text
21 messages, anything that would be in our Google
22 Drive folders, anything that would have been -- I
23 need to double-check if we went through Keith's
24 e-mails that would have been in our system.
25      Q.   Do you remember, like, using certain

1 search terms?  Or, like, how -- when you say you
2 scanned through them, I'm presuming you didn't
3 read all your e-mails.  How did you search
4 through them?
5      A.   Anything containing Keith in it,
6 anything containing either of his e-mail
7 addresses.
8      Q.   Okay.  Did you use any eDiscovery
9 software or -- a particular software for this
10 purpose or just used the tools available in
11 Gmail?
12      A.   Went through every single text
13 message and screen-shotted the whole thing.
14      Q.   I'm sorry.  Can you repeat that?
15      A.   I just went through every single
16 text message and screen-shot it.
17      Q.   Okay.  That's what you sent?
18      A.   Yes.  Sorry.  You said that's what I
19 sent?
20      Q.   Yes.
21      A.   Yeah, that's what I sent.
22      Q.   Okay.  Earlier we discussed the top
23 ten shareholders in the company, and you said
24 that you would be able to have access to their
25 contact information to the extent -- you said

1 might not have their physical addresses, but you
2 have their e-mail and phone numbers.  Would you
3 be able to provide that through Ms. Nobles in the
4 next week?
5     A.    The contact information of our
6 investors?
7     Q.    Of the top ten investors that we
8 discussed earlier.  I'm not asking you to commit
9 that you will, because Ms. Nobles might have an
10 objection, but would you be able to?
11     A.    Yes, I can get their e-mail
12 addresses.
13     Q.    Okay.  Other than this lawsuit, has
14 Drive Coffee, Inc., Drive Coffee, LLC or any
15 other entity related to Drive Coffee been sued in
16 court?
17     A.    Absolutely not.
18     Q.    Okay.  Have you ever been sued in
19 court?
20     A.    Absolutely not.
21     Q.    To your knowledge, has Drive Coffee,
22 Inc. or Drive Coffee, LLC or any other entity
23 related to Drive had a charge made against it in
24 either state or federal department of labor
25 related to wages?

1     A.    We have not that we had been made
2 aware of.
3     Q.    Okay.  Have you personally had any
4 interaction with an agent or representative from
5 any state or federal department of labor from the
6 beginning of Drive till today?
7     A.    I have not.
8     Q.    To your knowledge, has any other
9 Drive agent, anybody representing Drive, or
10 employee, had any interaction with an agent or
11 representative from any state or federal
12 department of labor from the inception of Drive
13 to the present?
14     A.    Well, we have no employees, so no,
15 nobody else has been contacted.
16     Q.    You've mentioned two accounting
17 firms that have done work on behalf of Drive,
18 Withum prior to Simple Startup.  Other than those
19 two, have there been any other accounting firms
20 that have done work on behalf of Drive?
21     A.    No.
22     Q.    Okay.  And does Drive have a CFO or
23 somebody who provides management accounting or
24 advice to Drive?
25     A.    No.

1     Q.    Has Drive ever had an audit or
2 reviewed financials prepared?
3     A.    No.
4     Q.    What role, if any, are you playing
5 currently in preparing tax documents of any kind
6 for Drive?
7     A.    Sorry.  Can you repeat the question?
8     Q.    What role, if any, are you playing
9 in participating -- or participating in preparing
10 tax documents of any kind for Drive?
11     A.    I'm working with our accountant to
12 catch up on everything --
13     Q.    Is that --
14     A.    -- as I clearly mentioned -- since
15 even months before the pandemic, as you've heard
16 from our financial struggles, 120 percent of my
17 time and energy was focused on triage of the
18 company and keeping it alive.  As a result, we
19 need to do some cleanup, which we are in the
20 process of doing.
21     Q.    Have you --
22     A.    Unfortunately, we have had a few
23 distractions along the way.
24     Q.    And I believe you testified earlier,
25 but I just want to make sure I got it right, that

1 to your knowledge, Drive has not filed income tax
2 forms during its existence yet and you're
3 catching up on that.
4     A.    No, that's something that we're
5 working on right now.
6     Q.    Okay.  So that is an accurate
7 statement?
8     A.    That is an accurate statement.
9     Q.    Okay.  What are Drive's gross
10 revenues in the past 12 months?
11     A.    I don't know that number off the top
12 of my head.
13     Q.    Do you know the number of gross
14 revenues for the past -- for 2020?
15     A.    I don't know that number off the top
16 of my head.
17     Q.    Would you be able to get that
18 number?
19     A.    I can get that for you.
20     Q.    Okay.  How long would it take you to
21 get that?
22     A.    A few minutes.
23     Q.    Okay.  While you're looking, I'm
24 just -- Mr. Grappo, if it's all right, just to
25 save you time and make this a little bit easier,

1 I want to know -- the questions are going to be
2 three questions:  One, what were the 2020 gross
3 revenues?  Did they exceed 500,000 in 2020?  Did
4 they exceed 500,000 in 2019?
5         And if you can answer them all at
6 once, if it would be easier to do that as one
7 search.
8      A.   Yes, gross revenues did exceed
9 500,000 in 2020.
10     Q.   Okay.  And what were they?
11     A.   No, they did not in 2019.
12     Q.   Okay.  And can you give me the
13 amounts for each of those years?
14     A.   I don't have that number easily
15 accessible because we have had some numbers that
16 have come in outside of Shopify.  I can give a
17 rough idea of what they were.
18         I believe revenues in 2019 were
19 somewhere in the neighborhood of 200,000.
20     Q.   Okay.
21     A.   And I believe they are somewhere
22 around 800,000 for 2020.
23     Q.   Okay.  What assets does Drive hold?
24     A.   Green coffee, empty tin cans, empty
25 aluminum beverage cans, shelving equipment, desks

1 from Home Depot, a couple of couches, and a
2 coffee roaster.
3      Q.   Are you working with your
4 accountants to include all of these on a balance
5 sheet?
6      A.   Of course.
7      Q.   Okay.  Has that been completed yet?
8      A.   It is not completed yet.
9      Q.   Okay.  When it is completed, would
10 you be able to provide that to your attorney?
11     A.   I would be able to.
12         MR. ANDERSON:  Ms. Nobles --
13         MS. NOBLES:  Yes.
14         MR. ANDERSON:  -- I'd like to take a
15 brief break.  I think we're done, but I just want
16 to go over my notes for a moment and see if there
17 is anything else.  And of course, you have an
18 opportunity, if you wish, at that time -- but --
19 so is five minutes enough?  Or do you want to
20 take a full ten here?
21         MS. NOBLES:  Let's take a full ten,
22 just give last minute -- chance to refresh and
23 figure out if there's anything else.
24         MR. ANDERSON:  Very good.  Ten
25 minutes.  Thanks.

1         (Whereupon, a break was taken.)
2         MR. ANDERSON:  We have nothing
3 further.
4         MS. NOBLES:  Okay.  I just have a
5 couple of a little cleanup questions.  And I'm
6 going to need your help.  Sorry.
7         MR. ANDERSON:  Tell me what you
8 need.
9         MS. NOBLES:  I need -- I think it's
10 Exhibit 15, defendants' interrogatory responses.
11 And the first page.  We just want to go back and
12 clarify the discussion around interrogatory
13 number 1.
14         MR. ANDERSON:  Okay.  There we are.
15             EXAMINATION
16 BY MS. NOBLES:
17     Q.   Okay.  Mr. Grappo, you testified
18 that -- and there was some discussion about
19 this -- that until the initiation of the present
20 lawsuit, plaintiff never asserted to claim to the
21 employee status to the Drive parties.
22         And I just want to allow you to
23 clarify what you mean by the initiation of the
24 present lawsuit.  Because we were also presented
25 with an e-mail from May, which was just a couple

1 of months prior to the actual filing of the
2 lawsuit, in which Mr. Clingman claimed that he
3 was an employee.
4         So during the entire time that you
5 knew Mr. Clingman in the context of Drive Coffee,
6 did he ever tell you that he was an employee of
7 Drive Coffee?
8      A.   No.
9      Q.   Did he ever indicate to you that he
10 thought he was an employee of Drive Coffee?
11     A.   No.
12     Q.   Did he ever ask you where his
13 paycheck was, you know, every two weeks that you
14 would expect --
15         MR. ANDERSON:  Mrs. Nobles --
16 BY MS. NOBLES:
17     Q.   -- as an employee?
18         MR. ANDERSON:  -- I am going to ask
19 you to stop leading your witness.  I think the
20 first couple of questions were fine, but I think
21 we are getting into specifics that are quite
22 leading.
23 BY MS. NOBLES:
24     Q.   You can go ahead and answer my
25 question.

Page 226

1    A.    No.

2    Q.    Okay.  What conversations did you
3  have with Mr. Clingman about his employment --
4  his status as an employee?

5    A.    We never had a conversation about
6  his status as an employee.  We had many
7  conversations about what the world would look
8  like if we got the money we were trying to raise
9  at the time, but there was never a conversation
10  as an employee.

11    Q.    Okay.  All right.

12    MS. NOBLES:  Well, I just wanted to
13  clarify there that the -- you know, on behalf of
14  the defendants, "until the initiation of the
15  present lawsuit" did not mean whatever the exact
16  filing date was of this lawsuit.  And I have no
17  further questions.

18    MR. ANDERSON:  All right.  Thank
19  you, Ms. Nobles.  Thank you, Ms. Stotz.  Thank
20  you, Mr. Grappo.  Appreciate it.  We are
21  adjourned.  Thank you.

22    THE COURT REPORTER:  I'm sorry.
23  Before we go off the record, if all counsel could
24  state their orders for the record, please.

25    MR. ANDERSON:  I'll let Ms. Dodson

Page 227

1  speak for us.

2    MS. DODSON:  We will hold off for
3  right now and we'll let you know in the next week
4  or so what we want.

5    THE COURT REPORTER:  So you don't
6  want it transcribed?

7    MS. DODSON:  Not right now.

8    MS. NOBLES:  We would like a
9  transcript with exhibits.

10    (The witness is excused.)

11    (WHEREUPON, the within proceedings
12  were concluded at the approximate hour of
13  3:06 p.m. MDT on the 7th day of April, 2021.)

14    *    *    *    *    *

15

16

17

18

19

20

21

22

23

24

25

Page 228

1    I, ALEXANDER GRAPPO, do hereby certify
2  that I have read the above and foregoing
3  deposition and that the same is a true and
4  accurate transcription of my testimony, except
5  for attached amendments, if any.

6    Amendments attached   (  ) Yes  (  ) No

7

8    _____

   ALEXANDER GRAPPO

9

10

11    The signature above of ALEXANDER GRAPPO
12  was subscribed and sworn to before me in the
13  county of _____, state of
14  _____, this _____ day of
15  _____, 2021.

16

17

   _____

18    Notary Public

   My Commission expires:

19

20

21

22

23

24

25

Page 229

1    REPORTER'S CERTIFICATE
2  STATE OF COLORADO         )
                             ) ss.
3  COUNTY OF DOUGLAS         )

4    I, SUZANNE STOTZ, Certified Shorthand
   Reporter and Notary Public ID 20194025684, State
   of Colorado, do hereby certify that previous to
   the commencement of the examination, the said
   ALEXANDER GRAPPO was duly sworn or affirmed by me
   to testify to the truth in relation to the
7  matters in controversy between the parties
   hereto; that the said deposition was taken in
8  machine shorthand by me at the time and place
   aforesaid and was thereafter reduced to
9  typewritten form; that the foregoing is a true
   transcript of the questions asked, testimony
10  given, and proceedings had.
11    I further certify that I am not
   employed by, related to, nor of counsel for any
12  of the parties herein, nor otherwise interested
   in the outcome of this litigation.
13
   IN WITNESS WHEREOF, I have affixed my
14  signature and seal this 20th day of April, 2021.
15    My commission expires July 10, 2023.
16
17  __X__  Reading and Signing was requested.

18  _____  Reading and Signing was waived.

19  _____  Reading and Signing is not required.
20    _____
21    Suzanne Stotz, CRR, RPR
22
23
24
25

## Exhibits

**EX 0001 Alexander Grappo 040721**
 4:4 6:3,10
 9:5
**EX 0002 Alexander Grappo 040721**
 4:5 8:25
 9:1,13,14
 111:3,6
**EX 0003 Alexander Grappo 040721**
 4:6 111:1,
 11,14
**EX 0004 Alexander Grappo 040721**
 4:7 139:4,5,
 10
**EX 0005 Alexander Grappo 040721**
 4:8 142:23
 145:24,25
**EX 0006 Alexander Grappo 040721**
 4:10 150:8,
 16
**EX 0007 Alexander Grappo 040721**
 4:11 155:22,
 25 156:4
**EX 0008 Alexander Grappo 040721**
 4:13 168:20,
 24
**EX 0009 Alexander Grappo 040721**
 4:14 171:16,
 17
**EX 0010 Alexander Grappo 040721**
 4:16 175:6,
 12 176:11
**EX 0011 Alexander Grappo 040721**
 4:17 177:1
 178:3
 204:23,24
 210:6
**EX 0012 Alexander Grappo 040721**
 189:7
**EX 0013 Alexander Grappo 040721**
 4:19 189:11,
 15,17
**EX 0014 Alexander Grappo 040721**
**EX 0015 Alexander Grappo 040721**
 4:20 208:16,
 18 224:10

## $

**$10,000**
 56:6,8
 179:16
**$116,000**
 170:25
**$13,300**
 175:19
**$150,000**
 170:16
 171:13
 210:19
**$1500**
 204:25
**$170**
 197:20
**$20**
 49:21 50:1
 51:16
**$20,000**
 56:5
**$30**
 90:14
**$30,000**
 174:14,16
**$3500**
 176:13
 204:25
**$38,729.68**
 26:4
**$4,000**
 102:2
**$5**
 169:21
 170:2,11,12,
 19,25
**$6**
 170:5
**$60**
 96:16

## 0

**0002**
 177:2
**00125**
 171:23

## 1

**1**
 6:3,10 9:5
 10:14 98:3
 169:23,24
 170:15 203:1
 209:1 224:13
**10**
 175:6,9,12
 176:7,11,23,
 24 177:2,25
 178:5
**10,000**
 179:10
**100**
 27:23 37:4
 70:1 122:24
 137:3
**1040s**
 64:2
**1099**
 47:3,8 64:9,
 10,25 65:6,7
**1099'd**
 47:2
**10th**
 152:10
 205:1,7
**11**
 22:13 177:1
 178:3
 204:23,24
 210:6
**1120**
 45:20
**11:20**
 104:5
**11:22**
 140:1
**11th**
 156:5
**12**
 138:17 189:7
 221:10
**120**
 220:16
**126**
 168:22
**127**
 168:22,25
**12:05**
 104:6,11
**13**
 10:2,14
 189:11,15,17
**13,300**
 176:2
**13-3**
 176:1

**131**
175:10
**132**
175:13
176:8,10
**136**
142:23
150:12,22,23
152:3 189:14
**139**
152:10
**13th**
210:9
**14**
10:15 149:12
**14,609**
175:22
**14,609.58**
176:2
**142**
152:21
**145**
153:18
**146**
154:16
**147**
154:23
**148**
150:12,17,23
154:22,24
**15**
10:15 204:17
208:16,18
224:10
**150,000**
174:6,7
**15th**
189:24
**16**
64:21
**17**
64:22
**17th**
153:11
156:23
**18**
21:12 64:9

**18th**
199:23
**19**
64:9 189:16
**190**
190:6
**197**
201:10
**198**
202:10 204:1
**1:20**
104:4
**1:44**
156:5
**1st**
202:18

---

**2**

---

**2**
9:1,13,14
111:3,6
176:23,24
178:4 208:25
**20**
64:9 173:23
209:6
**200**
142:23 146:1
189:14,16,18
**200,000**
222:19
**2004**
13:14 14:9
16:6
**2005**
15:9
**2006**
14:9 15:19,
23
**2007**
15:3,23
16:6,12
17:5,11,15
**2009**
16:14 17:11,
15

**2010**
16:14
**2011**
15:3 16:12
17:5 22:7,15
**2012**
17:17
**2015**
19:12 64:21
**2017**
19:23 30:21
31:20 36:2
47:7 63:23
64:9,19
66:3,22
68:14
**2018**
28:1,22
59:21,24
63:23 68:19
70:2 133:11
**2019**
32:7 53:13
63:20 70:3
98:3,24,25
100:11,25
101:10
105:21
110:11
122:21
125:14,15
138:3 140:1,
24 151:10
156:5 157:1
166:21 168:1
171:25
172:23 173:9
176:10 206:5
222:4,11,18
**2020**
27:1 56:2
63:17 110:11
120:18
125:13,15
133:16
166:21 168:2
178:17 182:8
189:24

**205**:18
206:4,5
209:7 210:9
211:4 221:14
222:2,3,9,22
**2021**
227:13
**20th**
200:18
**21**
214:4 215:7
**23rd**
140:1 182:8
186:13
**24,950**
179:3
**24-hour**
37:4
**25**
151:12 175:3
178:25
**25th**
140:24
141:14
151:14
**26th**
202:2,13
**27**
176:9
**27th**
151:9,15
**2:00**
140:20,21,23
141:13
151:13
188:23
**2:10**
188:24

---

**3**

---

**3**
111:1,11,14
177:11
212:16 213:5
**30**
109:9 175:3

178:25

**30(b)(6)**
7:23 8:7,15
9:1,15,21
22:22 111:7

**30,000**
175:2 198:13

**35**
74:17

**3500**
204:15

**3801**
13:11 53:23

**3:06**
227:13

---

**4**

**4**
9:25 139:4,
5,10 169:23
177:13

**424-644-4104**
147:16

**45**
104:3,4

**4:00**
140:20,21,22
141:13
151:12
188:23

---

**5**

**5**
10:13,14
142:23
145:24,25
170:6 177:15
182:6

**50,000**
174:7

**500,000**
222:3,4,9

**56,500**
26:12,15

---

**6**

**6**
138:17
150:8,16
177:17 182:6
214:3

**633**
12:25

**64**
143:19
148:10

---

**7**

**7**
97:23
155:22,25
156:4 177:19
178:16
204:24
214:11

**7-eleven**
32:7

**70,000**
174:7

**7th**
152:18,21
178:17
227:13

---

**8**

**8**
168:20,24
177:21
178:10,15
204:24
210:7,9,10

**8/11/19**
156:1

**800,000**
222:22

**80205**
13:12 53:24

**80206**
13:1

**81**
111:12

**82**
111:12

---

**9**

**9**
171:16,17
177:23
210:6,11

**940**
46:7

**941**
46:7

**944**
46:8

**96,000**
20:5

**9:30**
200:21

---

**A**

**a.m.**
140:1

**ability**
7:3 124:6
159:13

**able**
6:15 27:7
38:5 66:2,
13,21 70:16
74:18 77:2
78:22,24
88:21 111:18
117:20
162:19
164:25
203:7,8
212:20
217:24
218:3,10
221:17
223:10,11

**aboard**
83:11

**above**
170:8 214:12

**absent**
143:14

**absolutely**
77:11 163:19
166:24
218:17,20

**acceptable**
136:17

**access**
52:12,13
69:14 70:12
74:10 83:18
85:22 86:9,
12,13 90:16,
17 97:19
143:14
172:16
173:7,11
187:9,12,14,
17 207:16,
17,20,22
208:7,9,11
217:24

**accessible**
222:15

**accord**
101:16

**account**
39:2,5,21
41:4,12,19
70:11 81:7,
11 86:5,9,20
88:21 128:17
169:22
170:12,23
173:2,12,13
186:10,20
189:8 208:7

**accountant**
43:6 132:15,
21 220:11

**accountants**
41:7,16
42:18,20

55:24 61:15
62:14 66:17,
18 223:4
**accounted**
128:8,14
213:21
**accounting**
41:8 45:1,3
62:2 92:12
129:2
132:11,12,17
133:2,4,10
178:17
219:16,19,23
**accounts**
39:5,17,19
41:1,3,24
42:3,8,13
45:3,4 47:12
69:19,20
70:8,9,10,12
79:13,14
133:23
**accurate**
28:2,6 31:18
89:10 100:6
101:18
105:20 106:1
120:5,7
149:1,4,19
178:11,19
179:5,7
185:10 212:6
221:6,8
**achieve**
135:9 166:22
**achieved**
135:10
162:20
164:24
**acknowledging**
140:13,18
**acquire**
40:3 58:14
89:22
**acquired**
40:8,18,21
57:8

**acronym**
40:10,12
**acted**
216:16
**acting**
179:22 183:7
**action**
186:20
187:22
**actions**
36:3 190:4
**activation**
116:5
**active**
33:12,22
**actively**
143:14
**activities**
36:1 82:19
84:13,24
85:3,5 94:5,
13,17 102:4
**actual**
40:12 225:1
**Ad**
88:10
**add**
98:18 142:13
**added**
110:19,23
149:5 169:20
202:3,6
**addition**
98:12 179:8
**additional**
30:12 149:5
170:7 179:10
**address**
12:18,20
13:9 53:21
85:24 96:17,
22 98:1
147:6 164:6
182:19
207:15
**addressed**
121:24

**addresses**
77:2,20
104:17 217:7
218:1,12
**addressing**
209:25
**adjourned**
226:21
**administrativ
e**
83:18 85:22
86:8,12
**Adrian**
39:9
**ads**
200:12,20
201:1,7
**advance**
10:3
**advertising**
79:12
**advice**
37:21 71:9
106:22
219:24
**advise**
71:5
**advises**
113:19
**advising**
161:11
**advisor**
113:18,21,25
**advisors**
62:14
**affirmative**
214:5
**afford**
110:4
**age**
21:12
**agent**
219:4,9,10
**ago**
30:22 31:1,
17,21 32:4
44:1 49:7,8,

15 81:17
100:3,4,5,8
141:19
172:24
**agree**
12:1,5 84:20
89:4,8
114:19 115:6
182:9,11
194:7 211:5
213:6,17
**agreed**
120:11 209:8
211:10
212:21
213:13
**agreed-upon**
210:19
**agreement**
183:13,19
184:9,12,14
**agreements**
183:15
**ahead**
8:4,24,25
50:21 103:20
121:1 150:20
152:17 191:3
208:17
225:24
**ahold**
20:24 200:16
**airplane**
156:21
**airplanes**
72:2
**airport**
200:5
**Alex**
12:8 58:7
87:13 91:21
95:25 98:7
102:16,18
103:22 104:8
129:23 147:2
148:10
149:23 174:5

183:22
205:20

**Alex's**
130:4

**alex@**
**drivecoffee.**
**com**
145:10

**Alexander**
5:10 12:10,
13 176:12

**alive**
220:18

**Allen**
76:11

**allow**
198:18
224:22

**allowed**
123:7 167:10

**allowing**
167:20

**allows**
70:19

**Alto**
38:2,20

**Altvia**
19:8,14,21,
22,24 20:2,7
64:13,19,22,
24 65:3,7

**aluminum**
222:25

**Alyssa**
43:17,18,24
81:16 92:6,7
95:25 130:9

**Amazon**
196:9,23
197:2,4,10,
11,13,18,20
199:25
200:10
208:7,9,11
214:22
215:24,25

**amend**
212:9

**America**
39:14,16,20,
25 69:5 81:8

**Amex**
201:23

**amount**
26:8 88:9
90:6,7
101:25 110:4
159:20
164:24
175:25
198:14,16,17

**amounts**
222:13

**analysis**
167:22

**analyst**
15:18

**and/or**
41:11 87:12
99:22 120:21
127:21

**Anderson**
5:8,15,17
6:5 9:8,17
13:2 28:10,
14 48:1,10,
11 52:19,24,
25 57:21
58:1,4,11
75:20 103:1,
10,19 104:1,
4,11,15
111:6,10,16
128:10 139:7
143:4,11,16,
25 144:6,9,
12,15,19,21,
23 145:1,7,
8,14,20,23
146:3,19
147:2,7,10
148:18
149:20
150:21 156:3

165:18,20
169:2 171:20
175:15 177:4
188:18,22
189:2,20
208:21
215:9,12
223:12,14,24
224:2,7,14
225:15,18
226:18,25

**Andersondodso**
**n**
5:18

**Andrew**
91:16,17
95:25 102:21
129:21

**angle**
155:1

**answer**
8:20 12:22
26:1 27:8
28:22,24
46:2 48:3,8
57:4 59:8
64:5,7 68:2,
6,10 69:25
74:8 75:14
85:10 100:6
102:19,23
103:7 112:16
128:6
136:15,17,18
146:9,14
148:11
162:15
165:16
173:16
209:17 211:1
212:2 215:3,
15 222:5
225:24

**answered**
11:24 22:25
136:16
155:17
212:13

**answering**
62:10 74:14

**anybody**
7:13,18
10:22 67:25
80:15 85:2,
14,15 87:10
118:20
119:5,23
120:10
124:23
136:22 164:5
180:16
186:25
199:19
205:22
216:12 219:9

**anymore**
96:10,12

**anyone**
87:7 110:22
123:10 129:8
183:16
186:21

**apologize**
106:13

**Apparently**
9:11

**appears**
140:15,25
149:10
154:6,12,21
155:3 175:20
176:18
191:20
194:18,21
196:3 205:9

**applicable**
70:22 71:6

**application**
17:23,25
18:9 70:19

**applied**
41:11

**appreciate**
144:18
149:21 150:4
226:20

approach
165:2
approximate
227:12
approximately
53:16 209:6
apps
54:13,15
208:11
April
166:21 168:2
182:8 186:13
202:18
205:1,7,18
227:13
area
15:17 95:12
160:19 215:4
areas
69:9,10
93:16
around
19:23 28:5
30:18,19
36:21 52:2
53:16 55:12
56:5 81:20
121:6,9
125:4 152:20
154:20
156:23
160:18 187:5
197:9,14,15,
16 199:11
200:14
201:12 211:6
222:22
224:12
arranged
24:25
arrangement
109:3
arranging
152:19
asked
27:11 38:10
57:2 63:7

70:15 85:8,
16,17 97:24
98:21,24
142:12
155:14 158:6
183:15
184:22
185:25
186:13,25
195:24
210:23
asking
8:16 32:5
43:16 83:14
126:24
134:10,12
143:19 148:5
149:6,7
154:8 167:18
173:15
182:21
191:9,22
192:2,3,22,
24 194:4
196:6 203:15
215:6,13
218:8
asks
192:13
195:2,15
198:12
200:18
aspects
187:12
Aspen
125:7,18
126:9,13
153:9,12
156:23,25
158:5,24
160:7,8,9,
10,13,17,21
205:15
assembling
125:19
asserted
209:11 212:4
224:20

assessment
211:5
assets
222:23
assist
70:25 216:12
assistance
42:19 164:13
assistant
43:22
assisting
16:20 43:22
91:18 92:13
116:20
assists
41:17 42:24
91:5,13
92:24
associate
16:18
associates
24:11
assume
46:13 65:19
141:17
142:10
170:21
assumptions
124:20
ate
160:19
attachment
156:6
attempt
123:17
attempted
101:16
attempting
123:17
164:13
attend
17:4
attendance
127:21
attending
210:25

attention
208:16
210:12
attorney
7:9,12,15,18
8:1,22 12:21
37:25 48:18
70:25 71:2,
3,5 73:4,19,
20 77:7
223:10
attorney's
39:9
attorneys
37:19 41:7
62:14
attracting
124:13
audit
220:1
August
17:11,15
152:10 156:5
Austin
32:13
authenticate
148:20
authority
79:15,18,22,
24 81:3
82:12,15,18
183:1 184:3
authorized
170:3,5
autonomy
50:22 89:6
available
93:23 123:22
207:6 217:10
award
30:10
aware
10:25 21:5
24:19 25:23
27:5 29:13
47:13,17,20,
24 48:8,12,

15 54:16
78:5,12
97:14 117:21
123:8 135:3
163:3,6,7,9,
14 203:21,23
219:2

**B**

B-A-Y-A-N-I
  76:20
B-I-O-N-E
  76:19
B-O-K-A-I-E
  107:10
B-Y-I-N-G-T-
O-N
  108:5
back
  22:7,15 27:9
  32:2,3 35:25
  36:2,3 37:2
  48:7 68:12
  70:15,18
  99:25 133:23
  137:5 140:19
  179:25
  180:25 182:5
  186:9 190:1
  193:10 198:9
  204:21,23
  205:6 210:5,
  8 224:11
back-and-
forth
  155:5,8,11
back-up
  122:22
background
  192:23
backgrounds
  192:15
backing
  137:5
backlog
  51:20

backward
  62:20
bad
  23:21 202:21
  203:4
bag
  128:3
balance
  26:6 223:4
bank
  39:1,5,14,
  16,18,20,24
  68:3,8 69:4
  81:7 169:22
  170:23
banking
  39:13 69:3,5
bar
  199:9
barcode
  163:8 201:17
barcodes
  201:12,24
  208:1,3
based
  22:22 46:20
  196:3 212:13
bases
  214:4
basic
  49:16 92:14
  107:24
  124:21 164:4
basically
  81:16 96:16
  158:4 189:24
  193:10 209:1
basis
  20:22 79:10
  88:10 90:8
  98:14 128:3
  209:9 212:22
  213:7,18
  214:6
Bates
  144:8 146:1
  150:17

168:25
171:18
175:13 177:2
189:18
bathroom
  103:16
Bauer
  75:18
Bayani
  76:18
Beach
  15:22
beans
  60:13,14,16,
  22
bear
  111:12 169:7
Becky
  98:15
  100:15,16,
  17,22
  101:21,24
  106:9 119:7,
  9 120:25
  121:1,22,23,
  25 137:24
  138:5,7,20
  139:21 140:5
  151:25
  153:19,20
  157:6,10,11
  174:6 205:16
  206:1,2,24
began
  31:6 102:13
  103:8,13
begin
  70:3 151:9,
  14 152:21
  208:25
beginning
  36:9 127:19
  128:5 133:12
  210:14 219:6
begins
  189:23

behalf
  82:13,16
  84:20 107:4,
  20,22
  126:14,21
  127:22
  130:21
  161:3,12,13,
  24 162:9
  163:5 164:18
  166:22
  167:25 168:4
  183:16
  184:1,2
  185:12,14,18
  186:8
  219:17,20
  226:13
behind
  124:1
belief
  209:18
believe
  19:22 20:4
  21:8 26:25
  32:21 33:20
  34:2,17 37:2
  38:25 39:3
  41:14 42:25
  44:1,11
  45:18 53:12
  56:2 63:7
  69:21 70:5,
  11 73:16,18
  79:20,21,23,
  24 81:2
  85:11,23
  86:7,13,25
  87:2 90:14,
  18 91:21
  96:16 101:11
  102:2 133:17
  134:2 138:3
  148:11
  152:13
  155:18
  168:4,17
  174:14,18

178:18,22
179:4,6
186:22
187:13 188:3
191:13 194:9
206:19
207:9,22
212:8 215:22
216:15
220:24
222:18,21
**believed**
124:17
**believers**
124:14
**believes**
210:1
**benefit**
67:21 96:18
101:9 105:2
161:9
**benefits**
210:20
**Berg**
76:3 91:16
102:21
129:21
**best**
15:4 29:3
34:11 37:15,
18 41:21
42:10 47:9
53:13 57:10,
12,16,18
59:2 67:4
73:3,6 93:2
102:6 106:11
133:17
150:14
182:20
183:14,24
184:15,17
185:8 194:2
201:1 203:14
207:14,18
215:1
**best-tasting**
23:19

**better**
9:18 143:20,
21 144:5
147:3 172:6
**beverage**
222:25
**beverages**
23:9,12,18
**big**
19:16 54:4
79:6 195:1
**bigger**
169:7 171:24
**biggest**
137:2
**bill**
90:6,7,8
124:1
134:17,22
135:9,17
136:12
**billed**
135:23
**bills**
88:13 90:4
96:24 123:21
198:19
**bit**
15:6 26:14
51:7 106:13
142:11,12
149:13
169:7,8
221:25
**Black**
197:19
**blanking**
40:10
**blocking**
119:25
**blurriness**
62:21
**board**
73:8,14,17
115:13
**boats**
72:1

**Bokaie**
107:9 114:3
115:25
**bonus**
55:19
**bookkeeping**
45:6 92:14
**books**
133:20
**bored**
162:18
**boss**
86:23,25
**bother**
202:20
**bothered**
19:16
**bottom**
139:19 140:1
144:13
150:24 204:1
210:10
**bought**
24:23 57:4
59:12,24
60:3,21
153:6
**Boulder**
42:22 43:12
66:19
**bounce**
210:5
**bound**
101:7
**boundaries**
197:21
**box**
107:25
**boxes**
51:22,23
52:3 94:15
**brainstorming**
207:3 214:24
**brand**
5:23,25
199:13

**break**
52:17 58:10
103:17,21,23
104:13
136:14
188:16 189:1
223:15 224:1
**Brent**
106:16
113:15
**Brew**
191:23 193:9
**brief**
223:15
**bring**
95:14 157:17
169:7
**bringing**
62:16 156:24
196:7 199:24
**broader**
210:23
**broke**
26:14 130:3
**brother**
28:19 29:22
91:22 109:18
**Brown**
133:7
**bucks**
37:4
**budget**
169:12
170:18
171:25 173:8
**budgeted**
170:6
**building**
54:7 95:8
97:8
**Bull**
152:15
**business**
17:5,14 23:1
24:5,6,11
31:15 33:24
35:20 36:4,

17 51:17
54:9 56:25
61:7 71:19
97:9,12
108:21
127:13,20
160:21
197:12
210:25
214:16
**businesses**
24:3 36:18
**busy**
162:19
167:19
**buy**
58:22 61:4
109:5
**buyers**
214:20
215:21,22
**buying**
59:15
**Byington**
108:4,5,19
109:17
116:14

─────────

**C**

**caffeine**
196:7 197:21
199:24
**calculate**
66:22 67:5
**calculating**
66:24
**California**
15:22 17:7
22:19 25:2
**call**
17:18,21
18:21 43:21
89:7 105:23
106:21 119:2
136:6
141:11,17

150:8 173:8
188:10
201:1,14
**called**
17:18 19:8
25:4 34:1,2
42:21 99:20
105:7 132:23
165:4 199:18
**calling**
139:3 210:12
**calls**
141:20
207:11 215:7
**campaign**
192:10
193:12
**campus**
17:6
**candidates**
168:11
**cans**
222:24,25
**cap**
74:9,10
**capacity**
8:6,11 98:3
209:19
**capital**
36:11 37:15
137:4 159:10
**car**
190:14 200:5
**card**
68:3,9
**cards**
96:18
**care**
38:22 41:9
**cared**
165:4 199:5
**carrier**
72:6,8
**carry**
165:1
**cars**
31:16

**case**
72:20
115:17,19
123:6 134:2
137:18 170:7
216:3
**cases**
114:11
**cash**
56:1 65:16,
19,21 68:25
69:1,22
101:23
118:9,12,15,
16,21,24,25
119:6,9
198:8
**Castillo**
32:12 98:15
101:12 102:4
157:5
**catch**
47:11 95:12
103:2 220:12
**catching**
221:3
**categorize**
29:3
**caught**
62:16 111:4
**caused**
202:4
**cautious**
208:8
**cc'd**
145:5
**cell**
94:3 124:1
**central**
95:11
**CEO**
11:19 27:12
79:7 86:25
87:13 113:10
174:1 199:19
**CEOS**
62:12

**certain**
61:23 85:19
88:9 90:6
117:8 144:14
163:6
184:20,22
212:14
216:25
**certainly**
57:13 83:9
184:2 210:3
**cetera**
72:12 97:16
**CFO**
219:22
**chain**
21:3 139:5
141:5 148:2
177:1 204:5
207:19
**chairman**
73:21,22
**chance**
147:18
223:22
**change**
18:12,20,23
51:10,11
84:7,14
94:11 166:6
**changed**
18:22
**charge**
90:5 218:23
**chart**
114:13
115:11
117:22,25
120:10
**charts**
168:21
**chat**
207:5
**chats**
206:20 207:1
**check**
61:14 65:21

68:25 69:1
**checked**
151:23
**Checking**
39:21
**checks**
97:1
**Chicago**
195:16
**chief**
117:17
210:18
**choice**
119:15
150:13
**choose**
105:22
**Chris**
104:21,22
**Christopher**
5:17 52:15
75:8 188:14
**circulated**
115:20
**circumstance**
58:19
**circumstances**
119:8
**City**
108:12,16,
17,18,21
109:11,19,22
116:15,21
118:6,15
128:13
151:20
**Civil**
5:2
**claim**
123:17
209:11
211:2,4,21,
23 212:1,4
224:20
**claimed**
167:7 168:8
210:2 225:2

**claiming**
134:22
209:24,25
**claims**
179:22
209:21 210:1
211:17
**clarified**
48:17,18
**clarify**
8:9 82:21
224:12,23
226:13
**class**
34:22 181:20
**classes**
34:25
**classification**
47:22 51:11
61:15 136:7,
8
**classifications**
62:12
**classified**
55:22 62:7,
15
**classifying**
60:2
**cleanup**
62:1 220:19
224:5
**clear**
6:15 8:23
53:6 77:11
91:25 118:17
122:19
123:3,19
124:3 136:3
150:9 166:9,
11 169:13
198:16
211:13
213:15 214:1
**clearer**
18:19

**clearly**
111:19
119:14
124:20 125:2
220:14
**client**
144:17 145:3
**clients**
24:5,6,10
164:1
**climate**
93:17
**Clingman**
5:18 109:25
117:15
118:23 125:6
126:19
131:2,6,8,12
135:21
137:18,21
139:24 140:3
146:13
147:13,24
148:8 149:9
151:17
153:13,19
154:9 155:7
156:1,7,22,
24 157:7
161:2,13
163:22,24
164:12,22
165:7 166:22
167:25
168:13
171:4,13
174:13
175:19
176:17
178:18
180:13,23
182:18
183:12
184:10,12
185:3,11,13
187:1,17,23
189:5 190:2,
9 191:9

205:12
206:11
207:13,17
214:8 225:2,
5 226:3
**Clingman's**
189:8
**close**
52:18 76:21
121:10
122:11
137:23
**closed-off**
93:16
**closet**
194:6
**CMO**
100:11
105:18,19
170:15
171:3,5
**CMO-TYPE**
106:4,7
**co-founder**
27:16,21
28:1,7,21
**co-owner**
109:18
**codes**
199:9
**coffee**
8:17 11:13,
18,20 12:2,
3,4 13:20
20:8,11,12,
17 21:6,10
23:1,7,8,9,
11,24 24:23
27:13 31:6,
13,16 32:17
33:3,17,22,
24 34:3,8,9,
13,23 35:7,
11,15,21,22
36:2,4,6,7,
14 39:2,6
40:2,8,18,
21,25 41:11,

19,23 42:3,7
43:8,19,25
44:3,7 53:2
54:2 56:25
57:1 58:20,
25 59:17,19,
25 60:2,7,8,
17,22,23
61:1 62:9,24
63:6,14
64:11 68:23
73:1,25
83:19 87:24
89:4,14,24
90:24 94:15,
19,22 98:9
107:23
108:12,16,
17,18,22
109:12,19,22
110:1,7,8,
20,23
116:16,17
118:6,15
120:12
123:11
128:13,14,15
132:13
153:4,14
164:6,11
181:19
183:5,16,17,
21 186:14
187:1 191:24
195:12
197:19
214:21,23
215:2
218:14,15,
21,22 222:24
223:2 225:5,
7,10
**Coffee's**
39:12 209:9
**coffee-
related**
56:14,21

**coffees**
89:21 109:6
**coincide**
205:9
**coincidental**
211:17
**Cold**
191:23 193:9
**colleague**
163:25
**colleagues**
157:24
**collect**
216:18
**collected**
170:3
**collecting**
131:22 216:8
**Collective**
99:21,23
105:8,9,10,
15,19 117:1,
13
**collectively**
131:18
**Colorado**
5:2 12:17
13:1,11
21:13 22:8,
10,19 32:22,
24 33:18,25
34:4 35:18
41:2,13,20,
25 42:5,9,22
43:17 53:23
71:11 152:22
153:3
**column**
169:16
**combination**
58:23
**combined**
103:20
**come**
36:6 49:14
52:8,17 59:7
68:22 76:21

95:25 107:22
126:8 137:21
153:3 156:22
157:4,14
161:21 165:6
174:2,16
182:18 185:4
186:24
187:23 188:4
190:19
202:15
222:16
**comes**
19:18 60:12
123:12
**comfortable**
62:10
**comments**
154:6
**commercial**
15:14 53:3,8
68:16 72:10
**commit**
194:17 218:8
**commitment**
23:14
**committed**
123:4 127:25
**committing**
168:5
**common**
34:24 35:4,
8,12 72:6,7
180:4
**communicate**
28:4 186:21
188:8 206:18
**communicated**
151:12
187:23
206:12
207:12
**communicating**
152:2 214:22
215:21,24
**communication**
186:14

**communications**
182:13
205:25
**comp**
41:19 42:8
**companies**
24:20 36:12
72:10 89:1
209:23
**company**
17:18 18:8,
21,25 19:5,8
20:20 21:2
22:23 26:18
29:4,6,8,12,
17,20,21,25
30:2,5,17
31:12 32:10
34:3,4,6,21
36:23 37:13
43:5 45:16
48:24 51:10
53:7 54:25
55:13 56:19,
20 63:2,3
64:10 65:1,
4,8,15 68:13
73:23 81:22,
25 83:5
99:20 105:7
107:14
108:8,11
112:19
114:1,17
115:13
117:7,20
122:7,20,22,
25 123:3
130:19,20,21
134:25 135:2
137:1,8,19
154:6 159:1,
14 165:25
169:14
172:17
181:18
186:22,25

187:17
202:16
203:18,19
210:24
212:19,20,22
213:2,6,7
217:23
220:18
**company's**
49:12
**compared**
26:17
**compensate**
87:25 101:21
108:14
**compensated**
29:19 30:2,8
55:10 80:7,
24,25 88:2,
3,5 102:3
106:23
108:1,16,18
118:1,4,7,
14,15,21,24
129:8
130:14,17,18
131:6
**compensation**
55:16,18
65:11,14
66:5 90:23
107:2 108:19
118:10
119:3,6,10,
17,18 142:18
**complete**
148:6 178:11
**completed**
61:20 63:14,
16,19,22,25
223:7,8,9
**completely**
110:21
**compliance**
70:22 71:6,
14
**comprehensive**
85:11

**concept**
196:5
**concern**
137:14
**concerned**
117:16
198:25
**concluded**
227:12
**conclusion**
205:10 215:7
**concur**
194:19
**conditional**
110:2 124:5,
6
**confidential**
75:10,13
184:21,22
**confidentiality**
77:9
**confirm**
29:2 80:2,11
**confirming**
149:3
**confusion**
199:14
**connect**
44:21 201:6
**connected**
125:16
**connection**
31:11 53:1
54:6 56:13
57:7 216:2
**conservatively**
170:18
**consider**
71:22 86:23
87:5,10,22
96:21 113:23
120:8
135:10,18
140:8 162:8
179:19

193:17
196:19
205:18,22
**considered**
62:23 73:5
80:22 98:4
119:6,9
124:21 171:4
174:11
188:10
**considering**
153:14 174:9
197:11
**considers**
197:13
**consisted**
214:19
215:16
**consistent**
106:4,7
150:1 160:4
161:25 205:1
**constitutes**
176:22
**consult**
62:13 99:3
101:3 134:8
**consultant**
209:15
**consultants**
62:3
**consulted**
7:9 37:19
136:22,24
**consulting**
17:14 161:11
**consumer**
24:3,4
**consumers**
24:8
**contact**
77:17 140:14
195:15,16,
17,18 215:20
217:25 218:5
**contacted**
219:15

**contacting**
214:20
**contend**
214:7
**content**
17:22,25
18:1,10
110:7,12
116:4 173:3
189:9 196:7
197:21
199:24
200:10
**context**
80:12 151:9,
15 225:5
**contingent**
148:25
**continue**
13:23 14:20
152:8 205:25
**continued**
30:7 55:15
126:14,19
147:23 206:7
210:21
**continues**
154:23
210:10
**continuing**
30:4 147:20
189:23
**contract**
90:22 98:13
108:9 183:13
184:1 212:22
213:7,18
**contracted**
60:25 114:8
115:5,10
116:16,21
**contractor**
47:23 48:22
49:1 50:14
55:8 183:18
184:9 209:5,
15,20

**contractor/**
**consultant**
209:9
**contractors**
47:25 48:9,
14 50:8,10,
15 98:9
215:1
**contracts**
82:13,16
**controlled**
93:17
**convenient**
9:11
**conversation**
100:15
120:13
124:10 142:8
147:13,21,23
148:7,15
149:8,11
153:8
154:19,23
166:6 167:5,
6 178:6
181:25 195:9
196:3,10
197:9 202:19
213:1 226:5,
9
**conversations**
11:2 148:3
159:4 181:9,
10 199:1
205:11 206:6
226:2,7
**convincing**
124:14
**coordinate**
214:20,23
215:25
**coordinated**
44:3 164:9
**coordination**
164:4
**coordinator**
43:21 92:9

**copy**
142:24 143:1
144:16
**corner**
150:25
**corp**
11:21,22
32:24 35:15,
23 36:22
37:11,16,23
**corporate**
32:19 33:23
71:2,3,4,5
78:6
**corporation**
8:20 23:3
32:18,23
**corporations**
77:23
**correct**
7:20 14:8,11
15:11,20,24,
25 16:13,15
17:3,16,20
18:14 19:10
20:14 21:20
22:5 23:5
25:6,12
26:23 28:8,
13 29:9,12
30:9,14
32:14 33:14
34:11 36:18,
19 43:4
44:16 45:10
50:11 52:5
53:19 54:21
55:16 57:19
64:20,23
65:17,20
66:20 76:13
77:3 80:5,9
81:9,20
82:10,11
84:1,2,9,17
87:21 91:3
96:2 102:20
105:13 107:7

109:23
110:18
113:8,11
118:19
125:22
129:12,15,
18,20,22,25
130:10,12,15
131:7,9
138:14 152:5
154:11
160:25 178:9
185:7 191:25
192:6,7
201:7 206:12
215:19
**corrected**
215:18
**correcting**
101:1
**correction**
105:11
**correctly**
114:4
**correspond**
182:17
212:10
**corresponding**
181:13
**couches**
223:1
**counsel**
5:5 9:3,22
10:21 211:11
226:23
**counts**
73:17
**couple**
22:21 24:5
32:4 104:19
138:9 140:12
142:6 158:19
163:10,11
168:7 216:6
223:1 224:5,
25 225:20
**course**

8:12 48:19
118:2 199:7
223:6,17
**court**
5:5 6:1
28:10 40:16
48:2,4
103:3,6
128:4 139:4
145:12
214:14
218:16,19
226:22 227:5
**courtesy**
180:5
**cover**
213:12,21
**covered**
186:12
**covers**
189:24
**COVID**
194:10
**CPAS**
45:8,9,10
**create**
23:17
**created**
33:7,9 120:6
130:24
172:12,14
**creating**
31:15 92:13
**creation**
36:1 127:12
**creative**
29:11,16,20
**credit**
25:19,22
39:24 68:3,9
96:18 198:9
**Crop**
195:9,19
**crossing**
137:13
**CTO**
216:15

CTO-TYPE
216:17
Cup
195:9,19
current
11:12,15
12:16 50:12
98:22,25
99:1 115:12
135:15
136:20
180:11
Cushman
15:9,12
customer
16:21 24:24
91:19 163:23
customer-
facing
97:7,15
customers
72:21 94:16
97:10 98:12
196:16
199:20
cut
103:4,7
128:5
165:15,16
183:23

**D**

D-A-N-N-E-R
76:7
daily
20:22 98:9
dairy
199:14
damn
40:11
Dan
198:14
Dan's
198:6
Daniel
76:3

Danner
76:3
date
22:17 44:12
100:1 140:23
161:20,22
162:25
178:19
179:11
182:12
186:7,15
194:17
204:19 205:4
226:16
dated
156:1,5
176:9 178:17
dates
27:3 153:10,
15 209:2,4
David
12:10,13
day
19:23 49:13,
21 50:1
51:3,15
68:22
107:12,18
110:2 125:21
141:20,22
196:5,16
198:6,8
200:4 201:4
203:12
227:13
day-to-day
79:10
days
28:5 52:12
88:20,24
109:9 151:10
197:13
202:17
deal
144:3 164:7,
8,15,18,19
197:24

dealing
183:6
December
68:19 69:22
70:2
decide
50:23 83:6
157:13
decided
198:20
deciding
37:10
decision
37:9 182:22
183:1
decisions
157:21
deck
111:15
112:1,3,4,5,
7,8,11,13,
16,20,23,24
113:1,2,3,7,
10 114:15,
20,24 115:4
117:23 120:5
decks
114:11
declined
210:22
dedicated
49:4
deep
138:11
defendant
214:6
defendants
226:14
defendants'
208:18,22
224:10
defense
214:5
define
67:20 90:21
117:7 161:5

definitely
134:14 150:4
191:11
202:22
definition
101:4,6
161:15
162:7,8,11,
13
definitive
69:25
defrauded
134:22
135:11
defuse
179:17
degree
14:24
Delaware
11:22,23
23:3 32:17,
18,24 37:16
delay
194:3
deliver
72:14,16,21
95:3,5,7,9,
13
delivery
98:11 181:22
Denver
12:17 13:1,
11 22:4
31:24 32:1
53:23 55:2
93:7 96:7
125:7,17
126:9,13
153:12
156:22,25
158:1,6,7,24
159:18
160:7,8,10,
11,14 162:2,
4 164:10
205:15
department

26:22 41:1,
5,12,24
42:4,13
47:13 71:10
218:24
219:5,12
**depending**
84:25
**depends**
58:17 90:9
96:23
**depiction**
115:12 120:5
**deponent's**
5:13
**deposition**
5:20 6:11,20
7:8,14,24
8:13,16
9:15,21
10:22 11:2
22:24 74:24
76:25 143:17
209:13
213:10
**depositions**
6:4,23
**Depot**
60:3 223:1
**describe**
27:16 50:14
79:8 84:3
89:13 93:6
109:24
169:10
**described**
13:21 30:25
31:7 49:18
79:6 84:21
92:1,2
113:13 115:8
116:2,13
**describes**
116:9 117:16
**describing**
49:20,24
50:3

**description**
89:4,9,11
105:20 161:8
**design**
23:17 29:23,
24 30:5,13
36:6 75:17
78:4 91:13
116:23
119:20
191:10
198:12
**designed**
23:17,18
115:14
**designer**
112:21
190:10
191:14
**designers**
36:5
**designing**
191:17
**desired**
162:21
**desks**
93:20,22
222:25
**destroyed**
86:19
**details**
135:14 204:9
**determine**
71:12 80:25
99:4 101:4
215:1
**determines**
214:14
**developed**
17:22
**development**
15:17 17:14
**difference**
8:8 48:21
50:13 114:9
180:10

**differences**
47:24 48:8,
13 176:3
**different**
13:22 59:2
70:3 78:16,
17 94:12
99:8 112:13
173:23,24,25
180:7 212:8
**differentiated**
18:18
**differently**
113:14
**differing**
210:15
**difficult**
7:3 137:2
**difficulty**
123:20
**dig**
27:9 38:7,15
**dinner**
151:25
154:15
158:3,8,9
200:6
**dinners**
123:21
181:21
**diplomat**
14:4
**direct**
24:2,4 82:19
84:12 108:19
109:20
174:24
**direct-to-consumer**
36:14
**directed**
84:24 110:11
**direction**
85:7
**directly**
46:21 57:14

105:6 130:2
133:25 145:5
214:15
**director**
29:11 89:3
116:4 117:11
**directors**
73:9,11,14,
18
**directs**
85:2,5
**disagreements**
135:20
**disappointment**
121:25
**disaster**
40:18
**disclose**
74:21 75:4
**discover**
26:1
**discoverable**
20:25
**discovery**
111:11
**discretion**
110:21
**discuss**
11:5 121:4,
21 122:3
154:19 163:3
164:21
168:12
**discussed**
36:16 51:15
100:21
120:15,20,23
122:16
164:23
165:1,10,23
166:13
168:18
205:16
217:22 218:8
**discussing**
68:15 121:8,

17 142:17
168:15
**discussion**
75:8 99:13
149:16 181:5
224:12,18
**discussions**
120:9 181:7
**display**
24:17,24
26:21 32:6
191:6
**displayed**
24:20
**dispute**
214:12
**dissolve**
19:2
**dissolved**
19:1
**distinction**
31:5
**distinguish**
167:15
**distinguishing**
46:17
**distractions**
220:23
**dividends**
35:8,12
**divorce**
123:5,7
159:13
**docs**
173:18
187:10
**document**
9:7 111:22
115:10
117:6,10,17
144:2,5
146:11 171:8
173:7 175:12
176:21 178:3
188:9

**documenting**
174:19
**documents**
7:12 125:25
126:4 159:5,
6,9 187:14
216:4,7,9,
10,15,19
220:5,10
**Dodson**
143:6,10
226:25
227:2,7
**dog**
200:6
**doing**
7:22 29:24
36:7,13
44:18,24
45:3,5 51:18
62:1 77:8
87:9,12 92:1
105:11
108:21
163:4,5
178:17
185:19
196:2,24
197:19 202:4
211:16
220:20
**dollar**
201:15
**dollars**
170:23
**Dominguez**
91:7,22
98:16
102:16,18
129:16,23
**donate**
24:9
**donating**
194:24
**door**
49:22 50:2
51:17

**Dorsey**
38:19 39:10
**dotting**
137:12
**double-check**
216:23
**downtown**
96:7
**drinks**
155:2
**Drive**
8:17 11:13,
18,20 12:2,
3,4 13:20
20:8,10,12,
16 21:6,10
23:1,6,8,10
25:18 27:12,
13 30:15,25
31:10,12
32:16,17
33:3,17,22,
24 34:2,3,7,
9,13,23
35:7,11,15,
20,22 36:1,4
39:2,6,12
40:2,8,18,
21,25 41:10,
18,23 42:2,7
43:8,19,25
44:2,7,25
45:17 49:25
50:3,7 53:1
54:2,7 55:5
56:14 57:17
59:16,17,19
61:13,17,20,
25 62:9,23
63:6,14
64:11 65:11
66:5,11
67:8,11,12,
15,18,20,22
69:20 70:21,
22 71:16,19
72:2,3,6,9
73:1,7,8,12,

25 74:4
77:22,25
78:1,6 79:7,
9 80:4,7,15,
23 81:24
82:13,16,20,
24 83:3,19,
25 84:4,7,
13,20 85:24
86:2,23
87:1,2,3,6,
12 89:15,16
90:24 98:2,9
99:24
100:18,20,
22,25 101:9,
17,20,22
102:5,25
104:21,22,25
105:2,14
106:20,24
107:4,12,13,
17,20,22
108:14,16,21
109:10,25
110:7,8,20,
23 112:19
116:16
117:10 118:1
120:12
121:13
123:11
124:10,17
126:14,21
127:12,13,
16,18,19,20,
22 128:8
131:14,16,
18,21 132:13
133:10 134:4
142:11,14
153:4,6,14
154:1 155:1
157:22
160:20
161:3,10,12,
14 162:10
163:5 164:6
166:23 167:8

168:1,5
171:24 173:8
176:22,24
177:2,11,13,
15,17 178:3,
4,15 181:13,
19 182:6
183:5,13,16,
21 184:6
185:3,6,12,
14,19 186:8,
14 187:1,8,
25 191:24
193:5 204:24
205:19
207:4,16
209:5,9,12
210:6,9,10,
11,18 214:7,
12,21,23
215:2 216:22
218:14,15,
21,22,23
219:6,9,12,
17,20,22,24
220:1,6,10
221:1 222:23
224:21
225:5,7,10
**Drive's**
70:8 71:19
221:9
**Drivecoffee.**
**com**
182:19
**Drivecoffee.**
**com.**
86:3
**driving**
200:5
**dropping**
210:8
**Drove**
160:18
**Dubai**
13:23
**due**
209:9 212:7

**duly**
5:11
**duties**
216:17

---

**E**

**E-I-D-L**
40:17
**e-mail**
54:13 77:18,
19 85:23,24
86:1,14,20
98:1 128:23
139:5,8,9,
13,25 140:17
141:5
143:21,24
144:1,25
145:2,4,17
146:16
147:5,6,12
155:22,25
156:4,8,10
164:6 167:6
176:19,25
177:1 178:8,
11,16
179:12,13,24
180:17,18
181:14
182:4,17,19
186:10,20
187:1,5,12,
20 188:9
192:11
193:24
195:24
204:4,5
206:12,13
207:10,15
210:8,14,16
211:5,9
217:6 218:2,
11 224:25
**e-mailed**
204:10

**e-mails**
27:10 86:19
91:19 151:11
155:5,9,10
161:17,18,24
162:4,23
163:4,10
164:3 168:7
182:8 185:18
189:4,7
190:1,5,10
191:8,9,10,
17 193:21
210:5
216:20,24
217:3
**eager**
183:4
**earlier**
27:11 64:18
79:5 153:11
163:17
180:20 187:9
189:14
213:1,9
217:22 218:8
220:24
**early**
28:5 29:3,23
30:11 35:18
46:20 55:14
155:13
**easier**
221:25 222:6
**easily**
222:14
**Easter**
151:13
**Eastern**
140:22
141:13
**eat**
76:25
**ecommerce**
25:15
**economic**
40:9,10,17
137:2

**ediscovery**
217:8
**edits**
199:16
**Educational**
15:16
**effect**
164:2 196:23
198:3
**effort**
32:9 164:17
**efforts**
30:7 79:12,
13 214:19
215:16
**EIDL**
40:9,16
**eight**
49:20,25
51:2,15
**eighth**
201:11 214:5
**EIN**
38:23
**either**
10:17 24:9
35:8 40:6,7
128:19
146:18 151:1
184:9 212:22
213:7 217:6
218:24
**elect**
73:21
**electronic**
69:11
**eliminate**
187:13
**else's**
70:8
**emergency**
137:15
**employ**
203:8 212:20
**employed**
29:5,7
56:10,12

64:16 98:2
157:22
165:25
213:25
**employee**
43:7,9 47:23
48:22,23
49:9,11
50:13 55:4
61:13,25
62:9,23
67:11,16
98:8 123:13,
14 183:21
184:5 209:12
210:3 211:3,
9 212:4
214:13
219:10
224:21
225:3,6,10,
17 226:4,6,
10
**employees**
24:10 47:16,
22,25 48:9,
13 50:7 52:5
67:8,10
70:23 71:7
80:2,4,23
87:11 98:14
117:7 123:11
167:16
214:25
219:14
**employer**
11:12,15
**employment**
19:21 20:7
70:25 123:18
125:25 126:4
159:5,6,9
209:2,4
213:15,18
226:3
**empty**
193:8 222:24

**encourage**
153:17
**encouraged**
136:10
**end**
174:12 211:9
215:17
**ending**
125:15
**Endowment**
15:16
**energy**
15:17 117:11
155:2 220:17
**engagements**
115:21
**ensure**
63:3
**enter**
82:13 184:14
**enterprise**
18:9,18
**entire**
148:2 149:3
225:4
**entirely**
27:3 69:7
158:20 208:6
212:5
**entirety**
148:20
**entities**
24:17 33:23
78:6
**entity**
11:20 32:19,
25 33:1,2,4,
7,9,12
35:17,22
37:5 38:23,
24 218:15,22
**entry**
75:19
**equipment**
56:15,17,21
57:1,4,9,11,
14,17 58:13,

15,16,17,21,
25 59:7,9,
12,15,17,18,
19,23 60:2,
21 61:11
222:25
**equity**
210:20
**Eric**
92:17,18,23
95:25 102:10
130:11
**essentially**
43:20 55:18
181:15
**establish**
208:3
**established**
16:11 64:18
**estate**
15:14
**estimate**
56:5
**estimation**
106:1
**et**
72:12 97:16
**Eugene**
76:18
**evaluating**
157:23,24
**Evan**
91:11,12,13
95:24 103:11
129:19
**event**
156:25 157:4
**events**
48:19
**eventually**
66:15 166:12
**everybody**
95:23 115:3,
6 123:19
124:3 128:25
134:11 135:5
157:20

160:15 189:6
206:7
**everyone**
85:6 123:8
128:7 129:5
134:7,24
167:13 183:7
196:15
**everyone's**
148:24
**evidence**
175:10
**evidenced**
209:21
**evident**
194:11
**exact**
27:3 34:15
44:12 61:15
101:4 112:5
185:17
198:16
226:15
**exactly**
38:3 59:3
70:4 113:4
125:5 138:6,
16 144:9,15
163:12 166:4
172:20 180:7
208:5 211:4
**EXAMINATION**
5:14 224:15
**exceed**
222:3,4,8
**exceeds**
23:14
**Excellent**
79:4
**exception**
25:1 64:24
129:5 135:20
**excerpt**
111:14 171:6
**exchange**
146:12
151:16

179:24
189:23
**excited**
199:2
**exclusively**
95:21
**excused**
227:10
**executive**
29:11 43:21
92:8
**exempt**
214:8,15
**exercised**
110:16
**exhibit**
6:3,10 8:25
9:5,13,14
106:12
111:1,3,6,
11,14 139:4,
5,10 142:22,
23 145:24,25
150:8,16
155:22,25
156:4
168:20,24
171:16,17
175:6,12
176:11,20,21
177:1 178:3,
16 182:6
189:7,11,15,
17 201:11
204:23,24
208:16,17,18
210:6,7
224:10
**exhibits**
6:16 174:18,
22 178:23
189:22 207:7
227:9
**exist**
33:4
**existence**
63:13 70:21
221:2

**existing**
158:3,10
215:22
**exists**
33:6
**expect**
116:10
166:22
225:14
**expectations**
127:10
**expenditures**
170:9,13,24
**expenses**
179:9
**experience**
5:23 23:18
**experts**
136:9
**explain**
114:8 151:8
212:25 213:5
**explained**
125:1
**explaining**
126:5 159:11
**extensively**
136:24
**extent**
214:14
217:25
**extra**
88:20 208:8
**extraordinari
ly**
123:2
**extreme**
121:25
**extremely**
179:22 180:1

_____

**F**
_____

**F-O-N-G**
43:3
**Facebook**

**200:12,20,25**
**facilities**
160:21
**facility**
69:11 93:6
**fact**
20:10 51:6
52:4 61:24
101:2 115:15
121:5 122:7
125:24 131:1
163:3,24
172:23 194:8
197:10 198:1
209:14
210:15
211:8,20
**factual**
214:4
**fail**
137:8
**failing**
123:1
**fair**
31:20 57:15
88:23 99:2
114:2 131:13
136:21 148:9
164:18 180:1
193:13
202:23
203:11
**fairly**
38:18
**fall**
26:25 30:21
31:19 36:2
137:5
**false**
124:22
**familiar**
45:19 46:12
121:12,16
122:15
133:19
172:18
203:17

**208:6,10**
**family**
122:24 137:5
**Fantastic**
6:18 7:1
8:24 9:20
10:19 52:24
54:6
**far**
70:18 84:23
106:19
117:15
149:11
178:13
198:25
**father**
21:19
**father's**
14:2 21:24
**favor**
207:22
**February**
28:22 53:13
68:18
**federal**
71:11 81:25
214:8 218:24
219:5,11
**Fedex**
72:11 95:6
**feel**
88:10 123:18
124:15
157:19
202:20,23
**feeling**
190:7 199:6
203:4
**feelings**
11:5
**fees**
175:23 176:4
**feet**
93:9
**felt**
19:18 20:20
203:11

figure
  157:22 165:3
  202:4 223:23
figured
  144:20
file
  75:11
filed
  81:25 82:3,
  5,9 221:1
filing
  225:1 226:16
filings
  46:3
fill
  116:7 117:20
filled
  49:10 50:25
  97:5
filter
  147:3
final
  123:22
finalized
  123:8
finalizing
  202:25
finally
  140:19
  141:23
financed
  57:11
financial
  45:6 220:16
financially
  214:2
financials
  132:12 133:5
  220:2
financing
  57:8,14
  212:23
  213:8,16
find
  28:4 36:8
  54:1,3 68:12
  70:16 87:8

97:11 99:25
  106:12
  122:17
  151:18
  173:14
finding
  191:14
fine
  6:6 29:18
  53:15 58:8
  103:18,24
  145:6,15
  151:5 169:9
  188:18
  225:20
finish
  10:4 185:23
finished
  204:6
fire
  79:18,24
firm
  5:18 15:12,
  14 29:23
  38:2,18
  39:11 133:5
  137:4
firms
  23:15
  219:17,19
first
  5:11 6:14
  8:5 20:11
  22:21 27:18
  29:4 36:15,
  16 37:20
  39:5 49:19
  56:7 59:6,
  11,23 60:20
  67:14,18,23,
  24 80:2
  85:23 111:17
  112:16
  122:10
  125:16
  130:16 131:5
  139:10,25
  141:3 142:1,

5,6 160:10,
  13 161:2,13
  175:9 176:25
  181:20 196:8
  208:19
  210:13
  211:25
  224:11
  225:20
five
  223:19
fleet
  72:24
flight
  153:23
flip
  139:14
  143:8,18,19
  146:6 147:19
  152:3,7,16
  155:23
  192:25
  211:16
flipping
  214:11
flooded
  20:22
fly
  152:22
flying
  181:19
focus
  137:7
focused
  124:13
  137:11
  220:17
folder
  193:3
folders
  193:5,8
  216:22
folks
  17:24
follow
  37:14

following
  5:1 48:6
  97:24 141:5
  152:23
follows
  5:12
Fong
  42:25 43:7
food
  21:3
forced
  137:16
foreign
  14:5 32:25
  33:1
Forest
  13:16,17
forget
  83:1 124:11
  180:7
forgetting
  193:18
form
  128:21
  164:2,16
  167:21
  213:21 215:8
formal
  16:19 44:9
  46:19 50:24
  107:14 109:2
  130:23 136:6
  184:25
formalized
  159:3
formally
  24:25 30:16
  55:22 107:18
  133:13 167:2
format
  132:9
formation
  81:24
formats
  207:11
formed
  35:17 37:22

55:13 56:18,
19 73:23
114:1 206:9

**forming**
36:21 37:1

**forms**
45:12,23
46:7,8,12
47:3 64:1
65:13 132:1
207:12 221:2

**forth**
140:19 190:1
193:10

**forward**
62:20 63:3
81:4 125:23
143:18 145:2

**found**
20:21,24
107:24

**founded**
17:17 56:20

**founder**
11:19 27:12,
13 79:7
87:14
113:10,20,22

**founders**
62:12

**founding**
20:7 27:20
113:18,21

**four**
30:22 31:16
44:1

**frame**
189:25

**frankly**
164:5 207:20

**free**
96:16

**frequently**
168:16

**Friday**
152:23

**fridge**
190:19,23,
24,25 191:1,
2,4

**friend**
104:23
106:17
107:6,11,16
113:17 114:7
116:3
121:10,15
137:23
154:15
207:21

**friendly**
108:25 183:7
198:23

**friends**
10:24 109:1
119:12
122:11
162:17
166:10
167:11,13,15
183:6,7
196:15
199:2,5
203:14

**friendships**
206:9

**front**
97:18,21
142:24 143:1
181:15 202:8

**frustration**
122:1

**fulfill**
194:15

**fulfilling**
194:17

**fulfillment**
91:14,18,24
92:2,24

**full**
12:9 45:2
156:8 210:13
223:20,21

**full-on**
123:11

**full-time**
48:24 49:11
98:8 210:21
212:20
213:18

**fully**
47:5 169:14
198:18

**fun**
160:16
168:10

**function**
210:24

**functions**
89:25

**funded**
58:22,23
117:21
166:13
169:14

**funding**
19:3 40:22
58:14,16
59:7 110:3,4
114:16 116:8
122:22,23
123:16
157:17 159:2
162:19
164:24
165:25
202:15

**fundraise**
36:10 124:6

**fundraising**
35:20 79:11
114:17
122:21
142:16

**funds**
40:3,9,19
59:3 174:19

**future**
114:12
115:1,15

124:5 174:2
181:8,9
197:7 199:3,
6

---

**G**

---

**Gary**
21:25

**gave**
56:8 78:9
143:22

**general**
171:14 207:3
214:16

**generalize**
59:1

**generally**
83:6 88:13,
19,22,23
90:10 95:4
97:6,9,16
171:10

**generated**
212:23 213:8

**generic**
171:11

**genuine**
206:9

**getting**
31:24 38:23
47:19 54:5
62:6 63:1
91:5 123:15
135:14
155:16
156:7,20,21
162:16
181:20
201:12
203:25
225:21

**gift**
24:9

**gifting**
24:13

gifts
  207:2
girlfriend
  31:2
give
  12:19 69:24
  94:11 101:6
  139:12
  172:5,16
  182:22
  213:13
  222:12,16
  223:22
given
  5:20 14:2
  16:18 38:5
  50:18,22
  53:21 85:7,
  12 89:6 94:8
  97:8,9,12
  98:19 121:23
  123:20
  134:14,18
  157:20
  167:10 168:6
  183:20 184:5
  197:19
giving
  167:18
glitched
  48:2
Gmail
  147:4 182:14
  217:11
goes
  49:2 63:1
  96:8,12
  153:8 154:19
going
  6:9 7:2 8:25
  9:13,25
  22:7,20 23:2
  28:16,17
  32:2,3 35:25
  37:12 49:22
  50:2 51:17
  52:16 55:23
  62:19,20

70:2 81:3
82:8 83:15
84:15
104:17,18
110:25
111:18
124:22
125:10
134:19
138:24 139:2
140:18
142:21
144:1,16
145:24
146:7,9,11
150:10,14,22
151:8,15
154:4
155:21,22,23
156:8
168:19,22
171:15,23
172:5 173:16
175:4,5,6
176:19,24
177:8 180:25
181:20 182:4
188:16
189:5,6,10,
21 190:1
192:25
194:12,14
201:16
202:6,16,25
204:22
208:15,16,24
210:5 214:3
222:1 224:6
225:18
good
  11:11 21:5
  23:20 33:1
  36:8 47:19
  52:21 57:21,
  24 58:4
  62:6,16,19
  63:4 67:1,7
  132:18
  136:19 152:8

155:1,20
186:6 191:18
194:20
196:20
197:18
199:15,21,23
207:2 223:24
Google
  54:13 86:5
  173:1,18
  187:8,10
  193:5 207:16
  208:10
  216:21
government
  40:22 71:11
governments
  82:1
graduate
  13:13 14:13,
  15,18
graduated
  14:16,23
grants
  40:22
Grappo
  5:10,16 6:14
  11:12 12:8,
  10,13 21:23,
  25 22:2 98:7
  111:17
  143:7,22
  144:24 145:9
  146:5 150:11
  156:1 174:5
  176:12
  189:3,10
  205:21
  212:18,21
  221:24
  224:17
  226:20
great
  151:7,13
  211:19
green
  60:14,15
  94:19 109:6

195:12
222:24
grinding
  56:22 58:21
  60:8,22,24
gross
  221:9,13
  222:2,8
ground
  6:3,10,20,
  23,24 60:23
group
  157:25
  158:11,13,23
  160:6,7,9,24
  206:20
  207:1,5
grow
  215:2
grown
  13:21
GS1
  207:20,24
  208:11
guess
  22:8 49:16
  52:12 79:22
  105:19
  176:13
  181:23
  194:23 195:1
  196:2 205:3
guessing
  193:4 195:25
  204:4
guidelines
  47:14,21
Gusto
  132:5
guy
  195:16
guys
  140:18 141:1
  178:14 181:7
  193:11
  194:15

## H

H-A-M-M-A-R-
B-E-R-G
  28:12
habit
  74:20
half
  172:24
Hall
  104:22
Hammarberg
  27:25 29:10
hand
  61:11
handbooks
  127:14
handle
  44:8 83:7,9
  112:20
  165:24
  166:12
  191:14
handled
  16:19 44:2
  46:15,16
  54:16 164:5
handles
  54:18 55:1
  86:17 182:24
  216:17
handling
  44:10 45:1
  46:13 47:18
  51:19,21
hands-off
  165:2 166:1
hang
  40:11 109:1
  157:6
happen
  194:12
happened
  18:24 54:3
  62:22 109:9
  135:13

156:17
happily
  29:1
happy
  8:10 115:23
  143:24
  148:16
  173:19
hard
  59:14 148:14
hard-written
  132:8
hat
  69:18
he'll
  192:24
head
  74:6 78:21
  102:2
  116:17,18
  161:23 174:3
  208:13
  221:12,16
hear
  103:5 198:9
heard
  140:3 220:15
held
  17:13 69:20
  73:18 75:21
  125:17
  149:16
help
  6:7,8 28:16
  36:5 51:22
  54:9 59:11
  68:22 85:9
  90:2 112:20
  119:13
  122:23 183:9
  190:10
  191:16
  198:10
  213:14 224:6
helped
  216:16

helping
  62:3
hey
  188:14 198:6
  199:21
  202:19
high
  13:13,15,16
higher
  14:24
highly
  211:17
hire
  67:14 79:16,
  22 80:8 92:8
  110:5 159:10
  164:25 190:9
  203:7
hired
  44:11,13,21
  47:11 67:24
  70:24 84:16,
  18 107:18
  157:18
  162:20
  165:13 181:5
  209:19
  210:17
hiring
  124:5
history
  15:7
hit
  52:21 170:14
hoc
  88:10
hold
  34:14 83:16
  194:8,16
  201:23
  222:23 227:2
holding
  159:13 198:7
holds
  27:25
holiday
  134:6,13

136:1
holidays
  134:5
home
  51:8 52:6,7
  56:8 60:3
  223:1
honest
  90:13 198:18
honestly
  140:7
hope
  113:16
  178:15
hoped
  107:11 116:7
  117:20
hospital
  194:25
host
  54:14
hosted
  86:5,6
hosting
  84:7
hour
  49:21 50:1
  51:16 52:16
  90:7,11,14
  227:12
hourly
  134:7,12
  190:10
hours
  46:21 49:21,
  25 51:3,15
  94:25 127:24
  128:9,18,24
  129:2,6,9,
  11,14,17,19,
  21,24,25
  130:4,9,20
  131:2,10,11,
  24 132:2
  136:13
  140:12
  168:9,10

188:17 201:5
**house**
  56:6,9
**hundreds**
  200:3

---

**I**

**I"s**
  137:12
**I-9S**
  185:2
**idea**
  30:18,20
  31:8,14
  97:12 195:10
  196:14,18,20
  197:14,17
  199:15,20,
  21,23 222:17
**ideas**
  154:1 196:16
  197:23 207:3
**identificatio
n**
  6:4 9:16
  111:15 139:6
  146:2 150:18
  156:2 169:1
  171:19
  175:14 177:3
  189:19
  208:20
**identify**
  97:24 144:8
**Ignored**
  196:21
**illegitimate**
  135:18
**imagine**
  124:19 168:9
**Imola**
  191:23
**impact**
  40:10
**important**
  31:4 161:16

198:24 206:8
**impossibility**
  126:1
**impossible**
  58:25
**impression**
  98:20 123:14
  168:3 206:9
**impressions**
  196:8
**in-**
  185:16
**in-person**
  89:24 141:7
**inaccurate**
  99:6 100:12,
  13
**inbox**
  20:21 21:2
  180:17,18
**inception**
  35:16,23
  40:23 54:7
  81:24
  127:11,19
  134:4 219:12
**include**
  21:9 60:9,13
  69:6 99:13
  102:10,11
  115:23 223:4
**included**
  96:15,17
  98:6 99:2,4
  206:21
**including**
  29:7 97:25
  166:8 199:20
**income**
  45:15 221:1
**inconsequenti
al**
  185:17
  193:19
**inconsistent**
  160:2

**incorporated**
  78:13
**incorporating**
  30:17 31:15
**incorporation**
  127:12
**incorrect**
  31:12
**increased**
  165:7
**independent**
  47:22,25
  48:9,13,22,
  25 110:16
  182:25
  183:18 184:9
  209:5,20
  215:1
**indicate**
  16:12 159:17
  174:5 179:25
  225:9
**indicated**
  17:11 131:1
  188:5 193:23
  204:25 216:6
**indicates**
  191:21
  193:8,15
  203:9,24
**indicating**
  203:2 213:6
**individual**
  97:25 131:20
**individuals**
  68:15,17
  83:3 84:13
  98:13,14
  120:17
**industry**
  36:7
**info**
  200:11
**inform**
  192:9 198:20
**information**
  38:4 68:5

70:16 75:9
  77:10,12
  78:23,25
  152:15
  217:25 218:5
**initial**
  30:10 36:1
  59:6 170:8
  204:12
  215:20
**initially**
  31:23 108:9
**initiation**
  209:10
  212:3,5
  224:19,23
  226:14
**injury**
  40:17
**input**
  29:16,20
  183:1
**inside**
  93:17
**Instagram**
  18:7
**instance**
  83:25 84:6
  86:18 113:15
  114:21 115:2
  155:2
**institution**
  14:24
**instruct**
  12:22
**instruction**
  86:20 187:16
**instructions**
  85:12
**instrumental**
  164:15
**intent**
  170:23
**intents**
  27:22
**interaction**
  219:4,10

interest
  31:6,13
  69:25 77:23
  148:24 194:2
interested
  125:20
  166:19
interesting
  9:9 115:3
interestingly
  117:9
interfere
  7:3
interference
  102:24 128:2
  183:20
  185:20
intermittentl
y
  98:10
intern
  15:9,22
interpret
  31:9
interrogatori
es
  97:20 111:4
  208:19,24
  209:17
interrogatory
  97:23 100:23
  101:14
  102:9,12
  209:1 211:2
  212:16 213:5
  214:4,11
  215:6
  224:10,12
interrupt
  50:21
interspersed
  153:25
interview
  30:24
intimately
  121:12,16

intro
  139:21
  140:13
introduced
  12:8 121:24
  137:22
  138:13
  163:21,22
  181:14
introducing
  138:21
introduction
  138:19
  140:2,9,18
  151:11
introductory
  141:16
inventory
  60:10 79:13
  94:19
invest
  159:14
invested
  29:21
investing
  123:5
investment
  123:6 124:7
  126:2 154:2
  170:3
investments
  58:23
investor
  25:17,20
  79:14 123:4
  127:7 159:12
  212:23
  213:8,16
investors
  27:18 29:4
  35:6 112:23
  122:11
  126:20
  127:3,5,6
  137:23
  154:18
  158:3,8,9,10

  218:6,7
inviting
  140:13
invoice
  88:24 90:9,
  12 109:13
invoiced
  90:10 108:17
invoices
  88:15,18
  90:16 130:24
involved
  20:19 27:19
  32:10 33:23
  46:4 60:5,21
  107:12
  123:20 124:4
  167:21 183:4
  195:21
  202:22
  206:19
  216:8,9
involvement
  107:14
  132:10
irrational
  179:22 180:1
IRS
  64:2
issue
  121:6,9
  159:13
  201:24
issued
  30:11 47:8
issues
  201:18
  207:25
item
  176:11

_____

**J**

J-A-Z-M-I-N-E
  91:2
J-I-L-L-A
  76:17

J-O-A-K-I-M
  28:18
January
  15:19,23
  16:14 17:10,
  15 28:1
  98:3,24,25
  100:25
  101:10
Jazmine
  90:25 91:1,4
  95:24 98:16
  129:13
Jilla
  76:15,16
Jim
  75:18
Joakim
  28:19,20
  116:23,24
  119:20,22
  121:2 122:4
job
  14:2,3 16:19
  132:18
  199:19
  210:21,22
  211:10,18
jobs
  16:2,3,7,9
John
  138:13,15
  151:25
join
  116:11,14
  142:16
joined
  126:12,13
jointly
  75:21
Jonathan
  76:4,9,11
  78:11,16
  137:24
Jones
  76:4,9
  137:24

138:13

**Jordan**
13:22

**Josephine**
12:25

**judgment**
110:17

**juggled**
29:2

**July**
15:10,22
16:13 17:17
19:12 140:1,
24 151:9,12

**jump**
149:1 214:3

**jumping**
106:13

**June**
15:19

**jurisdictions**
32:20

---

## K

**K-A-V-A-L-L-**
**A-R**
54:23

**K-N-U-D-S-E-N**
106:16

**Kavallar**
54:23 83:23,
24

**Kavallar's**
54:24

**keep**
49:21 50:1
51:16 75:12
97:7 122:25
125:14
162:19
167:19
193:18,19
204:21

**keeping**
75:9 220:18

**Keith**
109:25
117:15,16,21
118:23,25
120:16,20
121:24
122:8,12,14,
16 123:23,24
125:5,11,16,
17 126:18
131:1,8,12
137:18,20,25
138:20
139:23
140:3,5,13,
17 142:8
151:25
152:22
156:4,7
157:6,10,11
162:3
163:21,23
166:9,15
168:4 174:6
178:6 181:4
182:8 183:4,
15 184:12
185:5 196:19
197:6,15,16
198:21
203:15
205:17
206:2,19
209:19
210:8,16
217:5

**Keith's**
166:10 173:1
203:14
216:23

**Keith@**
**drivecoffee.**
**com.**
182:9

**kept**
133:20

**key**
210:25

**key-coded**
97:8

**keys**
52:11

**kind**
6:10,12
11:3,20
15:12 17:25
39:19 47:16
54:11 65:21
69:12 97:4
116:9 135:6
141:8 142:18
164:25
220:5,10

**kinds**
174:16
196:17 200:4

**knew**
83:4 138:20
225:5

**knock**
192:4

**know**
6:21 9:10
10:7,16 21:3
26:7 27:22,
23 31:11
36:11,25
37:3,13,14,
20 41:10
46:1,2 49:2,
4 56:17 57:3
59:9 60:10
62:5,11,22
64:1 66:6,7,
9,12 68:11
69:8,25
70:1,4,5
72:20 74:6
75:6,9,11
78:20 80:11
83:7 86:14
88:22 97:13,
14,15 102:11
112:6,11
113:1,4
115:9 122:4,

5 133:19
134:8 135:6
137:15 142:1
144:16
146:15
148:10 149:1
151:1,23,24
159:8,15
161:16,22
162:16,24
163:2,7
166:17
168:10
170:22,24
171:6 176:2
180:14
181:17,19
186:11
188:1,15
190:15
192:16
194:14 195:2
199:2,4
200:15
201:14
203:17
206:6,7
209:23 210:2
211:20
212:11,12,13
213:23
221:11,13,15
222:1 225:13
226:13 227:3

**knowing**
136:13

**knowledge**
8:15,19
22:23,25
34:12 41:18,
21,23 42:2,
10 47:9
49:16 53:14
56:10 57:10,
16,18 59:2
67:4 73:3,6
87:4 88:25
89:2 93:2

101:17
105:14
107:22
108:20,24
109:4,10
123:9 133:6,
18 135:13
218:21 219:8
221:1
**known**
7:23 33:2
138:4,7,15
**Knudsen**
106:16
113:15

---

L

---

**L-E-E**
76:12
**L-U-B-A**
92:22
**L-U-K-E**
108:5
**labeled**
178:4
**labor**
41:12 42:4,
13 47:13
68:22 71:10
218:24
219:5,12
**lack**
19:3 159:9
**landing**
164:15
**large**
25:23 169:3
198:17
**larger**
18:17
**largest**
34:20
**latte**
198:11
199:13,19
200:1

**lattes**
202:25
**law**
5:17
**laws**
70:22 71:7
214:9
**lawsuit**
120:16,21
209:11
211:3,14
212:5 218:13
224:20,24
225:2
226:15,16
**lay**
17:24
**layer**
37:1
**leading**
225:19,22
**leads**
20:23
**leaning**
197:1,3,10,
20 199:25
**learn**
37:17 166:18
**learning**
14:25 36:6,7
167:13
212:11
**lease**
53:12 96:13
**leave**
12:21 56:15
135:16
136:8,12
**leaving**
65:7
**Lee**
76:11 78:11,
16
**left**
19:17,22
22:17 58:12
64:19

104:16,18
154:10,13
**legal**
36:25 37:3
63:4 101:8
115:11
136:18
211:11 215:7
**legally**
115:22
**Lemans**
191:23
**letter**
49:11
**letters**
50:24
**letting**
137:7
**level**
180:2,4
**liability**
34:6
**lie**
136:5
**liens**
57:17
**life**
10:24 16:3
134:19
**light**
212:25
**Limited**
34:6
**limits**
20:25
**Lindsay**
98:15 99:11,
13,15,19,22
100:10
105:4,5
107:16
116:25 117:2
118:4
120:22,24
121:1,4,10
130:14
157:5,9,11

174:6 205:16
206:2,24
**Lindsay's**
116:3
**line**
25:19,21
26:7,9,11,17
39:24 153:15
171:3 176:11
198:9
**lines**
188:7
**link**
143:24
**Linkedin**
19:16 20:13,
22 21:7
100:10
**links**
143:10 144:3
**Lisa**
75:2 99:3
101:3 178:23
**list**
10:1 78:9
98:22
100:14,15,24
101:13,14
102:10 115:9
118:21
119:17 120:2
**listed**
20:13 28:21
87:2 95:17,
23 99:1,11
113:10,17
114:7 115:21
116:4,17
128:24
150:24
**listing**
19:11 20:16
200:10
**lists**
29:11 89:3
100:10
105:18 116:6

literal
  65:19
literally
  56:18 195:14
  196:23
litigation
  121:5,8
little
  15:6 26:14
  106:13
  142:11,12
  148:14
  149:13
  169:6,8
  221:25 224:5
live
  12:15 22:3
lived
  22:10,12,19
livery
  190:11,12,
  13,16,20
LLC
  19:8 33:3,
  17,21,25
  34:5,8 35:18
  36:21 37:7,8
  39:2 64:12
  77:25 78:13,
  15,16,18
  218:14,22
LLCS
  78:7,10
Lloyd
  76:4,9
  137:24
  138:13
Lnobles@
sussexlawfirm
.com.
  145:19
loan
  26:12 40:18
loans
  40:22 58:13
local
  195:17

located
  31:25 55:2
  132:24
location
  25:1,3 49:13
  51:5 53:17
  153:9 158:14
locations
  32:5 96:5,25
  97:2
locked
  54:5 187:8
logged
  163:7 215:23
logistics
  16:20 201:12
long
  27:2,4 44:6
  58:1 104:2
  138:4,6,11,
  15 141:19
  142:22 145:5
  148:21
  197:14,15
  206:6 211:21
  221:20
longer
  39:10 185:11
  186:1 203:10
look
  8:4,25 21:4
  26:2 27:6
  36:10 76:25
  113:6
  114:16,25
  115:1,16
  120:4 149:14
  150:5,12
  157:24 159:1
  170:10
  172:25
  173:10 174:2
  186:9,23
  189:11 190:3
  194:24
  195:17 197:7
  199:6 208:24
  226:7

looked
  156:16
  189:14
looking
  32:3 36:5,11
  117:22 135:8
  142:13,15
  154:16
  167:19 180:9
  182:5 195:18
  201:10
  202:12 205:2
  211:19
  213:20
  221:23
looks
  9:23 120:7
  140:16 147:2
  149:19
  175:10 176:6
lost
  38:12
lot
  20:18 23:15
  62:1 97:10
  172:13
lots
  13:21 173:17
  181:7
Luba
  92:17,21
  102:10
  130:11
Luke
  108:4,14,19
  116:14
lunch
  103:23
  104:13

_____

### M

M-A-R-K-U-S
  28:11
M-O-R-T-Z-F-
I-E-L-D
  87:20

Macy's
  26:21,22
  32:5 163:10,
  15,17,25
  191:4,6
  192:1,2
  193:12,16,24
  214:20
  215:21,22
made
  8:22 58:24
  59:4 72:5
  101:23 123:7
  135:4 154:6
  157:21
  166:9,10
  176:17
  182:22
  185:16
  199:16
  211:2,18,21,
  23 213:12
  214:1 218:23
  219:1
mail
  96:19 192:9
Mailchimp
  192:10
mailing
  96:17,22
major
  137:4
majority
  34:17,19,21
  181:17
  198:25
make
  7:2 12:7
  19:4 31:5
  40:15 47:15
  51:12 59:14
  70:21 84:7
  95:5 100:6
  104:8,20
  145:24
  147:19
  149:25 169:6
  171:24 172:6

183:1 187:15
204:6 220:25
221:25
makes
72:9 74:23
199:12
making
63:9 137:8,
11 170:13
179:11,21
200:6 211:4
Malibu
17:6 25:9
man
202:19
manage
46:23 79:11,
12
management
16:20 98:5
205:19,23
219:23
manager
19:9,13,25
20:3 114:8,
21,23
manner
50:4 179:23
183:8
manufacturing
58:20
March
53:13 81:19
189:23,24
199:23
200:18
202:2,13
Marisol
91:7,8 92:1
95:24 98:16
129:16
130:7,8
174:7
Marisol's
91:22
marked
6:4 9:15

111:15 139:6
146:1 150:17
156:1
168:21,25
171:18,22
175:13 177:2
189:19
208:20
market
23:19 36:13
152:15 154:3
marketing
54:14 79:13
117:17
126:19,22
154:1 161:10
165:8 166:7
209:6 210:18
214:16,19
215:15
Markus
27:25 29:10,
14 116:22,24
119:19,22
121:2 122:3
match
102:8
material
90:1
materials
7:13,16,19
15:17
Matt
107:15 116:2
matter
5:19 74:20
210:15
MDT
227:13
mean
12:4 22:16
23:10 26:10
30:16,17
31:8,9 38:14
50:21 51:21
52:1 56:17
57:2 60:1,2,
23 63:25

66:19 68:12,
13 69:10
70:24 72:7
74:15 75:2
77:5,15
79:21,25
82:21 83:10
85:15 88:7
90:21 93:15
100:7 101:7
108:25
112:19 113:1
124:8 129:7
136:6 148:2,
13,22 149:18
151:24
161:5,7,19
162:24
163:19 164:7
169:17,25
172:16
175:22
178:21
181:12
182:15
188:23
190:12
192:18
196:19
197:1,3,12
198:15,20,
22,23 200:3
203:5 205:3,
4 211:16,22
224:23
226:15
means
52:11,13
88:5 174:19
214:6
meant
18:3 43:13
84:12 115:11
141:6 153:5
182:16
213:11
measure
166:25

measured
167:3
mechanics
6:13
media
114:8,21,22
meet
56:8 127:2
137:21
140:19
141:1,4
151:18
158:13
meeting
123:22
125:17,24
126:15
127:4,9
141:4,8,9,
14,23,25
142:5 152:3,
20 153:12
157:15
159:7,18
160:8 162:2
163:23
205:17
meetings
125:6,12
126:20 127:5
142:7 158:23
210:25
megabyte
146:20
member
34:10 42:19,
23 43:12,13,
17 78:1
110:24
members
21:9 34:7
41:17 47:1,4
51:7 110:20
125:18
142:14
153:13
memes
207:2

memorized
148:1
menial
164:3 167:20
185:18
193:20,21
mention
117:4,12
140:5 155:14
mentioned
32:16 117:3,
5 159:15
180:20 182:1
184:20
185:15,16
219:16
220:14
mentioning
154:14
mentor
106:18 107:6
113:17
merchandise
24:18 32:6
merged
70:10
message
147:12 180:6
188:9 201:20
217:13,16
messages
145:25
150:16
155:8,11
162:17
189:18 200:4
216:21
messing
19:19
messy
85:25
met
122:8,12
142:2 153:7,
13 158:2,10,
19

method
68:25
Michael
76:3,6
Michelle
22:2
mid-april
206:4,5
mid-february
209:7
mid-september
206:4,5
209:7
middle
132:19
153:18
154:16
milk
199:13,14,18
200:1
million
169:21
170:2,5,7,
11,12,19,25
197:20
mind
53:22 74:13
146:22
mine
121:11
137:23
146:24
minute
6:14 38:10,
15 127:10
139:11
146:21
158:25
174:23
223:22
minutes
52:20 58:3
104:3 221:22
223:19,25
missed
128:12

missing
148:1,4
149:4,6
mistake
160:12
mists
38:12
mobile
17:22,25
mochas
202:25
model
173:25 174:1
moment
6:19 10:2
34:16 61:24
83:17 87:11
114:14
135:22
139:12
188:19
204:23
223:16
monetary
65:11 66:4
money
37:1,12
65:22,24
68:25 88:7,
9,21 105:15
109:11
119:11
123:3,22,25
124:4 128:23
131:8 136:14
166:14 167:7
169:15
198:7,14
204:13
211:24
213:13,23
214:1 226:8
Monica
17:18
Monitor
192:11
Monster

117:11
month
69:22 96:16
100:3
169:16,17,
18,23,24
170:15
monthly
170:24
months
100:8,9
123:12
138:9,10,17
211:23
220:15
221:10 225:1
Moody
98:15
100:15,16
101:22
106:10
137:24,25
139:21
153:21,22
157:6
morning
200:22
Mortzfield
85:13 87:18
90:5 98:16
118:18 121:3
129:10
mother
21:19
mother's
21:22,23
motion
75:12
motivation
31:10 54:5
motor
105:15
Motors
16:13
Motorsport
99:21,23
105:9,10,15,

19 117:1,11,
12
**Motorsports**
105:7
**Mountain**
140:20,21,
22,23 141:13
151:13
**mountains**
160:18
**move**
63:2 179:17
**multiple**
74:3 112:13
115:9 136:25
159:21,23
160:1 171:8

---

## N

**N-I-C-K**
43:1
**N-I-K-O**
54:20
**name**
5:16 12:9
18:12,20,22,
23 21:22,23,
24 22:1
28:11 39:9
54:2,19,22
71:25 76:5
78:15,16,17,
18 83:22
91:21 97:25
101:20 107:9
108:10
109:16
205:20
**named**
99:12
**names**
12:12 68:21
74:25 98:18
102:8 104:19
**nature**
23:1 97:9,12

114:22
121:14
**NDA**
184:14,24,25
**necessarily**
119:2 137:11
**necessary**
68:6
**need**
12:19 21:4
46:5 61:14
67:5 68:1
75:6,14
98:18 99:3,4
146:6 148:21
190:9,11,16,
19 201:14
212:9 216:23
220:19
224:6,8,9
**needed**
36:24 37:10
68:10 98:11
119:11
136:14
149:22
213:24 214:1
**needs**
55:1 84:17
161:8 192:3
215:18
**negate**
184:19
**neighborhood**
222:19
**network**
18:7 191:19
**Neumann**
43:17 81:16
92:6 130:9
**Neumann's**
43:18
**never**
16:18 19:16
35:18 47:8
50:24 80:3
84:18 100:19

105:1
107:18,19,21
108:18
125:15
135:10 140:3
146:22 165:4
181:4,5
183:15
184:18
185:4,9
203:11
209:11 211:2
212:3 224:20
226:5,9
**Newport**
15:22
**news**
199:4
**newsletter**
191:10
**Nicaragua**
13:22
**nice**
181:20,21
**Nick**
42:25 43:7
**Nick's**
83:21
**Niko**
54:19,24
56:10,12
83:20,21,24
84:8,18,20
85:7,8,12,17
86:16,17,20
110:13,15,16
182:24,25
186:25
187:11,16
216:15
**Niko's**
110:21
**Nobles**
5:9 9:4
12:23 52:15,
22 57:22,24
58:3,6,9
75:5 103:4,

19,22,25
104:2,3,7,10
111:2,8
143:5,9,12
144:4,7,11,
13,16,18,20
145:1,4,16,
18,22
146:17,24
147:5 148:9
165:15,19
188:14,20,25
215:5 218:3,
9 223:12,13,
21 224:4,9,
16 225:15,
16,23
226:12,19
227:8
**Nobu**
160:19
**non-cash**
119:17,18
**nondisclosure**
184:14
**note**
98:4 113:9
176:6
**notes**
32:3 223:16
**notice**
9:1,2,14,21
10:1 111:7
152:9
**November**
176:9
**number**
9:1 26:13
56:4 66:6,8,
9,12,14,22
67:3,6 88:8
97:23 98:1
144:11
147:16,17
168:20
170:17
173:22
197:24 200:7

203:25 209:1
212:16 213:5
215:7
221:11,13,
15,18 222:14
224:13
numbers
41:4,12
144:8
149:23,25
150:24
174:3,8,10
176:1 218:2
222:15

O

O-L-S-S-O-N
28:20
oat
199:13,14,18
200:1
oath
5:13
objection
77:7 98:7
148:9 215:5,
8,11 218:10
objectives
114:17
oblige
115:23
observed
5:23
obstacle
77:6
obtain
67:3,17
123:16
obviously
7:10 48:17
occasion
80:14 84:19
131:2
occasions
101:19
159:16

209:22
occur
141:14
182:14
occurred
125:13
135:17
141:18
158:15
161:21
178:24
occurring
121:14
122:1,2
170:2 194:10
201:1
October
171:25
172:23 173:9
off-base
179:21
offer
49:11 50:24
179:10,11
offered
179:8
offering
179:15
offers
210:22
offhand
77:13 186:11
office
49:3 53:2
92:15 93:8,
24 96:6,8
officer
73:4,6
117:17
210:18
officers
73:1
offices
93:13,15
96:4
official
123:11

Oftentimes
207:2
okay
5:22 6:1,6,
22 7:1,7,10,
17,21 8:2,4
9:9,10,20
10:9,13
11:1,11,17
12:11,15
14:16,19,23
15:2,6,21
16:10,22
17:2,8,17
18:15,24
19:20 20:6,
10 21:11
22:6,20
23:24 24:2,
12,16,21
25:7,10,13
26:6,16,20,
24 27:11,15,
24 28:9,20,
25 29:10,19
30:1,4,15,24
31:7,14,19,
23 32:2,11,
15 33:6,10,
16,19 34:1
37:9,17,22
38:1 39:1,4,
15,19,24
40:25 43:11,
24 44:2,6,
13,17 45:2,
8,11,19,22
46:17 47:3,
7,12 48:10,
16 49:17
50:6,9,12
51:23 52:3,
14 53:10
55:4,14,20
57:7,15,20,
22 58:6,9
59:5,14,22
60:19 61:8,
12 62:8,18

63:9,12,16,
22,25 64:5,
8,21 65:6,
10,13,16
66:2,7,21
67:14 69:3,
18,23 70:7
71:9,16
72:1,5,18,25
73:8,11,14,
24 74:7,10,
13 75:16
76:2,8,14,22
77:10,19,22
78:12,15,22
79:4,15
80:6,10,17
81:2,18,22
82:7,12,18
84:6,12
85:14,19
86:4,8,22
87:5,8,19,25
88:9 89:3
90:4,11,19
91:2,4,6,10,
17,20,23,25
92:23 93:4,
13,19 94:1,5
95:16,20
96:3,13
97:1,3,23
99:10,17,22
100:10,14
101:12,21
102:3,15,17
103:16,25
104:1,10
105:1,4
106:6,9,19,
23 107:1,8
108:4,10,13,
20 109:4,7,
20,24 110:6,
19,25
111:21,24
112:3,8
113:6,9,20
114:2,6,19

115:2 116:2,
9,13 117:15
118:5,20
119:1,4,16,
22 120:4,8,
15,23 121:7,
17,21
122:13,17
126:5,8,11
127:2 128:22
129:13
130:13,25
131:13
132:7,10,21
133:6,9,22
134:3,16
135:4,19
136:15
138:1,18,24
139:24
140:6,8,11,
16 141:1,6,
12 142:13,21
143:3,11
145:7,23
146:4,20
147:15,18
148:5 149:15
150:4,19
151:7,20
152:1,6,9,14
153:2,5,17,
25 154:8,14
155:4,13,20
156:19
157:3,13
158:13,17,22
160:6,12,17,
23 161:1,25
162:5,13
163:2
164:12,17,20
166:3 168:19
169:10,16
170:14
171:2,12,15
172:7,9,13,
22 173:5,11
174:4,12,15

175:1,4,18,
21,25 176:6,
16 177:12,
14,16,21
178:2,10
179:2,24
180:13,20
181:3
182:12,18,25
183:3,18
184:13,17
185:1,10
186:4,12,17
187:7,15,19,
22 188:20,22
191:5,15,21
192:1,13,22
193:7,15,23
194:14,22
195:8,14,22
196:12,18,25
197:5,8
198:1,5
199:22
201:4,9,22
202:2,12,14
203:22
204:3,20
205:6,10,14
206:14,25
207:8,10,24
208:2,12
210:4 211:15
212:2 216:2,
12 217:8,17,
22 218:13,18
219:3,22
221:6,9,20,
23 222:10,
12,20,23
223:7,9
224:4,14,17
226:2,11

**older**
21:16,21
22:1

**Olsson**
28:20

**Oman**
13:23

**onboard**
47:16

**once**
72:22 117:20
165:24
170:10,14,25
197:6 222:6

**one**
11:24 22:25
25:1 32:8
34:22 39:22,
23 41:16
45:18 47:10
52:18 55:22
72:19 73:15
75:19 78:3
81:7,16 88:8
90:19 94:4
96:18 97:4
101:19
107:12,17
109:5,13
110:2,5
112:2 113:2
121:23 123:4
125:21
130:22
137:1,22
142:1 149:21
158:9 163:25
171:22
172:19,20
173:12,22
176:9 179:2
182:21,23
195:12
197:19,23,24
200:2,6
203:12,25
205:20
207:22
215:23
222:2,6

**ones**
23:15 46:13
98:4 99:1

**open**
37:10 39:4
143:24

**opens**
26:10

**operate**
23:16 36:24

**operating**
37:5 44:7
94:24 127:15

**operational**
94:4

**operations**
214:17

**opinion**
180:10
210:16

**opinions**
210:15

**opportunity**
18:17 38:5
157:23
195:1,2
223:18

**opposed**
23:11 115:6
155:1

**optimistic**
114:25

**options**
65:23

**order**
62:4 68:2,25
75:12 98:10
194:3

**orders**
51:20 226:24

**organization**
156:20

**organizational**
114:13
115:11

**organized**
33:17

**organizing**
156:22

original
35:17 203:13
origins
36:8
Orridge
98:15 99:11
105:5 130:14
157:5
Orridge's
107:16
outcome
164:2
outline
49:4
outlined
206:3
outside
62:3 186:21
208:10
222:16
outsource
41:8 57:3
outsourced
133:5
outstanding
26:5 109:13
outward-
facing
97:11
overseas
13:21
overseeing
210:24
oversubscribe
d
170:8
overtime
214:9
owe
105:15
109:10
owed
167:7
owned
72:3 108:8
owner
109:21

owners
116:15
ownership
74:19
owns
29:22 35:5
99:20

_____

**P**
_____

P-O-R-R-A-S
90:25
p.m.
140:20,21,
22,23 141:13
151:12,13
156:5 200:21
227:13
P000125
171:18
P000126
168:25
P000131
175:13
P00136
146:1 150:17
P00190
189:18
package
51:22,23
60:17,20
68:23 82:25
packages
54:8
packaging
23:16 56:23
58:20 60:7,
8,9,12,21
61:9,10
packed
164:10
Packing
94:15
page
9:25 10:3,
10,13,14
113:3

139:10,11,
14,15 144:14
149:12,24
150:25
152:3,10,21
153:18
154:16,22
156:8 176:8,
11 177:11
178:10,15,16
180:8 182:5,
6 189:6,16
190:6
201:10,11
202:10
204:1,24
208:25
210:6,7,10
214:3,11
224:11
pages
113:3 115:4
117:23,25
120:5,10,17
139:18
143:20
148:10 149:8
150:12
168:21
176:22,24
178:4 189:14
193:1
paid
16:22,25
17:1 19:24
20:2 35:12
46:20 55:7,
10,18 56:3
67:25 68:13,
24 70:5,6
84:22 88:6,
11,12,23
109:14
118:25
119:5,9
127:24 129:1
131:1 134:4,
7,12,13,15

136:1,4
168:13,16
178:18 181:1
204:1 213:24
paint
114:12
115:14
190:13,24
Palo
38:2,20
pandemic
220:15
paperwork
37:23 49:10
paragraph
210:13
Pardon
61:3 131:3
parentheses
115:5
parents
21:16,18
Park
13:16,17
part
12:24 75:10
106:12
119:24
125:21
147:20,22
149:8,11
150:6,7,9
152:19
155:13
157:22
165:16
173:25 190:6
191:5 193:17
199:19 208:4
part-time
68:22 190:9
participating
214:24 220:9
particular
47:14 112:11
193:12
199:17

206:11 217:9
**parties**
209:12
214:12
224:21
**partner**
24:17
**partners**
21:1 25:11
**partnerships**
79:12
**passed**
21:3
**passionate**
97:10
**passionately**
125:2
**passive**
172:13
**past**
22:6 26:20
37:21 49:17,
19 62:21,22
66:11 69:16
79:25 94:8,
11,13 120:18
130:14
131:7,9
221:10,14
**pay**
35:7 49:20
81:3 88:17,
21 96:13,16
124:1 134:6
135:9,25
136:1,8
159:10
168:12 170:1
180:21
198:18
212:21
213:6,17
**payable**
45:3 79:14
**paycheck**
225:13

**paying**
70:3 123:20
174:13
201:17,23
203:6
213:22,23
**payment**
40:3 41:5
46:16,18,22
56:6,9
69:11,15
137:9
**payments**
46:25 47:15
56:1 65:15,
16,22,25
69:6 88:4
174:17
176:16
213:12
**Paypal**
69:12,15
70:6 174:24
204:14
**payroll**
40:3 41:17
42:17 43:23
44:2,7,9,10,
15,23 45:23
46:7,15,18,
19 47:15
51:1 67:9,12
92:13
136:21,23
**pays**
49:25
**peer**
18:3
**people**
20:23 21:15
46:20 47:18
49:20,25
50:3,6,8
51:2,15,18,
19 69:6 70:6
77:2,13,17
78:7 79:16,
19,22 80:6,

21 82:19,23,
24,25 83:2,
6,16 85:8,20
86:22,25
89:6 93:5,20
95:16 97:13
98:22 99:9
104:17,21
105:22
107:23
110:19
113:12
114:16 115:9
116:6 119:12
120:9 122:12
124:16,19
125:20
126:8,12,13,
16 127:15,21
128:17
134:5,14,17,
20 136:4,11,
25 137:8,20
142:15
156:20
157:14,16,18
159:10,16
160:18
164:25 165:3
166:1 172:17
180:21
181:1,18
183:6 194:4
196:17
197:25 200:4
205:15
**people's**
94:3 131:15
**Pepperdine**
14:17,18,21
15:2 16:2,6,
10,12 17:4
**percent**
27:23 70:1
74:19 122:25
176:7 220:16
**percentage**
34:13,16

**perception**
121:18
**perfect**
52:23
**perfectly**
29:18 136:17
**perform**
45:22 67:21
82:19 86:22
88:25 101:16
126:14,19,23
133:9 161:3,
13 167:4
210:21
211:10
**performance**
166:25
167:2,8,9,22
181:22
**performed**
80:21 82:23
83:2 100:19,
25 101:19,22
106:3
107:13,19,21
127:16 161:9
214:15
**performing**
99:16,17,23
100:21
102:13,25
127:22 137:9
**performs**
89:11 100:17
**period**
98:9,21
155:6 166:20
206:3 212:14
213:14
**periods**
137:2 212:9,
10
**person**
6:8 17:15
67:15 80:8,
24 83:25
84:8 99:11
100:24

107:10
127:8,23
141:4,24,25
142:2 151:19
163:24
166:11,18
205:20

**personal**
8:6,11,15,18
10:24 12:20
18:4 22:25
63:17,19,23
68:8 69:19
71:22 104:23
106:17
107:11
121:10
122:11
137:23
138:11
152:2,19
162:11
182:14,17

**personally**
39:4 172:18
219:3

**pertain**
8:13

**Peter**
91:11,12
103:12
129:19

**phone**
77:18,20
94:2 123:24
124:1
141:11,16,20
147:16
149:24 164:9
188:10 202:1
206:16
207:6,11
218:2

**phones**
94:3

**phonetic**
75:18

**photo**
173:2

**photographer**
107:24

**photography**
191:16

**photos**
18:2,10
107:25
191:23
192:14
193:11

**Photoshop**
192:24

**phrase**
154:25

**physical**
49:12 218:1

**pick**
104:5,6
137:16

**picture**
114:12
115:14
135:21

**pie**
168:21

**piece**
59:11,23
60:20

**pieces**
59:23

**pier**
25:4,5,7,9

**pivot**
18:8,11,16

**place**
27:4 54:1,3
94:6,13,18
97:17 215:2

**placeholder**
171:11

**placement**
163:17
214:21

**places**
13:22 173:25

181:20

**plaintiff**
137:17
209:4,8,11
212:3,17
214:7,13
224:20

**plaintiff's**
111:12
142:23
168:22
171:23
175:10
176:8,10
208:19,23
209:2

**plaintiffs**
216:3

**plan**
152:22
200:10

**planned**
29:24

**platform**
25:15 192:9,
11 207:25

**platforms**
54:14 69:15
207:12

**play**
172:17

**played**
106:2

**playing**
30:18,19
220:4,8

**please**
5:5 21:22
26:3 50:21
51:8 52:9
75:23 78:19
145:17
189:11
215:10
226:24

**pleasure**
160:24

**plenty**
196:16

**PO**
194:17

**podcast**
30:25 124:10

**point**
25:1 29:5
52:17 57:22
72:24 74:1
87:16 90:2
94:7,9
103:23
106:11
107:12
110:5,10
112:2,25
116:11,19
117:8 121:11
123:10
124:24
125:8,23
131:21 132:6
135:4 141:5
142:14
143:17
148:19
155:18
156:15 162:3
163:9 170:11
172:12 182:7
183:5,24,25
184:20
185:21
186:1,5
187:16
194:24
203:13,25
204:4,8
207:22 208:9
210:20
211:13,22
215:23,24

**points**
159:22,24
160:1 170:22
213:13

poke
174:2
policies
127:14
Polytech
14:6,20 15:8
pop-up
26:21
population
73:15
Porras
90:25 91:4
98:17 129:13
portfolio
165:7 166:7,
8
portion
7:23 215:15
Portugal
13:22
position
98:1 124:18
154:1,24
215:2
positioning
154:7,20
155:1
possession
90:15
possible
213:15,19
possibly
36:10 85:20
87:14
post
8:25
Postal
72:11
posted
6:16
potential
36:12
114:12,20,25
126:20 127:6
157:16
158:2,8,9

potentially
166:15
169:14 176:5
192:20
215:23
pound
128:3,14,15
poundage
128:12
PPP
40:4
PR
195:2
practices
37:15,16,18
Pre-covid
141:10
precisely
114:10
predetermined
49:3 50:19
prefer
135:15
150:11
preferred
34:24 35:5,
8,12
preliminarily
5:19
premature
20:20
premium
23:24
preparation
7:13 56:22
prepare
7:7 8:19
11:2,9,10
22:24 45:11,
15,23
prepared
10:5,8,11,
16,18 46:9
47:3,5 98:11
220:2
preparing
45:25 46:3,7

220:5,9
preposterous
121:14,19
122:17 125:3
presence
21:6
present
19:12 24:19
28:1,22
98:4,24,25
100:11 101:1
105:21
108:23
112:24
219:13
224:19,24
226:15
presentation
112:23
117:24
presented
7:25 224:24
presently
19:13
preserved
186:23
president
87:3,6,14
pressured
203:13
Presumably
193:6 204:7
presuming
153:19 217:2
pretty
61:8 202:21
203:4
prevent
186:25
previous
164:1 180:25
previously
9:3 51:14
primarily
14:1 24:4
52:1

primary
21:2 23:22
96:22 137:7
prior
16:4 44:10
46:14 71:1
117:10
132:7,10,21
136:20,23
140:2
163:21,23
167:5 211:3
212:4 219:18
225:1
priorities
137:16
priority
203:25
privy
123:15
probably
68:18 74:17
85:13,15
133:12
142:11
178:23
183:3,10
184:20
194:12
195:25 211:6
Procedure
5:3
procedures
127:15
proceedings
5:1 227:11
process
37:10 62:5,
15 66:24
82:2 157:23
167:14
211:11
212:12
220:20
procuring
92:14
produced

176:22
178:4,14
**producing**
60:22
**product**
18:22,23
19:8,13,25
20:3 23:25
24:8,20
49:22 50:2
51:16 56:24
90:3 91:5
92:1,25
95:3,7
107:24
191:16,22
192:14
193:25
194:23,25
199:9
**production**
60:6 216:4,9
**products**
23:19 24:10,
15 191:24
192:25
196:22
199:10 208:1
**profile**
20:13
**profiles**
21:9
**profit**
19:4
**program**
24:13 40:4,
17,19
**programs**
40:23 54:9
**progressed**
20:20
**projections**
169:12,13
171:25
173:8,24
**projects**
212:19

**promised**
125:24
**promising**
126:3
**pronounce**
28:16,17
**pronouncing**
114:4
**proposed**
6:19 164:8
**prospective**
117:24
214:25
**prospects**
211:19
**protect**
115:22,25
**protection**
37:1 40:4
**protective**
75:12
**proven**
124:22
**proves**
211:22
**provide**
27:8 30:5
38:5 52:11
74:25 75:3,6
77:2 105:6
132:1,4
134:16
144:24
164:13
207:16 218:3
223:10
**provided**
89:21 98:13
127:15 128:8
129:1,4
134:6 185:14
**provider**
25:16
**provides**
89:15 90:22,
23 219:23

**providing**
77:6 101:4
134:5 159:5,
6 185:11
186:1,2
209:6,22
216:8
**proving**
119:14
**PTO**
136:1,5,6
180:21,23
181:5,11
**public**
75:10
**publicly**
20:25 74:21
**pull**
132:22
173:19
**pulled**
112:6,11
171:9
**purchase**
56:7,14
58:15,16
59:4 153:2
**purchased**
54:8,12
56:17,21
57:1 194:15
**purchases**
58:24 59:6
**purchasing**
79:13
**purely**
213:24
**purpose**
114:15 117:6
121:7 154:5
217:10
**purposes**
27:23
**pursuant**
5:2
**pursue**
18:19

**pursuing**
20:19
**pushing**
197:21
**put**
6:9 7:16
9:23 24:24
29:18 62:25
73:22 106:11
110:17
112:1,9,17
113:7 117:23
124:16
126:1,4
128:9 131:21
138:25
143:19
150:10,14
168:22
173:6,18
181:15 182:4
187:6
189:12,21
205:6 208:17
**puts**
110:9
**putting**
112:20
115:18 199:9

---

**Q**

**quadruple-
check**
79:23
**qualify**
22:18
**quality**
23:14
**Queen**
108:12,16,
17,21
109:11,19,22
116:15,21
118:6,15
128:13

**question**
12:22,24
26:1 28:15
32:4 40:14
41:6,15
44:19 46:2
49:23 56:16
59:8 62:11,
20 63:8
65:24 68:2,
6,10 74:8,14
75:15 82:7
85:25 97:24
98:23 101:7,
8,13 102:15,
17,21 103:11
105:25
131:4,5
136:16,18
146:7,9,15
147:9,11
148:23 149:2
151:2,7
155:17
185:23
212:13
213:3,4
215:10,14
216:7 220:7
225:25

**questions**
6:21,24
8:12,13,16,
21 11:24
32:4 41:22
222:1,2
224:5 225:20
226:17

**quick**
182:5 185:24
188:15

**Quickbooks**
132:13
133:21,23

**quickly**
10:16 140:12

**Quickpay**
176:12

**quite**
51:7 125:2
225:21

**quote**
124:11

**quote/unquote**
167:16

---

### R

**R-A-M-M-A-C-I-A-T-O**
75:25

**R-O-S-L-Y-N**
75:25

**race**
13:11 31:16
53:23 54:1,
2,4 93:6
96:4

**raise**
36:11 37:12
170:4 226:8

**raised**
170:5 171:1

**Ramacciato**
75:18

**ranch**
25:4,5,7

**random**
196:17

**range**
171:13,14

**ranges**
142:18

**rate**
90:11,14
167:8,9
168:12

**rates**
81:3

**raw**
60:10

**reach**
21:2 123:23

**reached**
110:3 114:17

140:11
163:20
170:10

**reaction**
196:21

**read**
6:8,15,19
48:7 151:1,
2,5 169:4
209:3 217:3

**readable**
175:8

**reads**
139:18

**ready**
103:23
125:25
146:8,14
152:16 203:1

**real**
15:14 37:13
182:5 185:24

**reason**
20:16 146:23
154:8 159:9
179:4,6

**reasonable**
186:15

**reasons**
115:18
149:22 159:6

**Rebecca**
21:23

**recall**
16:24 38:3
49:19 50:2
59:3,13,22
60:1 67:23
68:21 70:4
90:13 102:1
110:22
120:13
125:12
126:3,5,7
131:11
138:6,16
140:7 141:3,

23,25 142:9,
17 148:3
152:12
155:16
156:7,10,11,
12,14,23
159:4,8,11,
21,23 161:17
168:14,15
171:12
172:20
181:10,25
182:1 184:11
188:6 196:2,
10 198:15
199:17
200:25
201:20,25
204:20
205:11

**recalling**
130:16

**receivable**
45:4 79:14

**receive**
64:15 65:13
96:19,24
97:1

**received**
14:24 29:23
37:21 41:11
47:21 49:10
50:24 55:12,
14,17 56:1
61:17 63:5
64:8,10,13,
25 65:2,3,6,
7,10,22
66:4,11
88:19
119:18,19,
21,23 120:3
137:9 146:18

**receiving**
46:21 47:14
95:11 131:11
156:11,12
188:6

recent
92:8
recently
30:24 46:6,
14 62:8
94:22
102:13,19,23
103:8,13
Recess
138:23
recognize
111:21,24
139:12,16,
17,20
146:10,12
147:11,14,22
155:5 172:1,
9,11 175:16
176:14,25
177:7,9
178:2,5
179:13 206:8
recognizes
147:5
recollection
15:5 102:6
141:12,15
152:25
161:2,4,14
162:1 174:22
182:20
183:14,25
184:8,15,18,
23 185:1,8
195:19
197:1,8
201:2 203:15
207:14,18
211:25
recommendatio
ns
154:5
reconcile
74:16 209:16
record
75:11
145:13,15
149:16

161:19
226:23,24
records
68:3,9 69:4,
5,14
Red
152:15
reducing
197:22
refer
12:2 27:21
63:1 68:1
74:7 86:24
112:19
212:16
referred
16:17 26:11
referring
74:13 118:9
123:10 125:9
126:16
191:13 205:5
212:8
refresh
223:22
regarding
22:21 46:24
47:15,21
64:1 106:24
137:13
199:12
registered
32:18,19,21,
24 71:24
regular
24:24 88:10
98:1
regularly
206:10
reimbursement
179:9
reinitiate
202:18
related
56:23 57:14
58:24 62:12
164:19

181:19
214:16
218:15,23,25
relating
70:23 71:7
relation
104:21,22
relations
16:21 79:14
relationship
25:13 26:21
31:2 68:16
80:12,14
83:8 104:24
106:19
109:21,25
132:19
133:13
138:12
relationships
39:13 80:19
117:24
relatives
21:12
relevant
82:9
relied
144:22
relying
122:25
remain
173:17
remainder
140:17
remember
7:4 31:3
49:24 126:9,
10 138:1
141:16,19
142:3 151:24
156:16,17
158:15,17,22
159:22
178:21
179:11
185:17
190:21

192:20
195:5,6,10
196:11
198:24 208:5
216:25
remind
137:1
Remmy
32:12 98:15
101:12,15
102:4 106:10
157:5,9,11
205:16 206:2
remotely
5:7 95:17,21
remove
187:16
removing
187:12
rendered
105:16 162:9
renew
215:11
rent
53:2
rented
53:8 72:20
rep
45:2
repackage
60:11,15
repeat
23:2 44:19
49:23 103:6
128:5 131:3
183:22 213:3
217:14 220:7
reply
5:13
reporter
5:5 28:11
40:16 48:2,4
103:3,6
128:4 139:4
145:12
226:22 227:5

representation
106:2
representative
8:17,20
22:22 219:4,
11
representing
5:18 219:9
request
52:17 76:24
77:1,4 78:23
86:19 90:16
104:2 128:23
185:6 216:5
requested
8:19 98:8
107:2 185:9
requesting
58:2 74:24
190:16
requests
69:8 216:4
require
67:2 167:22
requirements
46:24
requires
83:8
requiring
181:21
research
36:7
resell
24:14
reselling
24:7,12
residence
12:16
residences
13:4
resign
188:4
resignation
188:5

resigned
187:24 188:2
resize
172:6
resolve
159:19
resources
47:14 187:17
respect
212:7
respond
198:2 200:1,
8
responded
140:15
191:15 201:3
216:5
responding
200:15
responds
201:5
response
98:6,19
99:10 100:24
195:4 208:25
209:3 212:15
213:5
214:10,19
215:6 216:3,
9
responses
97:19
208:19,22,23
224:10
responsibilit
ies
49:5
responsibilit
y
131:20
responsible
110:6 216:14
rest
113:2 149:14
result
163:16
166:17

220:18
results
168:6
resume
152:11,12
155:15,16,19
156:6,13,15,
18 180:14
retail
25:11 32:5
208:1
Revenue
41:1,5,24
revenues
26:17 58:22
221:10,14
222:3,8,18
review
6:11 7:12,
21,22 8:2
10:2,15
130:23
167:23 177:6
reviewed
7:16 9:3,22
149:18
189:4,9
210:4 220:2
reviewing
204:6
revision
64:3
revolving
26:9
rich
39:10 137:5
Rifle
197:19
right
5:16 11:11
12:1 14:10
15:3,4,18
17:9,19,24
18:11 19:9,
23 22:20
23:3,4,6
24:16 25:23

26:2 27:25
32:15 33:11
44:23,24
45:24 46:15
51:4 52:20
55:12 57:3,
11 58:5
59:10 61:12,
16 62:2
77:22 79:5,
10 81:8
83:15,24
87:8 90:19
92:5,7,16
97:22 99:7
103:15
104:16 109:2
111:8,9,13
113:16
114:23
115:24
117:3,9,18
118:8,24
125:7,19
126:2,15
134:20
135:12
139:2,9,17
140:24
142:21,25
143:2,21,24
144:2
145:11,15,22
149:17
150:5,15
152:1 154:9,
11,13 157:8
161:22
164:24
167:17
173:15 175:4
176:1 178:8
179:1 180:9
189:3 191:5
192:8
194:13,20
195:7 196:4,
23 200:14,24
202:17

208:15
211:6,8,22
212:10,15
215:9 220:25
221:5,24
226:11,18
227:3,7

**right-hand**
150:25

**rights**
35:1

**risk**
20:19

**road**
53:9

**roast**
60:17 61:1
68:14 109:11
116:16

**roasted**
108:9 128:15
194:1

**roaster**
36:9 87:24
89:14 116:18
223:2

**roasters**
61:2,4,5

**roasting**
34:3,8 36:8
56:22 58:21
60:8,22
68:13 94:23
108:8 116:20

**roasts**
23:8

**Robert**
76:11

**rogue**
32:9 101:15
102:4

**role**
16:16,23,25
17:1 22:21
29:15 43:5,
18 54:24
87:23 89:5,9

105:20
106:2,5,7
117:19
169:20
170:15
171:3,4,5
174:1 210:23
216:17
220:4,8

**roles**
79:9 115:12
116:7

**Roslyn**
75:18,24

**rough**
170:17 174:3
222:17

**roughly**
166:21

**round**
40:6,7 170:7

**rules**
5:2 6:3,10,
20,23,24

**run**
46:5 54:9

**running**
200:5

**runs**
42:17

─────────

**S**
─────────

**S's**
145:20

**S-C-O-T-T**
109:17

**S-H-A-Y-A-N**
107:9

**safe**
141:17
142:10
185:25

**salaried**
48:24 51:1

**salary**
20:4 142:18

170:24
171:13
210:19

**sale**
214:23
215:25

**sales**
16:20 117:17
161:10 165:8
166:8,12
210:24
212:24 213:9

**Santa**
17:18

**Sarah**
76:15 85:13
87:18,25
88:2 90:5,20
95:24 98:16
118:16,17,18
121:2
122:14,15
129:10 174:7
193:24

**Sarah's**
87:22

**sat**
5:22

**save**
122:21
221:25

**saved**
207:6

**saying**
22:13 29:2
33:7 38:9,10
83:10 84:23
113:16 122:5
128:25 129:3
135:5,12
159:21,23
160:3
162:16,17
164:14 186:2

**says**
113:21
114:22
117:10

140:21
152:11
155:15
172:22
175:25
190:11
191:8,11
193:7 194:14
195:14 197:3
200:22
202:19 204:3
211:9

**scale**
23:16 72:22

**scanned**
216:20 217:2

**scenarios**
173:25

**schedule**
49:3 141:7
151:23

**schedules**
50:19 51:9

**scheme**
190:13,24

**school**
13:13,15,16
14:13,15,20

**Scott**
109:16
116:14

**scratch**
173:18,20

**screen**
6:9,16
111:19
150:11,13
151:6 168:23
169:4 173:1
189:12,22
208:17

**screen-share**
200:20

**screen-shot**
217:16

screen-
shotted
  217:13
scroll
  177:5,8
scrolling
  176:23
search
  217:1,3
  222:7
Seattle
  194:25
second
  38:17 40:11
  139:11 172:6
  176:8,11
  210:6
secret
  197:14
secretary
  73:5,17
secured
  212:22
  213:8,16
securing
  211:11
see
  6:16 43:4
  59:10 86:25
  104:11
  111:18
  138:25
  154:12
  155:23 156:9
  163:8 172:3,
  8 174:4
  175:22,25
  177:9 178:13
  180:5 195:4,
  6 200:7
  202:10 204:2
  223:16
seed
  31:7
seeing
  18:17 146:16
  156:15 199:1

202:9 204:10
seek
  71:9
self-employed
  17:13
sell
  24:2,18
  60:23 197:17
selling
  197:11,13
sells
  23:8
send
  88:7 107:23
  152:11
  180:16
  193:16
  200:21 204:9
sending
  128:19,20
  152:12
  156:17
  162:23 163:4
sends
  88:15 140:2
Senior
  43:6
sense
  74:23 204:6
sentence
  212:17
separate
  32:23
separately
  65:24 75:8
  118:11
September
  19:23 100:11
  105:21
  152:18,21
  153:11
  156:23,25
  166:20 168:1
  205:14
  210:17
sequence
  148:4

series
  170:4 171:24
  173:8 193:4
serve
  24:7 29:15
  89:24 114:13
served
  15:15
serves
  43:20
service
  14:5 72:11
  89:14 101:20
  187:24
services
  30:5,13
  67:17,21,25
  80:22,23
  82:20,23
  83:2 86:23
  87:12 89:1,
  11 90:23
  98:13 99:16,
  18,23
  100:17,19,
  22,25 101:5,
  22 102:5,14,
  25 105:6,16
  106:4,6,24
  107:2,13,19,
  21 108:2,15
  126:14,17,
  20,22
  127:16,22
  128:8 133:10
  134:5 137:9,
  10 161:3,6,
  8,9,10,11,
  13,16 162:7,
  9,14 185:12,
  14 186:2,3
  209:6,22,24
  214:15
serving
  92:8
sessions
  214:25

set
  6:10 26:8
  42:12 81:3
  90:7 97:15
  136:22 152:2
  170:6 189:13
  207:21
setting
  44:8,15,22
  47:12 53:1,7
  136:20
settling
  140:20
seven
  31:1 88:24
several
  21:8 100:8,9
  119:12 155:6
  159:16
  166:10
  172:16
  209:21
  210:25
  213:13
shape
  164:2,16
  167:21
share
  9:13 18:1
  95:8 155:22
  175:9 192:5
  199:4
  200:11,12
shared
  143:9 193:4,
  5 199:7
shareholder
  34:18,19,20
shareholders
  35:13 73:24
  74:3,17,19,
  22 75:1,17
  78:5,6
  217:23
shares
  29:22,23
  30:1,11,12
  35:8 154:18

170:5
**sharing**
17:23,25
18:5,6,10
121:13
**Shayan**
107:8 114:3,
6 115:2
**Shayan's**
115:19
**sheet**
223:5
**sheets**
187:10
**shelves**
60:3
**shelving**
222:25
**shipments**
72:5,9
**shipped**
91:5 164:11
**shippers**
95:2
**shipping**
72:10 90:3
92:1 94:16
196:8
**shoot**
192:14
**Shopify**
25:14,17,20,
22 26:5
54:13,15
222:16
**shopping**
92:24
**shops**
24:23
**short**
56:6 68:22
159:19
**shortly**
162:1
**shot**
173:1

**show**
110:25
114:15
138:24
139:2,10
155:21 156:6
168:19
175:5,6
176:19
**showed**
160:19
**showing**
176:11
**showroom**
16:21
**shows**
49:12
**shut**
51:17 123:25
**shutting**
194:11
211:18
**sic**
18:13 76:1
190:5 191:16
**sick**
136:12
**side**
139:1 211:16
**sign**
183:13,15,25
**signals**
135:6
**signatory**
81:6
**signed**
49:11 53:12
82:8 183:10
184:25
**signer**
81:10
**signers**
81:15
**significant**
25:11
**signing**
184:11

**Silicon**
39:17
**similar**
18:7 36:13
122:15
189:25
**similarly**
116:13
**simple**
42:21 43:9,
12,13,16
44:3,6,21
46:10 47:10
66:19 67:3
68:5 132:11
133:24 134:1
162:22
219:18
**simply**
11:3 160:23
**single**
12:3 24:7
59:1 127:23
217:12,15
**sink**
167:10
203:16
**sister**
21:17,21
130:1,5,6
**sister's**
22:1
**sit**
7:4 48:20
194:5
**sitting**
93:20
**situation**
120:16
121:12,16,18
122:14,16,19
123:2,6,9
125:1 134:18
135:15
159:19
179:18,19
180:11

201:18
213:25
**six-month**
206:3
**size**
25:21 26:7,
11 169:8
**skeptics**
124:14
**skip**
60:6 189:5,6
190:6
**Skunk**
124:12
**slide**
111:15
**small**
26:17 123:20
198:17
**SMS**
147:12
**snafu**
143:15
**social**
18:6 114:8,
21,22
154:24,25
**software**
18:9 54:8,9,
11 83:1
132:5,12
133:20
207:17 217:9
**sold**
128:16
196:22
**sole**
27:13 34:10
**solid**
192:23
**Solutions**
19:8 64:14
**sort**
6:7 24:23
32:8 36:25
51:1 69:11
132:4 135:9

| | | | |
|---|---|---|---|
| 156:20 | **specifics** | **stamps** | **Startup** |
| 181:21 | 225:21 | 161:20 | 42:21 43:10, |
| 189:25 | **speculate** | 162:25 | 12,14,16 |
| 204:22 | 154:4 211:15 | **stand** | 44:4,7,22 |
| **sounds** | **spell** | 178:20 | 46:10 47:11 |
| 15:4 | 28:17 75:23 | 215:3,14 | 66:19 67:3 |
| **source** | 76:5,16 | **standard** | 68:5 132:11 |
| 67:2 | 92:18,21 | 12:23 127:15 | 133:24 134:1 |
| **sources** | **spelled** | **standing** | 219:18 |
| 58:15 71:12 | 18:12 | 47:19 62:6, | **state** |
| **sourcing** | **spend** | 16,19 63:4 | 5:11 14:7 |
| 116:18,20 | 160:24 | **Starbucks** | 21:12 22:12 |
| **space** | 195:23 | 200:18 | 33:16 41:1 |
| 18:18 24:18 | **spending** | **start** | 71:10 78:13 |
| 53:3,8 54:5 | 167:25 | 30:15,17,19 | 82:1 214:4, |
| 95:15 | **spent** | 31:10 36:4 | 8,18 218:24 |
| **spam** | 122:21 | 43:24 44:12 | 219:5,11 |
| 20:23 21:1 | 168:10 | 59:5,20 | 226:24 |
| 146:22 147:3 | 169:15 | 87:13,17 | **stated** |
| **spark** | 181:18 | 106:14 | 27:12 44:14 |
| 31:1 | **spoke** | 118:12 | 98:7 115:15 |
| **sparked** | 7:15 123:24 | 170:2,13,15 | 209:14 |
| 31:13 | 164:8 | 190:5 202:18 | 210:14 |
| **speak** | **spoken** | 212:19 | 214:12 |
| 112:5 113:4 | 10:20,22 | **start-up** | **statement** |
| 137:25 148:4 | **spot** | 20:19 37:14, | 80:3 180:25 |
| 171:9 173:3 | 52:21 | 17 56:13 | 221:7,8 |
| 186:19 227:1 | **spreadsheet** | 123:16 | **statements** |
| **speaking** | 128:20 | 132:17,20 | 45:7 213:10 |
| 97:6 171:10, | 168:20,24 | 137:3 209:10 | **states** |
| 12 | 171:17,21 | **start-ups** | 22:10,11 |
| **special** | 172:1,10,11, | 62:13 | 32:16 41:25 |
| 23:10 | 15,21 174:5 | **started** | 42:4,8 72:11 |
| **specific** | **spreadsheets** | 31:16,24 | **status** |
| 45:14 51:5 | 172:17 | 36:17,18,23 | 209:10,12 |
| 62:11 83:16 | 173:23 | 59:15 81:19 | 212:4 224:21 |
| 98:21 150:6 | **spring** | 99:9 102:19 | 226:4,6 |
| 159:12 184:8 | 120:18 | 127:13 | **steps** |
| 215:10 | **square** | 203:18 | 70:20 |
| **specifically** | 93:9 | **starting** | **stick** |
| 8:14 16:5 | **stamp** | 36:16 139:25 | 60:7 181:2 |
| 42:14 67:15 | 146:1 150:17 | 189:15 | **stipulate** |
| 134:10 | **stamped** | 210:17 | 5:6 |
| 137:18 | 168:25 | **starts** | **stock** |
| 158:24 | 171:18 | 198:6 210:9 | 29:22 34:23, |
| 159:22 | 175:13 177:2 | **starts-ups** | 24,25 35:4 |
| 210:13 | 189:18 | 114:11 | 55:12,14 |
| | | | 65:23 84:22 |

118:10
119:19,21,23
120:3
**Stockholm**
75:17 78:4
116:23
119:20
**stood**
124:9
**stop**
99:17,23
185:19
186:13
225:19
**stopped**
200:15
**stopping**
52:17 57:22
**storage**
18:4 60:6
94:19,20
**store**
26:22 32:8
60:3 180:15
214:21,22
**stores**
194:4
**Stotz**
103:1 128:12
226:19
**straight**
144:5 148:23
188:17
**strategic**
17:14
**strategically**
194:2
**strategy**
18:19
**street**
13:1,11
53:23 54:1,
2,4 93:6
96:4 195:15
**stress**
202:3,6

**strong**
180:10
**structure**
115:12 117:7
**struggle**
129:7
**struggles**
123:16
220:16
**struggling**
214:2
**stuck**
123:5
**Student**
15:16
**stuff**
19:18 72:21
87:9 110:9
194:10
202:24
**styles**
36:8
**subject**
64:2 145:24
**submit**
129:6 131:2
**submits**
130:9
**submitted**
64:1 129:9,
10,14,16,19,
21,23 130:1,
2,4,21
131:10,16,25
178:22 185:2
216:4
**submitting**
46:21 88:24
**subsequent**
17:9 20:7
126:11,15
127:9 141:1
160:8
**Subsequently**
15:15 19:7
**successfully**
154:2

**sued**
122:8
218:15,18
**sufficient**
212:23 213:9
**sufficiently**
169:3
**suggest**
182:12 201:6
**suggested**
137:25
191:18 192:4
**suggesting**
134:21
190:8,16
194:1 196:6
**suggestion**
195:5 199:12
**suggestions**
89:21
**suggests**
194:23
**summer**
44:12,14,18,
22,23
133:12,15,16
138:3
**superstition**
20:15
**superstitious**
19:17
**supplied**
139:4 143:7
**suppliers**
195:13
**supplies**
92:15
**support**
29:3
**suppose**
30:23
**supposed**
117:5
**sure**
8:11,22
12:6,7,19,25
23:2 24:1

26:19 27:3
35:2 38:17
40:15 44:12,
20 46:3
51:12,24
56:4 62:7
63:9 68:7,11
69:7 70:21
72:9 82:22
83:9 85:6,7
95:5 100:6,9
104:8,20
117:14
118:14
124:13 135:8
137:8,12
139:15
140:10
141:21 142:1
147:16,19,25
149:25
152:24 153:1
154:5 157:8
158:20 159:1
163:13
164:19
170:21
174:10 177:7
188:20
198:22
201:2,8
205:13
220:25
**Sussexlawfirm
.com**
145:21
**sustain**
124:7
**swearing**
5:6
**switch**
171:15
**Switching**
171:16
**sworn**
5:11
**symbol**
86:2

system
  44:9,10,15
  46:20 51:1
  92:13 94:2
  97:3,17
  128:17 129:3
  131:15,22,24
  136:21,23
  163:8 207:23
  216:24
systems
  131:17 187:2

**T**

T"s
  137:13
T-U-C-C-I-L-
L-O
  107:15
table
  74:9,11
tackle
  191:12
take
  6:13,18 10:2
  38:17,22
  41:8 74:15
  94:5,17
  103:16,20
  107:24
  135:21
  136:11 140:3
  141:20
  146:5,21
  148:21
  149:13,14
  160:7 165:2,
  11 166:15
  174:1 181:1
  188:15,21
  210:23
  221:20
  223:14,20,21
taken
  5:1 52:6
  58:10 70:20
  72:23 94:13

104:14 171:7
  189:1 224:1
takes
  88:20
talented
  136:9
talk
  7:13 10:8,
  11,17 11:25
  12:3 83:16
  118:11
  119:16
  122:13
  126:18
  137:17,20
  150:6,7
  163:15
  177:10
  198:11
talked
  7:11 82:24,
  25 105:5
  106:9,10
  113:13
  116:22
  137:19
  142:3,9
  151:11
  156:19
  158:18,23
  163:17 166:2
  190:4 193:24
  199:23
  206:10
talking
  31:3 51:13,
  14 58:12,18,
  19 59:9 68:9
  85:1 99:12
  122:5 150:9,
  23 152:21
  153:9,11
  187:9 190:25
  192:8 193:11
  204:5 205:8
  211:7
Targa
  191:23

target
  169:16,17,
  23,24 170:6,
  10
targets
  157:17 170:8
tasks
  49:4 71:21
  84:5 101:16
tax
  41:3 45:11,
  23 46:3,7,24
  220:5,10
  221:1
taxes
  41:5 45:15
  63:17,20,23
  64:2 81:25
  92:14
team
  21:8 41:16
  42:19,23
  43:12,13,17
  47:1,4 51:6
  87:15 90:20,
  21 92:13
  93:3 110:20,
  23 116:11
  124:15
  125:4,11,18,
  21 142:14,16
  159:17
  164:10
  205:19,23
technical
  102:24 128:2
  183:20
  185:20
  187:11
  216:17
technically
  73:5 99:19
  108:23
  114:25
technological
  143:15
technology
  55:1

Technology/
administrativ
e
  84:5
teeth
  167:11
  203:16
telephone
  97:25 141:8
tell
  21:22 36:20
  66:3 74:18
  78:18 84:10,
  14,15,16
  94:12 95:2
  106:15
  107:10 122:9
  139:12,13
  142:12
  145:3,16
  146:7,8
  148:14
  152:7,15
  172:4 194:19
  224:7 225:6
telling
  33:10 71:4
  167:12
tells
  196:4
ten
  22:6,15
  58:3,4
  74:19,25
  75:16 76:22
  78:9 126:20
  188:21
  217:23 218:7
  223:20,21,24
tenants
  95:9,10,14
tens
  141:20
tense
  172:14
term
  120:14
  213:20

terminate
19:21 80:14
82:16 132:18
188:12
terminated
80:18 133:13
termination
188:11
terms
88:17 168:5
181:4 198:23
217:1
Tesla
16:13,16
testified
5:12 6:1
220:24
224:17
testimony
33:11
Texas
32:13
text
145:25
146:12
147:12
150:16
151:16
155:8,11
161:20
163:1,9
188:9
189:17,23
196:11 198:5
202:2 205:2,
3 206:14
207:10,19
208:4 216:20
217:12,16
texts
151:9 189:13
199:8 200:9
201:9
Thank
9:20 11:23,
24 13:3,19
26:16 38:20
39:12 48:10

57:25 76:22
79:4 105:10
136:19
165:18
226:18,19,21
Thanks
223:25
theorize
124:23
theorizing
197:6
thing
47:16 59:1
91:9 92:3,4
106:11
116:25
119:24
142:18
147:19
148:16 149:3
156:9 167:17
175:7 177:10
181:24
200:19 209:3
217:13
things
7:4 8:8,14,
17 22:23
23:22 36:13
43:22 47:10
51:10 55:23
60:3 62:4
69:12 82:25
85:17 89:15,
17,19 95:14
115:18
123:21
134:20
162:18,21,23
163:5,6,14
167:11,19,20
180:7 181:22
183:9
184:21,22
195:20,23
200:7
202:21,22
203:5,10,16

216:16
think
20:18,19
22:18 24:22
27:17,18
28:3 29:1,2
31:4,5,9
32:17 36:15
40:13 53:21
59:15 63:10
75:6,7
76:10,22
77:25 82:24
92:9 99:8
100:2,7
104:17
106:10
109:5,8,14
114:24
124:9,12,18
125:1,3
128:12 129:7
136:2 139:19
140:22
141:17
142:10
143:6,20
144:4 145:5
148:19,23
151:10,22
154:9 161:7,
15,20
162:15,25
172:14
173:16,20
175:1 176:3
180:9 181:23
183:8
185:13,15,18
186:7,17
187:20
191:16
194:20 195:3
198:23
204:13
209:18
213:11,20
223:15 224:9
225:19,20

thinking
36:21
124:19,23
125:14
191:10
193:19
194:20
200:23
thinks
193:25
thought
9:12 17:8
43:11,15
62:25 63:1
157:20
196:12
199:15
225:10
thousand
170:22
197:23
thousands
196:15
thread
139:13
140:17
163:1,9
176:20,25
178:12 182:4
three
16:1 44:1
52:20 222:2
three-and-a-
half
31:21
thrown
170:18
tickets
153:3,6
156:21
tight
37:2
till
44:18 54:7
81:24 98:3
101:10
127:11 219:6

**time**
 12:3 15:7
 16:8 17:10
 20:21 30:12
 34:16 35:9
 36:9 37:20
 38:13 48:6,
 15 50:9 52:6
 53:7 56:18
 59:4 61:24
 67:18,23,24
 69:5 74:1,15
 76:25 80:15
 81:23 83:8
 84:25 85:1,
 17,18 87:11,
 16 89:17,18,
 20 90:5,10
 91:14 94:7,
 23 96:1
 98:21 100:5
 101:9,18
 104:8 106:21
 109:1 110:10
 112:7,25
 115:21
 116:11,19
 117:8
 119:11,14
 122:23 125:8
 127:18,21
 131:15,23
 132:6,16
 134:3,15
 135:24
 136:2,3,11,
 13 138:5,17,
 19 140:5,19,
 20,21,22,23
 141:13,18,19
 142:14 146:6
 148:24
 149:14
 151:18,21
 158:21
 159:20
 160:24
 162:17,25
 165:6,9,23

 166:20
 167:19,24
 168:1,5
 174:9,11
 179:3,4
 181:1,6,11,
 12,13,14,15,
 18,24 182:2
 183:5,11,12
 184:20
 186:20,24
 187:5,20,23
 188:5 189:25
 197:10
 198:19 199:5
 200:15,23
 205:12,18
 206:1 210:22
 211:7 212:8,
 10,14,18
 213:14,22
 220:17
 221:25
 223:18 225:4
 226:9
**timeline**
 44:21
**times**
 94:18 99:9
 101:15
 112:14
 158:4,19
 165:22
 173:24 207:3
 216:6
**tin**
 222:24
**title**
 11:17 16:19
 27:12 98:2
 164:21,25
 171:22,24
**titles**
 11:18 79:6
 164:23 165:5
 166:1,4
**today**
 7:2,5 10:8,

 11,23 11:25
 29:8,10 47:7
 48:20 54:7
 66:4,23
 67:9,12
 70:13 74:2
 81:24 87:17
 101:10
 127:20 134:4
 163:18
 178:20 198:7
 201:14
 209:13 219:6
**today's**
 7:8,14
**told**
 10:20 27:18,
 21 83:3 99:7
 114:6 136:12
 142:11
 156:14
 174:13 181:1
 193:2 212:18
**tomorrow**
 200:13,20
**tonight**
 154:15
**tools**
 217:10
**top**
 74:6,18,25
 75:16 78:9,
 20 102:1
 139:19
 149:24
 152:10
 153:18
 161:23 193:3
 208:13
 210:13
 217:22 218:7
 221:11,15
**topic**
 71:6 142:7
**topics**
 7:22 10:1,2,
 4,7,10,14,15
 22:21 206:25

**total**
 26:11 66:7
 174:14,15,17
 175:1,23
 178:22
**totally**
 104:9
**totals**
 179:2
**touching**
 114:10
**track**
 127:21
 132:12
**tracked**
 127:24 128:3
 129:2 131:14
**tracking**
 131:23
**tracks**
 131:19
**traditional**
 132:8
**train**
 161:20
**transcribed**
 227:6
**transcript**
 227:9
**transfer**
 101:23
 175:11,18
 204:18
**transferred**
 133:25
 174:20
**transfers**
 178:22
**trap**
 162:6
**travel**
 13:23 151:23
**treating**
 50:10
**tremendous**
 29:16,20

triage
220:17
tricky
162:7
trip
158:16
160:24
trouble
201:17
truck
72:20
trucks
72:1
true
17:12 19:12
20:12 32:6
87:3 101:2
120:4 149:4
truth
5:12 160:5
truthful
7:4 70:1
try
9:10,12
36:16 37:14
38:7,15 46:4
97:11 132:22
153:22 165:2
171:23 172:4
173:14 174:1
179:17
213:13
trying
20:24 23:15
36:8,13
44:20 56:7
62:19 63:2
122:21
123:16
124:25
135:16
136:16,18,25
141:7 151:18
162:6 167:17
170:4 174:21
178:21 183:9
200:10
201:19

207:21 208:2
226:8
TSHEETS
132:5
Tuccillo
107:15 116:2
turn
9:25 22:20
133:22
208:15
turnaround
37:5
Turning
10:13
twice
72:22
two
8:8 11:24
38:15 88:13
101:19 109:6
115:4
117:22,25
120:5,10,17
139:18
145:20 150:2
151:10
163:12
168:21
176:1,3,16
188:17 198:8
204:14
219:16,19
225:13
type
35:3
types
94:17
typically
51:7

U

U.S.
14:4
UBS
15:21

UCC
57:17 58:13
ugly
123:5
ultimately
35:19
un-spammed
147:1
unable
123:23
unaware
34:15 85:16
underlying
18:9
understand
6:12 8:5,7
40:13 51:13
56:16 62:18
64:4 74:23
75:5 79:7
80:1 83:13
84:22 85:10
87:9 104:20
105:24
112:15
113:23
124:8,25
149:23
167:24
170:20 183:4
understanding
48:21 49:6,
8,15 50:12
136:3 138:19
143:13
180:22
understandings
124:21
Understood
84:19 184:7
unemployed
212:17
unique
23:14,16
United
22:11 72:11

University
14:7,22
unlike
115:3
unrelated
201:24
unsure
130:23
UPCS
199:8
update
19:16 199:5,
7
updated
21:9
upright
138:25
UPS
72:11 95:6
URL
83:19 86:1
utilities
15:18
utilized
98:9
utterly
121:13

V

vacation
136:12
180:21,23
vaguely
156:17
Valley
39:18
value
20:21,24
213:2
various
78:7 82:23
83:2
vehicle
71:20,23

vehicles
  71:16,18
  72:2
Venmo
  69:12 70:6
  174:24 205:1
venture
  37:15 137:4
verbally
  184:21
version
  113:1,4
  171:7,9
versions
  112:13 171:8
  173:23
versus
  47:23 48:25
  97:4
videos
  18:2,10
view
  180:7
Virginia
  13:18,19
  14:6,20 15:8
virtually
  168:6
visible
  172:7
vision
  115:13
visit
  158:11
visited
  162:4
visits
  97:16
volunteer
  120:14
volunteers
  120:11
voting
  34:25

---

**W**

W-2
  49:10 61:17
  63:5 64:8,
  10,13 65:2,3
W-2S
  50:25 64:22,
  25
W-4
  61:20 63:14
W-4S
  185:2
W-9S
  185:2
W-I-T-H-U-M
  132:23
W-U-R-K-S-I-
G-H-T
  18:13
wages
  218:25
wait
  38:14 152:7
waiting
  198:8 202:15
  211:20
Wakefield
  15:9,13
walking
  200:6
want
  7:10 10:6
  21:1 27:19
  38:14 40:15
  51:12 60:13
  62:13 69:24
  76:25 77:11
  84:6 89:7
  97:13 100:5
  101:3 103:20
  104:20
  105:22
  118:12 122:9
  139:14
  143:7,17,18,

23 144:12
  145:12
  148:15,20,22
  149:1 150:6
  157:16 162:6
  163:11 165:3
  177:6 182:3
  190:3
  200:11,12,19
  202:22,24
  203:10
  211:12,15
  220:25 222:1
  223:15,19
  224:11,22
  227:4,6
wanted
  27:20 28:3
  29:17 32:9
  107:17 110:5
  119:13
  132:16
  149:25
  157:14,19
  160:15
  162:18,23
  166:12
  167:12
  202:20
  226:12
wanting
  195:20,23
warehouse
  49:21 50:1
  51:3,4,16
  52:4,9 92:15
  93:7,10,11,
  14,20,24
  94:3,6,14,24
  95:18 96:1,3
  98:10 158:11
waste
  194:23
watch
  106:15
way
  6:16 13:24
  15:23 18:7

22:9 25:18
  28:4,23,24
  29:3 30:2
  33:13,15
  36:22 48:5
  55:11 65:22
  70:3 73:1
  88:1 106:14,
  25 107:3
  111:13
  113:14
  114:13 122:1
  123:18 144:2
  162:16
  164:1,2,4,16
  167:1,3
  176:9 191:20
  194:18
  202:21 203:4
  213:22
  215:16
  220:23
ways
  88:8 154:1
  204:14
website
  13:20 83:19
  110:7,8,9,
  17,20,23
  214:24 216:1
week
  81:17 94:8,
  11,13 100:3
  112:14
  197:24 218:4
  227:3
weekend
  159:23 201:6
weeks
  44:1 88:14
  155:6 202:20
  209:7 225:13
well-known
  38:18
went
  14:6,21 15:2
  16:6 101:15
  137:1 142:16

158:3,8
160:6,11,13
216:23
217:12,15
**Wework**
96:6,8 97:7
158:14,20
**whatnot**
43:23 78:8
101:5
**Whatsapp**
206:18,20
207:11
**whatsoever**
106:25 107:5
**white**
107:25
192:14,23
**Whitney**
38:19 39:10
**wholesale**
72:21 98:11
**wide**
172:5
**wife**
56:7
**Wifi**
93:23,25
94:1
**winter**
133:11
**wire**
174:25
175:11,18
204:9
**wise**
201:15
**withdrawn**
17:9 65:1
81:22
**withholding**
46:23
**Withum**
132:23
219:18
**Withumsmith**
133:7

**witness**
5:6 9:6
12:25 28:13
58:8 75:2,16
103:8,24
104:9 128:7
143:23
146:25
147:4,8
148:13
149:17
150:19
225:19
227:10
**Woodbridge**
13:18,19
**word**
63:10 67:16
161:8 193:18
**wording**
181:2
**words**
90:6 166:5
185:17
**work**
6:13 15:6
21:1 22:8
29:24 49:12,
20,25 50:23
51:2,4,8,15
52:1,6 55:15
63:2 67:15,
18,20 80:6
83:1,2,25
84:4,20,23
87:12 90:22
91:13 93:5,
21 95:17,20
101:8 105:1,
12 107:17
116:10 118:1
126:21
135:9,10,17
157:19
161:7,9
166:5
173:18,21
201:19 209:8

219:17,20
**work-related**
71:21
**worked**
15:21 16:13
19:7 98:2
136:22
138:22
**workers**
194:25
**workers'**
41:19 42:8
**working**
5:17 50:3
80:11,14
84:13 92:12
103:13 109:2
130:15
134:13,18,23
135:2 167:25
168:4 201:13
209:14,15
212:19
220:11 221:5
223:3
**workplace**
13:6,10
**works**
18:7 48:24
124:12
150:13
151:13
188:25
192:17
**world**
13:23 141:10
197:12
211:18 226:7
**worried**
196:8 199:13
**Wow**
76:21
**write**
214:11
**writes**
192:1

**written**
127:14
128:20
131:24 132:1
184:23
**wrong**
119:15 122:5
**wrote**
192:2,16
**Wurksite**
18:12,21

---

**Y**

**yeah**
20:18 22:16
28:19 30:25
31:4,9 38:7,
14 40:15
41:4 43:15
44:20 45:17
49:24 51:24
52:13,19,22
53:10 57:24
61:10 65:21
69:2 77:9
81:18,21
103:18 104:9
113:19
114:5,10
115:8 117:19
124:10
128:13
130:22
134:14 135:8
142:6 143:9,
16,23 144:4,
6 146:17
147:7 148:5,
19 150:22
152:4,5,13,
17 153:15
154:12
155:10 158:7
160:4 162:3
166:1 172:4,
25 173:22
174:21

177:12,14,
18,22,24
178:14,24,25
179:2 180:12
183:10
190:11,24
191:13
194:9,19
195:12
198:15,22
199:11
200:3,14,19,
23,25 201:2
202:11,14,15
204:8 208:8
211:6 213:4,
11 215:18
217:21

**year**
14:12 15:10
49:7,8,15
63:17,20,23
66:3,11
100:4 120:18
125:10
172:23
197:20
210:19

**years**
14:2 16:5
22:6,14,15
30:22 31:1,
17,21 64:9,
15,16,21
66:22 137:3
138:8 222:13

**York**
17:2 22:12,
17 123:23,24
132:25 133:1
151:20,22,25
195:1

**younger**
14:2

**youngster**
13:25

**Yup**
195:25

---

### Z

**Zelle**
69:12,15
174:24
176:12
204:9,13,14,
17,25

**zoom**
37:3 172:2
175:7